## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**In re:**                                                    **Chapter 11**

**NEW TRINITY COAL INCORPORATED**           **Case No. 19-20088**

**Debtors**                                             **Judge Volk**

...................................................................................................................................

**NEW TRINITY COAL INCORPORATED**

Plaintiff,

v.                                                       Adversary proceeding No.


**ESSAR MINERALS CANADA LIMITED**
**ESSAR GLOBAL FUND LIMITED**
**and, RIVERDALE COMMODITIES, S.A**


## COMPLAINT TO DETERMINE THE EXTENT AND VALIDITY OF LIENS TO DETERMINE INSIDER STATUS FOR A TEMPORARY RESTRAINING ORDER AND A PERMANENT INJUNCTIVE RELIEF


Comes this day New Trinity Coal Incorporated, debtor and debtor-in-possession), submits this Motion pursuant to 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this Petition pursuant to 28 U.S.C. §§ 157 and 506(a), 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code")

2. The Debtor filed its Chapter 11 petition on March 4, 2019 (the "Petition Date").

Debtor continues to manage its assets and operate its business as debtor-in-possession, no trustee having been appointed.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157; 1334; 2201; FRCP 57, and B.R. 7001(1), (2), (7) and (9), Pursuant to B.R. 3007(b), an Objection to Claim may be included in an Adversary Proceeding. This adversary proceeding is properly before the Court under 28 U.S.C. § 157, and is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), 157 (b)(2)(F) and 157 (b)(2)(H).  However, as of the date this Complaint is filed, no Proof of Claim has been filed in this case.  Venue is appropriate in this district pursuant to 28 U.S.C. §1408 and 1409. This action may also be heard within the Court's non-core jurisdiction, as a matter "otherwise related to a case under Title 11," under 28 U.S.C. § 157(c)(1).

4.    That the Debtor New Trinity Coal Incorporated  (hereafter "NTCI" or the "Debtor") was incorporated September 20, 2013 under the laws of the State of Delaware in furtherance of the proposed reorganization plan then pending in United States Bankruptcy Court for the Eastern District of Kentucky ("USBCEDKY").

4.    Defendant Essar Minerals Canada Limited is a Canadian corporation with a principal office address in Sault Ste. Marie, Onterio, Canada.

5.    Defendant Essar Global Fund Limited is a Cayman Island corporation with its principle place of business in Dubai.

6.    Defendant Riverdale Commodities, S.A. is a Swiss corporation with a principal office address Place du Molard 7, 1204 Genève, Switzerland

7.    That a March, 2017 filing with the Swiss government, Defendant Riverdale Commodities, S.A. is the successor by name change to PeaKom SA which was the global trading

platform for Essar.[1]

## PRIOR BANKRUPTCY BACKGROUND

8.      That during March, 2010 Essar Global Fund Limited , through its subsidiary Essar

Minerals, Delaware, acquired coal producer Trinity Coal Partners LLC (Trinity) from Denham

Capital, for $600 million.

9.      That at the time of that acquisition Trinity, operated six mining complexes in the

Central Appalachian coal basin, with ten surface mines, three underground mines and six highwall

miner units in Kentucky and West Virginia. It had a proven resource base of approximately 200

million tons of coal, split between met and steam coal.

10.      That from the date of acquisition until February 18, 2013 Trinity was operated by

Essar Global Fund Limited purportedly through its subsidiaries, although upon information and

belief, all funding and corporate structure  decisions were made by Essar Global and/or  Prashant

Ruia .

11.      That on February 19, 2013, after less than three years under the management of

Essar Global Fund Limited and its subsidiaries, certain secured creditors who had funded the

acquisition of Trinity and Frasure Creek Mining, filed an involuntary Petition in the U.S.

---

[1]In a May 20, 2013 article Reuters quoted PeaKom SA, Chief Executive Gilles Sayer as saying that Essar
Group had set up an PeaKom SA office in Geneva to trade crude oil, refined petroleum products, coal, iron ore and
steel, as a global trading platform for Essar. Raman Jaggi, group treasurer of Essar, will serve as PeaKom's chief
financial officer and Tarun Naruka, Essar's former corporate finance lead.
    Riverdale Commodities SA is a closely held corporation but reports at the time indicated that PeaKom SA
had changed its name to Riverdale Commodities SA. In any event, after the name change Gilles Sayer has been
and is now listed as the Chief Executive officer Raman Jaggi is listed as the CFO & Director Finance.
    PeaKom, UK has been dissolved but the last reported directors of that PesKon affiliate were Gilles Sayer,
Raman Jaggi and Sushil Kumar Baid.
    News reports an investigations in Minnesota point toward Riverdale as the platform used to allow Essar to
regain control of the former Essar Steel Minnesota operations.

Bankruptcy Court for the Eastern District of Kentucky which was assigned bankruptcy case 13-50364. (The "2013 Bankruptcy") That case was converted to a voluntary matter which resulted in a Chapter 11 case and Trinity and its nineteen (19) related companies proceeded in a jointly administered bankruptcy under the management of a Chief Restructuring Officer

12.     That on November 13, 2013 an Order confirming the Plan was entered and shortly thereafter NTCI and its affiliated companies emerged in the reorganized form of the prior debtor less all of the former Kentucky operations. The primary asset of these entities is their leasehold interest in certain coal reserves, particularly metallurgical coal reserves in West Virginia.

13.     That as part of the 2013 Bankruptcy Plan of Reorganization Essar Global was to inject capital into the reorganized debtor in accordance with the Order Confirming the Debtors Joint Forth Plan of Reorganization.

14.     That among other requirements of the Plan was the requirement that Essar Global would pay Three Million Dollars ($3,000,000.00) per year for a period of three years to the Liquidating Trustee in the 2013 Bankruptcy case.

## NTCI POST CONFIRMATION OPERATIONS

15.     That after confirmation of the 2013 Bankruptcy, the Debtor commenced operations at West Virginia facilities.

16.     That the operation were so mismanaged and underfunded that the operations of New Trinity coal were idled after less than a year of operation.

17.     That the mining operations were idled on January 15, 2015 and the last officer departed in April, 2016, the record keeping and accounting was abysmal, NTCI had no officers or directors and substantially all of the pledged or leased mining equipment was repossessed.

18.     That on January 25, 2017, Gunjan Gupta was named as the new President and CEO and Paul Saluja was named the new Vice-President and General Counsel of the company.

19.     As there was no prior management to consult, the new officers were left to determine the status of the entities.  The Officers quickly realized that tax returns had not been filed for the year ending March 31, 2016.  The leases were in jeopardy for non-payment. The main lease with Pocahontas Land through Alpha Resources was being terminated for lack of payment. The security company that was physically securing the assets had not been paid possibly resulting in the assets of the company being exposed to vandalism and theft.

20.     That during this period, the management team met with various stakeholders to communicate the intention to operate the Deepwater mine. The first order of business was to better understand the hurdles and impediments to commence operations.  New Trinity Coal Incorporated, through their accountant, contacted both the IRS and the state taxing authorities to "self report" the late filing of the March 31, 2016 tax returns.

21.     The second major issue was to contact the WVDEP regarding the outstanding environmental violations.  The management team negotiated and entered into three Consent Orders with WVDEP that lifted the Applicant Violator System's "permit block."

22.     The issue most critical was for the new management team was to negotiate with Pocahontas Land Company in an attempt to retain the lease at Deepwater.  The lease was negotiated and finally executed on or about August 31, 2017.   New Trinity Coal Incorporated then met with the various stakeholders to discuss the process of moving the company forward so mining could resume.

23.     Also of great concern to the new management team was that the third annual

Three Million Dollar ($3,000,000.00) payments to Liquidating Trustee in the 2013 Bankruptcy which had been due and payable on February 1, 2016 had not been paid, and there was the possibility that the Reorganization Plan could be converted to a liquidation.

24.     In addition to the forgoing there was and is no way to determine how many unsecured creditors were never paid because the prior Essar management had failed to keep adequate records which made it impossible for the new management team to adjust or pay those claims.

25.     That Mr. Gupta and Saluja worked diligently throughout 2017 to negotiate and bring leases current, and the Deepwater lease was negotiated and finally executed on or about August 31, 2017. During a similar time the new management was successful at entering into Consent Orders with WVDEP that lifted the Applicant Violator System's "permit block' against NTCI and its affiliated companies.

26.     That during February, 2018 the new management was successful at restarting production and production has been continuos and uninterrupted since that date.

### FINDINGS BY VARIOUS COURTS OR GOVERNMENT AGENCIES OF BAD FAITH AND FRAUDULENT ACTIVITIES BY ESSAR GROUP COMPANIES

### Supreme Court of New York County

27.     In the United States there have been several very large judgments rendered against Essar Global or subsidiaries. Among them is the case of *Barclays Bank Plc, Et. Als., V. Essar Global Fund Limited*, Docket No. 157086/2016 Supreme Court, New York County. 2017 NY Slip Op 31092. (Hereafter the "New York Case") Judgment was previously awarded and one of

the Plaintiffs, Midtown, was exercising collection efforts. The Judge in the Supreme Court of

New York County found:

> "Midtown submits an affidavit by its Manager, Avram Z. Friedman, to explain the relationship between defendant and the 300-plus debtor-related entities. According to Friedman, who had been paying close attention to defendant's business due to its loan, described defendant as a holding company for five very wealthy individuals by the surname of Ruia. 1 Defendant's "primary function is to allocate capital (i.e., cash) among and between its many, many subsidiaries." (MS 1, Friedman Aff in Opp at 3, 20).
> Friedman avers that:
> Essar Global Fund Limited (Essar) is the primary holding company for all of the portfolio companies and other investments of Shashi Ruia, Ravi Ruia, Prashant Ruia, and Rewant Ruia (collectively, the Ruias). Through Essar, the Ruias own a global conglomerate (with dozens of companies doing business under the Essar name) that operates steel plants, oil and gas fields, refineries, gas stations, power plants, deep water ports, a fleet of cargo ships, and a telecom network.(id. at 3).
> _**Midtown's reason for discovery into the 300-plus debtor-related entities is due to the Essar Group s questionable transfers that allow defendant and its affiliates and subsidiaries to escape paying its debt**_.[2] For one, the Essar Group has avoided paying its debt by filing for bankruptcy. Midtown points to defendant's affiliate, Essar Steel Minnesota LLC (ESML), which after entering into a guaranty with another creditor, defaulted. And after amassing a debt of over $1 billion, filed for bankruptcy in Delaware (id. at 12-14). Another subsidiary, Essar Steel Algoma Inc., also defaulted with over $1 billion in debt and commenced restructuring proceedings in Canada. Pending the restructuring proceedings, it filed for bankruptcy in Delaware (id. at 15-17). Another of defendant's subsidiary, Trinity Coal Corp., owing about $104.3 million to creditors, also found itself in bankruptcy court in Kentucky. (id. at 18). The bankruptcy filings are not disputed.
> _**Midtown is also wary of the "red flags indicating a high likelihood of fraudulent or preferential transfers among Essar and its affiliates"**_ (id. header paragraph at p 5). It offers as an example, Essar Oil Ltd, which increased its lending to other affiliates in the past year, to wit, $500 million to Essar Power in March 2015 as compared to a fraction of the amount in the prior year (id. at 21). Yet another example is Essar Oil's loan of $312 million to the insolvent Essar Steel Limited in 2015 (id. at 23).
> Midtown sees such transfers as tactics used by defendant and the Essar Group to move assets beyond their creditors' reach to benefit the Ruias' personal gain (id. at 22). Indeed, another Essar wholly-owned subsidiary, Essar Global Assets Limited, has subsidiaries, Rosegem Enterprise Ltd., which owns a $150 million yacht with a helicopter; and Star Flight Express Ltd and White Spring Holdings Ltd, each owning a Boeing 737 aircraft. According to Midtown, these subsidiaries and their assets have been moved

---

[2]All underlining in the Findings by Various Courts section was added for emphasis.

outside this court's jurisdiction. White Springs Holdings Ltd was moved from Delaware to London just before Midtown filed its motion to enjoin defendants from moving these assets.

Ultimately the Judge ruled that the parties should agree to edit the request for information but obviously the Judge realized what the Plaintiff's were up against in trying to sort through the corporate shell game played by the Ruias and Essar Global. NTCI has been faced with the same type of obstruction but theirs was internal. While they have had some access to internal documents current management has been unwittingly cooperated in executing pre-dated documents before it become aware of the Indian IRP proceeding an the real purpose of the document alterations.

## Minnesota Department of Natural Resources

28.    The sentiments expressed by the Commissioner of the Minnesota Department of Natural Resources in a letter to  Gary Heasley, CEO of Mesabi Metallics Company LLC and supporting documents for the debarment of Essar Global, its affiliates  and Madhu Vuppuluri speaks volumes as to the reputation, dependability, and lack of fair dealing on the part of Essar Global. Commissioner Sarah Strommen stated:

> "As you may know the DNR and the State of Minnesota have a long and troubled history in working with Essar and its affiliates. Essar repeatedly failed to meet the construction and production milestones contained in the state mineral leases, failed to pay contractors, currently has approximately $64 million in unpaid debt to Itasca County and the state, and ultimately drove the project into bankruptcy. In short, Essar proved itself over a period of years to be an unreliable partner with contractors, local governments, and the State. The DNR has no confidence that Essar, if it were to take any operational, management, oversight, or even investor role in the Mesabi Metallics project, would act in good faith to ensure timely construction and professional operation of the project." See **Exhibit A**, DNR Letter and Detailed Explaination and Request for Debarment.

## UNITED STATES DISTRICT COURT DISTRICT OF MINNESOTA

29.     That March 30 2018 United States District Court District of Minnesota confirmed

the arbitration award issued by the International Court of Arbitration of the International Chamber

of Commerce on December 19, 2017 in ICC Case No. 22187/RD/MK and awarded judgement in

favor of ArcelorMittal USA, LLC's ("ArcelorMittal USA") against Essar Steel in the amount of:

a.      U.S. $1,380,991,356.04, which includes U.S. $1,379,457,503.00 in damages and

U.S. $1,533,853.04 in arbitration costs;

b.      Pre-judgment interest is awarded in favor of ArcelorMittal USA from and after

December 19, 2017 until March 30, 2018 at a compounded rate of interest of 8.60% on the sum

of U.S. $1,380,991,356.04, in the amount of $31,889,415.29;

c.      Post-judgment interest is awarded in accordance with 28 U.S.C. § 1961. See

**Exhibit B,** Arcelormittal USA LLC memorandum of Law in Support of Motion to Confirm

Arbitration Award.

### In re: ARCELORMITTAL USA LLC and ESSAR STEEL LIMITED, et. als.
### Case No: CL-2019-000030,31(March 25, 2019) IN THE HIGH COURT
### OF JUSTICE QUEEN'S BENCH DIVISION COMMERCIAL COURT,
### Royal Courts of Justice Strand, London, WC2A 2LL

30.     In an action seeking enforcement/collection of the Arbitration award granted by

the United States District Court District of Minnesota, The High Court of Justice Queen's Bench

Division, Commercial Court analyzed various prior proceedings and made multiple findings

regarding the business operation of Essar Group companies as follows:[3]

### The Ontario judgment

34.   "…. Algoma was among Essar Steel's subsidiaries. Its operations included a major port facility in Ontario. By the end of 2013, Algoma was facing serious financial difficulties. In 2014, it entered into certain transactions in order to address these difficulties. These culminated in two main transactions in November 2014: (i) a recapitalisation of Algoma; and (ii) the transfer ("the Port Transaction") of Algoma's principal port assets to another EGFL subsidiary, Port of Algoma Inc. ("Portco").

35.   On 9 November 2015, Algoma went under protection pursuant to the Canadian Companies' Creditors Arrangement Act (the "CCCA") and a "Monitor" (equivalent to an English trustee in bankruptcy) was appointed to represent it and other related companies. The Monitor brought proceedings in the Ontario Superior Court of Justice under s. 241 of the Canadian Business Corporations Act ("CBCA") against various Essar Group companies, including EGFL and Essar Steel. That section provides that the court may grant relief where a company's affairs are conducted in a way that is oppressive or unfairly prejudicial to or unfairly disregards the interests of (among others) creditors. The Monitor's case was that the Port Transaction was oppressive. The Ontario Court so found and granted relief in relation to it. The court's judgment runs to 49 pages and it followed a 5 day hearing at which evidence was given by two members of the Ruia family, Prashant and Rewant, as well as Mr. Seifert.

36.   I consider that a number of findings of the Ontario Court are of significance in the context of risk of dissipation.

37.   First, the court's decision includes findings of what the court described as "bad faith", including matters which are in substance findings of fraud, against the principal individuals. The particular context for the finding equivalent to fraud concerned a commitment which EGFL had made to its subsidiary to provide a cash investment of US$250-300 million. This commitment was made under agreements made on 24 July 2014. It was the failure of EGFL to adhere to this commitment which in due course led to a "Restructuring Support Agreement" entered into with Algoma and its creditors, and an associated Equity Commitment Letter of the same date; and it was this that led to the Port Transaction which the court found to be oppressive. In relation to the commitment of 24 July 2014, the Ontario Court found not simply that EGFL had failed to live up to its commitment, but that it made the commitment at a time when it had no intention of doing so. Thus the court concluded:

"[82] The entire Port Transaction and the GIP secured loan to Portco would not have

---

[3]Single spaced paragraph numbers refer to paragraph numbers in the Order and underlining was added for emphasis.

been necessary had Essar Global lived up to its obligations under the Restructuring
Support Agreement it made with Algoma and the accompanying Equity Commitment
Letter dated July 24, 2014 pledging a cash investment of $250 to $300 million. However,
it is quite clear from the evidence that, despite its obligations to Algoma under these
agreements, Essar Global had no intention of living up to its promises. Essar Global acted
in bad faith in this regard.

[83] On March 28, 2014, the Ruias made it clear to Mr. Saraf of Essar Services India Ltd
in Mumbai that they did not have $ 250 million for an equity investment in Algoma, that
they did not want to tell any banks or investors that they would put in $ 250 million of
equity and that they could only put in $ 120 million but would just take it out to reduce
liabilities of Algoma owed to Essar companies".

38.     Secondly, despite having entered into a commitment which entitled the subsidiary to a
significant cash injection, steps were taken by EGFL and the controlling Ruia family to
ensure that, in effect, EGFL was released of that obligation. It seems to me that this can properly
be described as the dissipation of a valuable asset, i.e. the right of the subsidiary to a capital
injection. Moreover, the Ontario Court found that here too there was bad faith.

"[88] It was Essar Global's decision not to fund Algoma according to the terms of the
Equity Commitment Letter that made it necessary to carry out the Port Transaction. The
Port Transaction was the result of the structure required by GIP to support the loan of
$150 million to Portco that was advanced to Algoma net of costs. That reduced the
amount of cash equity previously promised by Essar Global to be advanced to Algoma. In
the amended RSA, $150 million of historical debt owed by Algoma to Essar Global was
converted into preferred equity for Essar Global. That however was not cash as had been
agreed to be advanced by Essar Global to Algoma in the Equity Commitment Letter.
Moreover, the $150 million debt had been at the bottom of the capital structure of Algoma
and its value was certainly questionable, making the conversion of debt to equity also of
questionable value. On cross-examination, Mr. Seifert chose not to "speculate" on what he
would pay for the $150 million debt and said the value was something in the eye of the
beholder. This is confirmatory of the fact that the loans and equity conversion was of
questionable value and certainly less than the cash infusion that Essar Global had
previously agreed to put into Algoma and later reneged on.

[89] In my view, Essar Global's failure to inject cash equity into Algoma as agreed was the
root cause of the Port Transaction and the resulting long-term effect on Algoma and its
stakeholders of the transfer of control over the Port facilities from Algoma to
Portco/Essar Global. The cash equity injection agreed to by Essar Global was a
contractual alternative and clearly more beneficial to Algoma. That root cause was an
exercise in bad faith. Had an independent committee of the board of directors of Algoma
been struck, it may have been that steps may have been taken to hold Essar Global to its

bargain rather than simply look to third party financing from GIP under the structure of
the Port Transaction. The failure of the board of Algoma to look to some other way to
effect a Recapitalization was in itself an indication of a lack of regard for the interests of
stakeholders of Algoma."

39.    Thirdly, it is of some significance generally that, as AMUSA put it, it was EGFL and Essar
Steel that "called the shots" regarding the Recapitalisation and Port Transaction. Algoma's board
was not independent, and in the run-up to the transactions the views of the independent directors
had been overridden. This is relevant to the question of whether the court is entitled, in the
context of risk of dissipation, to disregard the separate corporate personality of the different
companies within the Essar Group; a point to which I return below.

40.    Fourthly, the Ontario Court examined the Port Transaction on its merits. The Monitor had
at one stage advanced a case that the port assets were transferred at an undervalue but this case
was ultimately not pursued. Nevertheless, the court broadly accepted the Monitor's case that
Algoma had been deprived of a critical asset, and that the Port Transaction was contrary to the
reasonable expectations of trade creditors, employees, pensioners and retirees. Algoma had lost
long-term control over critical and strategic assets on terms that enabled EGFL/Portco to veto
and control Algoma's affairs, and which gave unwarranted value to them. The Ontario Court
placed particular emphasis in this regard on the fact that Algoma had not sought to hold EGFL to
its contractual commitments to invest cash and had disregarded legal advice that that was what it
should do:

> "[122] Algoma's Board held meetings on October 30 and November 1, 2014. It is quite
> clear from the meeting minutes that it was Mr. Seifert who was leading the
> Recapitalization effort. At the November 1 meeting, Mr. Schrock of Weil, Gotschal &
> Manges advised that unsecured noteholders would not react well to proposed changes to
> the Port Transaction and would likely push for a higher infusion of cash/equity from Essar
> Global, as promised in the Equity Commitment Letter. The advisors said that the board
> should insist that Algoma press all parties to fully satisfy their commitments and this could
> include a letter to Essar Global setting forth its obligations regarding the equity
> commitments. That advice was not followed.
>
> [123] I fail to see how the directors of Algoma can rely on the business judgment rule in
> the face of not following advice to go after Essar Global on its cash equity commitment.
> There was no issue about the validity of that commitment. If the Ruia interests had
> acquiesced to forming an independent committee of the board, or listened to the truly
> independent directors before they resigned in frustration, steps may have been taken
> differently including accepting and following Mr. Schrock's advice. What happened in the
> Port Transaction was an exercise in self-dealing in that Algoma's critical Port asset was
> transferred out of Algoma to a wholly owned subsidiary of Essar Global with a change of
> control provision that benefited Essar Global at a time that a future insolvency was a

possibility. That would not have been necessary had Essar Global lived up to its cash injection commitment. Yet the board did not take any steps to call Essar Global on its commitment, even in the face of legal advice that it should do so."

### Indian Supreme Court's 2018 judgment

60.    On 4 October 2018, the Indian Supreme Court issued a lengthy judgment in a case between ArcelorMittal India Private Ltd. (a subsidiary within the ArcelorMittal Group) and Satish Kumar Gupta and others. The case concerned the Indian insolvency of Essar India, and respective bids by an ArcelorMittal company and also a company called Numetal to bid for Essar India. The decision of the Supreme Court is relied upon by AMUSA because of the findings which the court made concerning Mr. Rewant Ruia, a member of the Ruia family who also featured in connection with the Algoma transaction.

61.    One of the matters on which the Indian Supreme Court focused was a statutory provision (Section 29A (c) of the Insolvency and Bankruptcy Code 2016). This provision was aimed at ensuring that, as the court said, "persons who are in charge of the corporate debtor" for whom a resolution plan is made "do not come back in some other form to regain control of the company without first paying off its debts". The section is therefore an important protection for creditors. The relevant issue in the case concerned Numetal and its alleged connection with Mr. Ruia. In substance, if this was Mr. Ruia's company, then (as the Supreme Court said) "the only manner in which Numetal could successfully present a resolution plan would be to first pay off the debts of [Essar India], as well as those of such other corporate debtors of the Ruia group of companies ...".

62.    The court's decision concluded, in substance, that Mr. Ruia had sought to evade this prohibition, and had done so through what the court described in paragraph [88] of the judgment as a "smokescreen in the chain of control". The smokescreen involved the use of an elaborate chain of companies and trusts. The Indian Supreme Court therefore concluded that Numetal's participation was caught by the prohibition and was ineligible.

63.    AMUSA contends, convincingly in my view, that Mr. Rewant Ruia was likely to have been acting in concert with other members of his family to acquire Essar India's assets without meeting its liabilities to creditors. The case therefore provides solid evidence, in my view, of the misuse by the family of corporate structures to the prejudice of creditors of the Essar Group of companies.

64.    In his witness statement, Mr. Baid submitted that there had been no attempt to shield any corporate ownership structures from the relevant authorities. But this submission is difficult in my view to reconcile with the conclusions of the Supreme Court, including that there was "one more smokescreen in the chain of control, which would conceal the fact that the actual control over AEL is by none other than Shri Rewant Ruia himself".

### Directorate of Revenue Intelligence

65.     The Indian Directorate of Revenue Intelligence (the "DRI") produced a report dated 11 March 2015 (the "DRI Report"). The report runs to some 247 pages, but only the summary (22 pages) was contained in the exhibits. The summary does not directly concern Essar Steel, and it does not directly implicate any of the individuals who are the focus of AMUSA's case. Nevertheless, <u>the summary provides solid evidence of what appears to be serious fraudulent activity within the Essar Group. The DRI found that Essar Group entities had conspired to create a fraudulent invoicing customs duty scheme and participated in trade-based money laundering</u> via a UAE-incorporated company called Global Supplies (UAE) FZE ("GSF"). The DRI found GSF to be a "front company of the Essar Group" created <u>"to act as an intermediary invoicing agent for facilitating invoice inflation" and a "dummy agent … for enabling siphoning off of money abroad"</u>.

### Credibility Questions Raised Regarding Sushil Baid

31.     Sushil Baid, one of the two pre petition directors of NTCI  appears prominently in the London Court ruling as a principal in the dealings with the Essar family of companies and their less than good faith dealings in that matter. For example:

25.     **Mr. Baid** is the Third Respondent to the search order and the Sixth Defendant to the Part 8 Claim. **Mr. Baid** at material times held senior roles at relevant Essar Group companies, including the position of director at both Essar Steel and Essar Capital Services. He was also a director of EGFL (at least) for the month of December 2018. In his capacity as director of Essar Steel, he gave evidence on Essar Steel's behalf in the Mauritian enforcement proceedings in respect of the ICC award. He has also given evidence on its behalf in the present proceedings; and has given evidence in the Cayman proceedings as well. As a director of Essar Capital Services, **Mr. Baid** has also provided an English service address, and therefore he too is amenable to English jurisdiction pursuant to s. 1140 of the Companies Act 2006.

59.     Fifthly, and against this background and given the timing, **I consider that it is strongly arguable, to put it at its lowest, that the restatement of the accounts, and the removal or attempted removal of the US$ 1.5 billion asset, was connected with the substantial claim that AMUSA was in a position to make, and had indeed made, against Essar Steel.** The termination of the contract, which gave rise to the claim against Essar Steel, was in May 2016, and arbitration proceedings were commenced (after pre-arbitration correspondence) in August 2016. As at that time, the existence of the US$ 1.5 billion asset was of course shown in Essar Steel's accounts, both in the 2014 and the 2015 accounts. **It is now said by Essar Steel that this was a mistake on the part of the directors (Mr. Baid) who drew up and signed the accounts, and the auditors who audited them.** But as AMUSA rightly submitted, it does seem to be an extraordinary mistake to make, not least given the size of the asset and its importance in the context of Essar Steel's balance sheet. **The evidence provided by Essar Steel, including the**

**evidence of Mr. Baid, does not explain how this enormous mistake came to be made, either by the directors or the auditors, and no documents showing communications with the auditors have been provided** . . . . . . . . . .

64.    In his witness statement, **Mr. Baid** submitted that there had been no attempt to shield any corporate ownership structures from the relevant authorities. But **this submission is difficult in my view to reconcile with the conclusions of the Supreme Court**, including that there was "one more smokescreen in the chain of control, which would conceal the fact that the actual control over AEL is by none other than Shri Rewant Ruia himself".

86.    The first non-disclosure alleged concerns statements at the without notice application to the effect that England was the nerve centre for the management of group investments, that Essar Steel was being administered from England and that England was where the investment management centre was. It is said that these statements were speculation, largely based on the presence here of other Essar Group companies. In fact, Mr. Nouroozi's first Affidavit set out what in my view is a fair summary of the information that was available from Companies House as to the business of Essar Capital Services. **This included the fact that Essar Capital Services had previously provided management services to EGFL and associated companies, and that it had subsequently entered into a service agreement with ECL under which it appeared that similar services were provided. The continuing provision of services, of some considerable value, is recorded in the accounts of Essar Capital Services for the year ended 31 March 2017, which were signed by Mr. Baid on 25 January 2018.** These accounts include the statement that Essar Capital Services' "principal activity is to provide exclusive investment management services to Essar Capital Limited". The value of such services was over £ 5 million in 2016, and £ 3.7 million in 2017. **The filings also include identification of a number of active directors with addresses in different parts of the world.** It seems to me that AMUSA made appropriate enquiries and presented the evidence fairly to Butcher J.. The fact that more detailed evidence has now been forthcoming from **Mr. Baid** and others, and that this evidence suggests (contrary to the impression from the accounts filed in January 2018) that no significant professional services are now provided by Essar Capital Services, does not mean that there was a material non-disclosure by AMUSA.

111.    It is now accepted by **Mr. Baid**, on behalf of Essar Steel, that Mr. Vuppuluri did have continuing access to his emails. In paragraphs 9 and 10 of his second Affidavit in the Mauritian enforcement proceedings, **Mr. Baid** said as follows:

"I have been able to discuss matters further with Mr. Vuppuluri, having reviewed the contents of Mr. Lazar's witness statement. Mr. Vuppuluri has confirmed that his laptop was indeed returned to him by ESML and that he has continued to use the same email address since the bankruptcy. **At the time the letter dated 28 March 2017 that I referred to in Baid 1 was drafted, ESL did not appreciate this to be the case.** I am informed by Mr. Vuppuluri that at the time his laptop was returned to him, he assumed that it had been "wiped" and that he has not used it since its return. It has only become apparent to him that this is not in fact the case on recently checking the position......"

112.    These passages in his second Affidavit were in effect a correction to what **Mr.**

**Baid** had said on oath in his first Affidavit in those proceedings, where he had relied upon what was said by Essar Steel in the 28 March 2017 letter to the Tribunal.

113.   I consider that this aspect of the arbitration proceedings provides solid and powerful evidence in support of AMUSA's case that documentation relating to ESML, and available on Mr. Vuppuluri's computer, was deliberately withheld from production, and that deliberately false information was given to the Tribunal in the 28 March 2017 letter as to the availability of that information. If, as Essar Steel now accepts, Mr. Vuppuluri did in fact have access via his computer and email, it is somewhat remarkable that the contrary should have been stated in the letter dated 28 March 2017, and then reiterated in the response to AMUSA's request for production of documentation. In saying this, I should emphasize that I am not making a definitive fact-finding that documentation was deliberately withheld and that false information was deliberately given. It is theoretically possible that, if the matter were to be investigated in detail, with the benefit of cross-examination of **Mr. Baid** and Mr. Vuppuluri, a court might accept the innocent explanation put forward by **Mr. Baid** in his Affidavit in the Mauritian proceedings and repeated in substance in his first witness statement in these proceedings. **However, I do agree with Mr. Peto's submission that the account given by Mr. Baid is a "very unlikely story".** At its lowest, the episode indicates a cavalier attitude on the part of Essar Steel and Mr. Vuppuluri to the production of relevant documents, since it would not have been difficult – and indeed was incumbent on both of them – to check what the position actually was.

114.   **I was also unimpressed with Mr. Baid's attempt to criticise AMUSA for not having brought to Essar Steel's attention the fact that Mr. Vuppuluri still had access to emails and documents.** AMUSA's Redfern schedule response stated clearly that it was their understanding that Mr. Vuppuluri "has access to his emails and other files in connection with his duties at Essar Minnesota." The Tribunal's Procedural Order No. 3 referred to a letter dated 1 August 2017 from counsel to AMUSA stating that they had discussed with ESML counsel the question of Mr. Vuppuluri's continuing access to his email and computer and had been assured that such access was available and unimpeded.

132.   Ultimately, however, it seemed to me that Mr. McGrath's points were all highly technical in nature, and that there is no point of substance which would justify me in setting aside the search orders as against Prashant and **Mr. Baid,** notwithstanding that it will remain in place as against Essar Capital Services. It was clear from the skeleton argument in support of the without notice application that AMUSA did not anticipate serving Prashant or **Mr. Baid** personally within the jurisdiction. That is why AMUSA referred to s.1140 in some detail, emphasising (correctly in my view) that there was "no requirement under the statute that the director be resident or otherwise present in the jurisdiction in order to be served here". It was also of course clear from the application that the search would be carried out at Lansdowne House, which was described as the effective headquarters in this jurisdiction of the Essar Group. The likelihood that Prashant and

**Mr. Baid** would be elsewhere, and the reason for making them party to the search orders, was explained to Butcher J. as follows:

> "Also the fact that your Lordship's preservation order can't preserve documents on line, even if we have the most obedient people in the world at Lansdowne House it doesn't stop necessarily people abroad like **Mr. Baid** and others being able to access clouds elsewhere and deny access by changing passwords they don't then tell people in London.
>
> So we have a window to be able to go in and get these documents and preserve them for enforcement, which if we end up with a preservation order and serve it, that is as good as a tip-off. And it means that people like **Mr. Baid** and others, they are beyond the scenes.
>
> That's really the reason why there is no effective enforcement otherwise. So in this case a preservation order won't carry the can.
> ...
> It is a narrow window. If we can go in and if the gags work, you can't tip anybody off, you must tell us how we can get into these computers, we copy them before anyone outside can interfere. Then they are there for your Lordship and this court to decide what to do with them afterwards. And we can hear any objections."

133.   *It seems to me that there were good reasons to make Prashant and Mr. Baid party to the search orders, so as to try to prevent any outside interference by them with the relevant servers or computer systems at Lansdowne House.* Butcher J. would have understood that they were not present in the jurisdiction, and he would not have been contemplating personal service on these individuals, for example by a Supervising Solicitor boarding a plane to wherever they might be and serving them abroad. As it was, they were notified by email and knew about the orders at about 10.05 am on 16 January 2019. They opened the orders minutes later. There is no evidence that they did not understand the order, or that they were placed in any difficulty. The technical points raised by Mr. McGrath in relation to the order do not seem to have caused Prashant or **Mr. Baid** any prejudice.

170.   In the present case, this timing issue presents no difficulty. *Prashant, Mr. Baid and Mr. Wright all continue to work within or on behalf of the Essar Group, and Essar Capital Services is still a company within the group.* Even if one takes May 2016 as the starting point, that covers the period when Mr. Bell was still a non-executive director of EGFL: he only resigned in November 2017, shortly before the arbitration award. ( *See* Exhibit C, The High Court of Justice Queen's Bench Division, Commercial Court. )

## ORDER OF THE ADJUDICATING AUTHORITY(NATIONAL COMPANY LAW TRIBUNAL) AHMEDABAD BENCH AHMEDABAD

32.     That on March 8, 2019 the National Company Law Tribunal approved the bid of

ArcelorMittal to purchase  Essar Steele India, LTD  an upstream parent of Debtor, by an Indian

insolvency court, the National Company Law Tribunal, on March 8, 2019 via a Resolution Plan

("Resolution Plan").

33.     Said Resolution Plan was approved by a judgment that was appealed.

34.     The Resolution Plan allows for management of Essar Steel India, to be performed

by a monitoring committee comprised of three (3) ArcelorMittal representatives and

(4) creditor representatives ("Monitoring Committee").

35.     A March 18, 2019 interim order of the appellate court, the National Company Law

Appellate Tribunal, provides that the Monitoring Committee will exercise management

responsibilities during the course of the appeal.

36.     That  ArcelorMittal being the successful bibber and controlling 3 of the 7 votes on

the Monitoring Committee has more than  indirect inchoate rights in the Debtor, it  is not only in a

position to assert any control over the Debtor but may have some fiduciary duties in that regard.

37.     Either AncelorMittal should assert control through the Monitoring Committee or

allow the reorganization process to proceed without interference.( *See* **Exhibit D**, Order of the

Adjudicating Authority (National Company Law Tribunal) Ahmedabad Bench Ahmedabad. )


**BAD FAITH AND FRAUDULENT ACTIVITIES BY ESSAR GLOBAL**

38.    That immediately after the emergence from the 2013 Bankruptcy proceedings as described above, the corporate structure made no mention of New Trinity Holdings LLC. Essar Minerals Canada Ltd. was listed as the immediate parent of NTCI and New Resources Inc. (See, **Exhibit E**.)

39.    Later the corporate structure was portrayed by Essar Global as NTCI, New Resources Inc., New Trinity Holdings LLC and Essar Minerals Inc as sister companies owned and controlled by Essar Minerals Canada, Ltd. (See, **Exhibit F**.)

40.    That immediately before being employed as an officer of Debtor, Gunjan Gupta, one of two current directors of NTCI was directed by to submit an affidavit in the case of ***Barclays Bank Plc, Et. Als., V. Essar Global Fund Limited***, Docket No. 157086/2016 Supreme Court, New York County. 2017 NY Slip Op 31092.

41.    That the written resolution of the sole shareholder of the Company dated January 23, 2017 and signed by Venkatesh Hedge as a director for and on behalf of Essar Minerals Canada Limited that was presented Gunjan Gupta (*See*, **Exhibit G**.), and the Affidavit that he was directed to present (*See*, **Exhibit H**) are diametrically opposed to the information contained in the corporate books of the company and speak volumes to the veracity of the other officers of the Essar Group.

42.    That according to the resolution of the sole shareholder of Essar Minerals Canada Limited as of January 23, 2017, New Trinity Holdings, LLC is the is the owner of 100% of the corporate stock of both New Trinity Coal, Inc. and New Resources, Inc.

43.    That the purpose of the affidavit, although not known to Mr. Gupta at the time

appears to have been as effort to prevent execution upon the stock owned by Essar Canada by the

plaintiff in the *Barclays Bank Plc, Et. Als., V. Essar Global Fund Limited* matter.

44.    On April 7, 2017, NTCI was informed that Essar Global was seeking to place

Essar Global in a second senior creditor behind only Riverdale. On the same day, Kailash Daultani

another employee of Essar Global stated to NTCI officers, "I'm surprised that there is still

reconciliation to be done. $32,000,000.00 is due from NTCI to Essar Global and that's what is in

the Court affidavit."

45.    Nonetheless on May 3, 2017, Essar Global began to manipulate the fiscal viability

of NTCI by creating documents to memorialize debts which never existed. At that time Nitin

Gupta, an officer of Essar Global and/or a subsidiary thereof submitted to NTCI a document

which reflected a scheme which would create a $41,000,000.00 loan obligation from NTCI to

Essar Global. (See, **Exhibit I**) [ TAB 1]. Essar Global sought to document a series of nonexistent

transactions which would cause NTCI to undertake debt that did not exist.

46.    On May 10, 2017,  Nitin Gupta, an officer of Essar Global and/or a subsidiary

thereof proposed to modify the books of Essar Global and Essar Minerals Canada to show a loan

of $54,000,000.00 from Esaar to NTCI and $56,000,000.00 to New Resources Inc.

47.    An agenda page provided by Nitin Gupta reflecting progress from May 10, 2017

to May 15,2017 reflects how Essar Global meticulously documented its scheme to overstate the

obligations of NTCI to Essar Global   (See, **Exhibit J**)  (TAB 3).  Clearly Essar Global

motivation at this point was to put itself ahead of creditors who were in erstwhile search for assets

to be seized and to create additional liabilities for NTCI which would then constitute accounts receivable on the part of Essar Global against which Essar Global could borrow money.

48.    The actual funding structure of the company as disclosed by Essar Global reflects that there are no loans from Essar Global to NTCI.  It does reflect that there are loans from Essar Global to New Trinity Holdings, LLC and further that there are loans from New Trinity Holdings, LLC to NTCI (See, **Exhibit K**)  (TAB 4).  Further note that at the time of these discussions, New Trinity Holdings LLC and NOT Essar Minerals Canada was the immediate parent of NTCI.

49.    That Essar Global went forward with documenting its scheme, and on  September 5, 2017 NTCI received the first version of an assignment agreement back dated to August, 2017 which set forth amounts of monies claimed to have been advanced by Essar Global and various subsidiaries for which there was to be an assignment of the claims. At no time could the amounts of monies claimed to have been advanced be verified by the officers of NTCI and all attempts to do so were rebuffed by Essar Global or those acting as agents on its behalf. (See, **Exhibit L,** First August Assignment Agreement )

50.    That upon receipt of the Assignment agreement Gunjan Gupta of NTCI immediately alerted Essar Global of concerns with discrepancies in the amounts advanced, and/or transferred among subsidiaries, and the lack of any contract or evidence of payment between Essar Global and NTCI regarding those transfers. NTCI was advised on the same day by Nitin Gupta that the books of Essar Global did not show any loans to NTCI or to New resources, Inc. or New Trinity Holding LLC.

51.    On September 18, 2017, the officers of NTCI were advised  Essar Steel of India

had been placed in an involuntarily Indian Insolvency Proceeding (IRP) and that financials were

needed for certain subsidiaries of Essar Global in conjunction with that IRP.  The officers of New

Trinity were led to believe that the were not affected by the IRP as Essar Steel of India was not in

the chain of ownership and control as reflected by the representation of Essar Global,  Sushil Baid

and Ownership and control document filed with the WVDNR (See, **Exhibit P**, Ownership and

control file)

52    Various calls and communications were had by and between NTCI and Essar

Global representatives which consisted mainly of attempts to structure the "loans" from Essar

Global to NTCI using a paper trail to do so. Tax considerations were also discussed including the

fact that payments from US company to Canadian company could result in a 25% tax rate.

53    Another Assignment Agreement was forwarded to NTCI on April 20, 2018

backdated to August, 2017 with instructions to Sushil Baid to sign on behalf of  Essar Minerals

Canada Limited. Mr. Baid is the only other pre-petition  Board member of NTCI.  This version of

the Assignment largely reflected the earlier versions but omitted NTCI as a party. (See, **Exhibit

M,**  Second August Assignment Agreement )

54.    Agents of Essar Global then began to prepare and send letters of clarification to be

used for the purpose creating debt or loan amounts. Essar Global sought to have NTCI and other

subsidiaries to prepare and execute these letters as a means of establishing loan obligations despite

a lack of evidence as to the actual existence of any such obligations.

55.　　On April 26, 2018, NTCI recieved an Action Plan from Essar Global with stated objectives of consolidating and securing the receivables of Essar Global and Riverdale from EMCL and NTCI and to provide Essar Global with flexibility to raise financing against these receivables. See (See, **Exhibit N**). The amounts now claimed by Essar Global from the "Trinity chain" had risen to $131,000,000.00.  Of particular note in this document is a line which indicates total borrowing senior to SCB (Standard Charter Bank)  which has loaned money to Essar Global secured by assets of certain subsidiaries including EMCL and NTCI.

56.　　Standard Charter Bank is a major creditor in the insolvency proceeding in India involving Essar Steel India. SCB was also a subject of a subpoena in another case in the New York Case involving Essar Global.

57.　　The next version of an assignment agreement was received by NTCI from Essar Global thereafter  and it used a date of April 24, 2017, which preceded the date of the IRP. This date had never been used prior to this time. Again, this document omitted NTCI as a signor but reflected the numbers that Essar Global was attempting to assert was a loan to NTCI. (See, **Exhibit O,** April 24, 2017 Assignment Agreement )

58.　　In response to the newest version of the assignment agreement, on April 26, 2018, the officers of NTCI pointed out several salient facts, including the lack of any records evidencing loan obligations on the part of NTCI and NRI also. A letter of clarification as described above referred to $126,000,000.00 paid to NTHL despite the fact that NTHL had no bank account. It was also pointed out that there are no records of transactions from  EMCL to NTHL or NTCI in an amount of $28,900,000.00.

59.    Throughout these document drafting sessions  Essar Global and its agents
including Mr. Baid were eager to protect the primary lender to NTCI, namely, Riverdale
Commodities

60.    That upon information and belief after suffering significant losses in New York and
Minnesota relating to guarantees on loans for certain subsidiaries, Essar Global had begun to re-
document or create loans and guarantees among its subsidiaries. On April 27, 2018 NTCI
received for review a Facilities Agreement backdated to January, 2014 which provided that NTCI
would act as Guarantor for a Loan to EMCL in the amount of $70,355,811.00.

61.    On April 27, 2018, the officers of NTCI pointed out to Essar Global that NTHL
did not exist in January of 2014 and could not therefore have executed the document. The
Facilities Agreement was thereafter backdated to April 30, 2017.  Obviously, Essar Global is
creating a fiction in these dealings with NTCI. (See, **Exhibit Q**, draft Facilities Agreement )   This
is one of many documents that Essar Global created  to revise history and create loans where
none existed. The completion dates for the documents indicate on the face of the exhibit that the
documents are backdated. These actions continued since the commencement of the IRP
proceeding. (See, **Exhibit R**)

62.    That the current officers of NTCI, have operated since their engagement without
the benefit of raw data to establish any factual basis for loans claimed due from NTCI to Essar
Global. There was a tax return prepared for NTCI predecessor which has become a linchpin of
argument for Essar Global that NTCI owes money to Essar Global. The balance sheet for 2017
calendar year end shows a loan outstanding to Essar Global in the amount of $61,012,326.00

(See, **Exhibit S**). However, no contracts or other financial documents exist that can establish that or any other specific sums due from NTCI to Essar Global.

63.      That at all times relevant hereto, Essar Global has sought to impose upon the officers of NTIC an obligation to sign documents which do not accurately reflect the true facts or which are backdated so as to revise history. Those documents include form letters of confirmation or clarification of amounts due and owing (despite a lack of any other paper trail) (See, **Exhibit T**).

64.      That at this point the only verifiable Essar affiliated secured debt of which the officers of NTCI have knowledge is an existing obligation to Riverdale Commodities, S.A. in the sum of $19,899,760.00, but that too may be an insider debt as discussed below (See, **Exhibit U**).

65.      Consistent with the affidavit signed by Gunjan Gupta, a similar letter was sent, per instructions, to Sushil Baid at Essar Global. (See, **Exhibit V**).

66.      On May 8, 2018, Nexia, Baker & Aronson, Chartered Accountants, certified a share pledge agreement to Standard Charter Bank which secured a Facilities Agreement dated January 3, 2014 by and between ESOL and Standard Charter Bank. The certificate also declared that EMCL held 100% of the shares of NTCI and ESOL held 99.99% of the shares of ECML. Attached to the certificate is a diagram of the shareholding structure of ESOL, EM,L, EMCL, NTCI and NRI along with statements of liabilities of EMCL and NTCI.

67      On June 28, 2018, NTCI received various financing documents from Essar Global. The documents included a Facilities Agreement evidencing a debt from EMCL to Essar Global

which listed NTCI as a Guarantor. The document was dated April 28, 2017. The obligation

matured and was due on March 31, 2018. The debt was already fully mature and subject to calling

of collateral nearly 90 days prior to receipt by NTCI. Upon information and belief these

documents were not executed until after June 28, 2018.  (See, **Exhibit W**) (TAB O1). Also

included among the financing documents were the following:

    a.    A share Pledge Agreement between EMCL and EGFL dated April 28,  (See, **Exhibit X**).

    b.    A Floating Charge Agreement dated April 27, 2018 between EMCL and EGFL. (See, **Exhibit Y**) .

    c.     An Assignment Agreement dated April 27, 2018 between various related Essar entities or subsidiaries including Essar Global and EMCL regarding the assignment of $126,142,149.00 advance and conversion to a loan.  (See, **Exhibit Z**) .

    e.    A Floating Charge Agreement dated April 27, 2018 between NTCI and Essar Global setting forth a loan obligation totaling $131,368,137.00  (See, **Exhibit AA**)

68.    On July 4, 2018, three letters were sent from NTCI board member Gunjan Gupta

as instructed by Essar Global which were dated April 28, 2017 and sought to change paper entries

on books for advances on equity or loan amounts.   (See, **Exhibit BB**)

69.    On July 5, 2018 Sushil Baid, acting on behalf of EMCL, as sole shareholder of

signed a Shareholders Special Resolution (bearing date April 13, 2017) of NTCI to authorize the

NTCI Board of Directors to execute a Loan agreement and Floating Charge Agreement over all

of the assets of NTCI in favor of Essar Global to secure loans of $70,000,000.00.  (See, **Exhibit CC**)  and another similar agreement for NRI for the same amount of money.   (See, **Exhibit DD**).

The actual floating charge agreement included an additional $61,000,000.00. Again, it appears

that EGFL through its agents, employees, representatives or operatives was using backdated

documents to indicate that actions not previously taken were represented as having been
previously performed.

70.     Gunjan Gupta pointed out to EGFL agents that backdating some of these
documents might interfere with the priority of liens and affect security interests, particularly that
of Riverdale Commodities, S.A. This made it necessary that EGFL execute a subordination
Agreement so as to preserve the priority of claims of Riverdale over Essar Global, which were
now going to appear as preceding the date of the Riverdale security interests secured by a filed
UCC-1.

71.     A series of letters went back and forth between NTCI, and Essar Global over a
few days in July, 2018. Two letters ultimately were sent out and signed.   (See, **Exhibit EE**).

72.     These matters continued to be the focus of numerous correspondence between the
officers of NTCI and Essar Global though the remainder of 2018.

73.     In a conversation with Pranav Agarwal on January 3, 2019 Mr. Agarwal stated to
NTCI Director Gupta that "We know these documents are being backdated so question of
IRP/Board approval at this point of time does not hold relevance." Corporate Secretary Saluja
refused to sign backdated documents. Ultimately Sushil Baid executed the backdated documents,
but only after he resolved the issue of whether or not he was actually a Board of Director on the
date that was upon the document.

74.     The detailed litany of events is necessary to fully understand the willingness of
Essar Global to revise documents to their advantage. The Ruias are among the wealthiest families

in the world. They make a habit of protecting their core holdings including Essar Global. Their

willingness to deceive can only be compared to street magicians or carnival operators.

## OWNERSHIP OF NEW TRINITY COAL INC. STOCK

75.    That according to the resolution of the sole shareholder of Essar Minerals Canada

Limited, New Trinity Holdings, LLC was the is the owner of 100% of the corporate stock of

both New Trinity Coal, Inc. and New Resources, Inc. as of January 23, 2017.

76.    That according to the officers of the Debtor, there have been no transfers of stock

of New Trinity Coal, Inc. between the date that the current officers took office on January 25,

2017 and the present.

77.    That if the resolution of the sole shareholder of Essar Minerals Canada Limited

January 23, 2017 is to be believed, at sometime prior to January 23, 2017, 100% of the corporate

stock of both New Trinity Coal, Inc. and New Resources, Inc. was transferred to New Trinity

Holdings, LLC.

## COUNT 1
## ESSAR GLOBAL FUND LIMITED
## ESSAR MINERALS CANADA LIMITED
## DETERMINATION OF EXTENT AND VALIDITY OF LIEN

78. The allegations contained in paragraphs 1 through 77 are incorporated herein as if fully

restated in their entirety.

79.     Debtor seeks a determination of the extent and validity of a lien on Real and

personal Property (the "Property") pursuant to B.R. 7001(2), which provides for an adversary

proceeding "to determine the validity, priority, or extent of a lien or other interest in property."

80.     That Essar Minerals Canada Limited co-operated or conspired with Essar Global

Fund Limited in a manner whereby a Sixty One Million Twelve Thousand Three hundred Twenty

Six Dollar ($61,012,326) long term obligation was created as owing from the Debtor to Essar

Minerals Canada Limited and  Essar Global Fund Limited.

81.     That on June 28, 2018, NTCI received various financing documents from Essar

Global including a Facilities Agreement evidencing a debt from EMCL to Essar Global which

listed NTCI as a Guarantor. The unsigned document was dated April 28, 2017 and contained a

maturity date of March 31, 2018 which made the agreement in default 90 days before it was

executed.  That these documents were not executed until after June 28, 2018.   (See, **Exhibit W**)

Also included among the financing documents were the following:

a.      A share Pledge Agreement between EMCL and EGFL dated April 28,  (See,
        **Exhibit X**) (TAB O2).

b.      A Floating Charge Agreement dated April 27, 2018 between EMCL and EGFL.
        (See, **Exhibit Y**) (TAB O3).

c.       An Assignment Agreement dated April 27, 2018 between various related Essar
        entities or subsidiaries including Essar Global and EMCL regarding the assignment
        of $126,142,149.00 advance and conversion to a loan.  (See, **Exhibit Z**) (TAB
        O9).

e.      A Floating Charge Agreement dated April 27, 2018 between NTCI and Essar
        Global setting forth a loan obligation totaling $131,368,137.00  (See, **Exhibit AA**)
        (TAB O10).

82.    That the Essar Minerals Canada Limited and/or Essar Global Fund Limited claim to have a blanket lien on assets of the Debtor as a result of these obligations.

83.    That the books and records of the debtor reflect no Promissory Note or other contemporaneous document which memorializes these transactions.

84.    That the debts to Essar Minerals Canada Limited and/or Essar Global Fund Limited were listed as disputed on the schedules previously filed there are no documents which perfect a lien upon any assets of the Debtor.

85.    That the debtor prays that these creditors be determined to be insiders of the debtor pursuant to §101(31), that these claim be determined to be unsecured and that any proof of claim subsequently filed be disallowed.


## COUNT I1
## RIVERDALE COMMODITIES, S.A. FORMERLY KNOWN AS PEAKOM SA
## DETERMINATION OF EXTENT AND VALIDITY OF LIEN AND INSIDER STATUS

86. The allegations contained in paragraphs 1 through 85 are incorporated herein as if fully restated in their entirety.

87.    That upon information and belief, Peakom, S.A. was a wholly owned subsidiary of the Essar Global Fund Limited and the financing company for the Essar Group.`

88.     That Essar Global Fund Limited required that financing of the NTCI operations be accomplished through Peakom, S.A. and later through its successor by name change Riverdale Commodities, S.A.

89.     That during December, 2016 at the direction of Essar Minerals Canada Limited and/or Essar Global Fund Limited the debtor entered into a financing arrangement with Peakom, S.A. for an advance of $8,000,000.00 which was to be repaid by coal sales totaling 500,000-600,000 short tons at the below market price of $99.00 per ton..00  (See, **Exhibit BB**)

90.     That on July 27, 2017 additional funding was necessary and the debtor was directed by Essar Global Fund Limited to enter into a financing arrangement with Riverdale Commodities, S.A. for an an additional advance of $8,000,000.00 ($16,000,000.00 total) to be repaid by the sale 625,000 short tons coal to Riverdale Commodities, S.A. (See, **Exhibit CC**)

91.     That on November 3, 2017 additional funding was necessary and the debtor was directed by Essar Global Fund Limited to enter into a financing arrangement with Riverdale Commodities, S.A. for an additional advance of $4,000,000.00 ($20,000,000.00 total) to be repaid by the sale 625,000 short tons coal to Riverdale Commodities, S.A.  In all prior agreements the coal sales were intended to amortize the debt but in this last arrangement the profit on the coal sales was to be retained by Riverdale Commodities, S.A. and the Debtor would be required to pay the $20,000,000.00 [currently Nineteen Million Eight Hundred Ninety Nine Thousand Seven Hundred and Sixty Dollar ($19,899,760.00)] principal in addition to delivering coal to  Riverdale at a drastically reduced price. (See, **Exhibit DD**)

92.    That Riverdale Commodities, S.A. claims to have a lien on certain assets of the Debtor including a lien upon coal in place (in the ground) which violates the terms of the lease where the coal is located.

93.    That the lien of Riverdale Commodities, S.A., if any, was perfected outside the applicable preference period and as such is voidable.

94.    That during these negotiations, Prashant Ruia, one of the principles of Essar Global Fund Limited actually directed that these more favorable terms be provided to Riverdale Commodities, S.A. over the objections of the officers of the Debtor NTCI.

95.    That the Debtor seeks a determination of the extent and validity of a lien on real and personal Property (the "Property") pursuant to B.R. 7001(2), which provides for an adversary proceeding "to determine the validity, priority, or extent of a lien or other interest in property."

96.    That the Debtor seeks a determination that any coal sales provision of the contract with Riverdale Commodities, S.A. was obtained by fraud and is therefore unenforceable.

97    That the relationship between the Debtor Riverdale Commodities, S.A. is sufficiently close to suggest that these transactions were not conducted at arm's length, and this creditor should be considered a non-statutory insider. In accordance with *In re Winstar Comm'ns, Inc., 554 F.3d 382 (3d Circuit 2009)*.

98.    That the Debtor seeks a determination that Riverdale Commodities, S.A. is a non-statutory insider of the Debtor and not entitled to vote on any plan of reorganization proposed by the Debtor.

## COUNT III

## INJUNCTIVE RELIEF

## TEMPORARY RESTRAINING ORDER

99. The allegations contained in paragraphs 1 through 98 are incorporated herein as if fully

restated in their entirety.

100. The Court's equitable powers, codified in Section 105 of the Bankruptcy Code,

permit it to "issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of this title." 11 U.S.C. §105.

101. The Debtor's reorganization efforts are being and will be severely hampered if the

Defendants are not enjoined: (a) from interfering with the reorganization process, (b) replacing

the officers of the Debtor without prior court approval, (c) interfering with the efforts of the

officers of the debtor to determine the ownership of the various affiliates of the Debtor including

New Trinity Holdings, LLC, New Resources, and its their subsidiaries, (d) designating critical

vendors, assumption of leases and securing debtor in possession financing and all of these actions

should be enjoined and if necessary fling such proceedings as necessary in order to to join certain

affiliated companies in this bankruptcy proceeding.

102. The public interest in successful reorganizations is significant and the prospects of

successful reorganization are diminished unless the restrictions imposed by the proposed

injunction are in place. The injunctive relief requested will not harm the Defendants since

Defendants, should not take the actions sought to be enjoined in the first instance without the

consent or approval of the court. The benefits to the estate outweigh any risk of limited harm.

103. Based on the foregoing facts, granting a temporary restraining order and preliminary injunction is appropriate, as (i) a threat of irreparable harm to the bankruptcy estate of the Debtor-in-Possession, and corresponding harm to its unsecured creditors exists, (ii) the risk of the harm outweighs the potential injury to the Defendants – Debtor submits that Defendants will not be harmed by the injunctive relief requested (since, even in the absence of a temporary restraining order and preliminary injunction, the Defendants should not be taking any of the actions sought to be enjoined without the consent or approval of the Courtr); (iii) there is a high degree of likelihood that Debtor will succeed on the merits based on the foregoing facts (iv) the injunction is in the public interest, including the interests of the creditors, for whose benefit the Chapter 11 reorganization process is largely designed.

104. Because Defendants have demonstrated a willingness to enter into transactions that significantly interfere with the Debtor's operations and the rights of creditors, the Court should enter an Order enjoining Defendants from interfering with the reorganization process or management of the company.

105. No bond or other security is appropriate or necessary in this situation, as Debtor seeks to preserve the status quo.

**WHEREFORE**, the Debtor prays that the Court set aside the liens of Essar Minerals Canada Limited, Essar Global Fund Limited and Riverdale Commodities, S.A. to the extent appropriate, determine that Riverdale Commodities, S.A. is an insider of the Debtor and should be treated appropriately, grant a temporary restraining Order and after such hearing as necessary a

permanent injunction to prevent interference with the management and operation of the Debtors

business and for such other and further releif as the Court deems appropriate.

NEW TRINITY COAL INCORPORATED
By Counsel

/S/ James M. Pierson
James M. Pierson (SBID # 2907)
PIERSON LEGAL SERVICES
P. O. Box 2291
Charleston, WV 25328
Phone: 304-925-2400
Fax: 304-925-2603
jpierson@piersonlegal.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRIC OF WEST VIRGINIA

In Re:

NEW TRINITY COAL INCORPORATED

Case No. 2:19-BK-20088

Debtor,

Chapter 11

## VERIFIED ADVERSARY PROCEEDING

I, Paul Saluja, Petitioner in the foregoing **VERIFIED ADVERSARY PROCEEDING** after being duly

sworn, say that the facts and allegations contained therein are true, except insofar as they are stated to be on

information, and that insofar as they are therein stated, they are believed to be true.

_____
INDERPAL "PAUL" SALUJA


Taken, subscribed and sworn to before me this ___5th___ day of ___April___, 20_19_

My commission expires: _8·16·2021_

_____
Notary Public

```
        OFFICIAL SEAL
       Melissa D. Lacy
        Notary Public
     State of West Virginia
     My Commission Expires
        August 16, 2021
       Route 2 Box 338
       Peca, WV 25159
```