# *EXHIBIT A*

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM



# DEPARTMENT OF NATURAL RESOURCES

February 13, 2019

Alice Roberts-Davis, Commissioner
Minnesota Department of Administration
200 Administration Building
50 Sherburne Avenue
St. Paul, Minnesota 55155

RE: Request for debarment of Essar Global, its affiliates, and Madhu Vuppuluri

Dear Commissioner Roberts-Davis:

Enclosed for processing is a Vendor Report and associated attachments requesting debarment of Essar Global, its affiliates, and Madhu Valipurri from doing business with the State of Minnesota. This Vendor Report was prepared by the Minnesota Department of Natural Resources (DNR) in consultation with the Minnesota Department of Employment and Economic Development and Itasca County.

As you may know, the DNR and the State of Minnesota have a long and troubled history in working with Essar, its affiliates, and its principal, Madhu Vuppuluri, related to what is now called the Mesabi Metallics mining project near Nashwauk, Minnesota. Essar repeatedly failed to meet the construction and production requirements contained in its state mineral leases, failed to pay contractors, currently owes the state approximately $64M in unpaid debt, and ultimately drove the project into bankruptcy.

Essar has recently taken actions to invest in the Mesabi Metallics project and to potentially reestablish a presence in Minnesota. DNR has initiated this debarment request in order to prevent further harm to the State of Minnesota.

Thank you for your attention to this important matter. If you have any questions about this request, please contact Sherry Enzler at (651)259-5066.

Sincerely,

Sarah Strommen
Commissioner

c:    Betsy Hayes, Department of Administration
      Sherry Enzler, DNR General Counsel

**Minnesota Department of Natural Resources | Commissioner's Office**
**500 Lafayette Road North, St. Paul, Minnesota 55155**

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

## DETAILED EXPLANATION AND REQUEST FOR DEBARMENT

**The State Mineral Leases and the Department of Employment and Economic Development (DEED) Reimbursement Agreement were breached by Essar Global, Essar Steel Minnesota, and all associated Essar Affiliates as well as its Principal Madhu Vuppuluri to the great detriment to the citizens of the state, the university trust fund, the school trust fund, sub-contractors, and Itasca County**

Background

1. On December 9, 2004, the Minnesota Department of Natural Resources (DNR) issued 27 mineral leases (Lease Agreements) to Minnesota Steel Industries LLC (Minnesota Steel). The leases were the result of negotiations conducted in accordance with Minn. Stat. §93.1925. Subject to the completion of required environmental review and permitting, the leases authorized Minnesota Steel to mine state minerals from property located west of Nashwauk, Minnesota in Itasca County, Minnesota. The particular ore body covered by the leases is one of the highest quality iron ore resources remaining on the Mesabi Range and one of the best sources of raw material for the production of value added iron products. *See* Attachment A Lease Agreement (this document is one of 27 identical Lease Agreements. The additional 26 Lease Agreements, which are identical to Attachment A but for the property description, are available upon request.) The 2004 Lease Agreements required Minnesota Steel to:
   - Pay royalties on all ore mined from the leased premise. Attachment A at ¶¶ 6.through 9
   - Start production of ore from State properties by December 31, 2010. Attachment A at ¶ 25.
   - Complete construction of plant facilities by December 31, 2010. *Id.*
   - Reach total plant production of 5 million tons of taconite iron ore by the end of 2012. *Id.*
   - Produce iron products with a metallic iron content greater than 75% iron during each calendar year commencing in 2013. *Id.*

2. Of the 27 Lease Agreements, 16 covered university trust fund lands, 2 covered school trust fund lands and 9 covered tax forfeited lands. *See* Attachment B Mesabi Metallics Active State Iron Ore and Taconite Leases. The Minnesota Constitution Article XI, sections 8 and 9 requires the state to manage school and university trust fund lands to generate revenue for the permanent school fund and the permanent university fund, respectively. The Minnesota Legislature has directed that it is the goal of the state to "secure maximum long-term economic return from the school trust lands consistent with the fiduciary responsibilities imposed by the trust relationship established in the Minnesota Constitution." Minn. Stat. § 127A.31. Minnesota Statutes, section 93.22 requires that 80% of all revenue payments from mineral leases associated with school or university trust lands, including royalties, be credited to either the school trust fund or the university trust fund as applicable. Eighty percent of the revenue from mineral rights

1

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

associated with tax forfeited lands are held by the state in trust for the taxing districts in which the lands are located. Minn. Stat. §§ 93.22 and 282.12.

3. By 2007, the necessary environmental review for the project encompassed by the Lease Agreement requirements was completed and the DNR and the Minnesota Pollution Control Agency had issued the necessary environmental permits for the commencement of mining and the construction of the required pellet plant, value added iron ore facility, and steel mill (the Project). The Project analyzed in the environmental review process and ultimately permitted included mining of the lands covered by the Lease Agreements.

4. In 2007, Essar Steel Minnesota, LLC (Essar Steel Minnesota), a subsidiary of Essar Global, acquired the Project and assumed the associated Lease Agreements and permits from Minnesota Steel. *See* Attachment C, Assignment of Permit to Mine from Minnesota Steel to Essar Steel Minnesota. Essar Global named Madhu Vuppuluri as CEO of its subsidiary Essar Steel Minnesota and charged him with managing the project. Madhu Vuppuluri remained the CEO of Essar Steel Minnesota until the company declared bankruptcy in 2016.

5. In 2008, Essar Steel commenced construction of a pellet plant but as outlined below never completed construction of said plant as required by either the Lease Agreements or any subsequent amendment thereto. The vast majority of construction related activities required by the Lease Agreements were undertaken through third party contracts between Essar Steel Minnesota and private contractors.

6. Also in 2008, the Minnesota legislature, to incentivize the introduction of value-added mining and mineral processing and its resulting job creation on the Iron Range, authorized a series of grants totaling $65.9 million to Itasca County for the construction of public infrastructure related to the project. Of the $65.9 million, $25.9M was from the DEED-administered Minnesota 21st Century Fund and $40 million was from general obligation bonds (GOB). The Project and Essar Steel Minnesota were the intended beneficiary of this funding. As noted below, the grant was to become immediately repayable by Essar Global in the event that construction of the Project was not completed:

   o  Use of GOB funding for a private project requires a showing of full project funding by the beneficiary, in this case Essar Steel Minnesota. Essar Steel Minnesota, however, did not have full funding to complete the project so in 2008 the state and Itasca County entered into a Reimbursement Agreement with Essar Global. *See* Attachment D Reimbursement Agreement. Parties to this agreement were Minnesota Steel dba Essar Steel Minnesota, Essar Global, Itasca County and DEED.

   o  Paragraph 2 of the Reimbursement Agreement required Essar Global and Essar Steel Minnesota dba as Minnesota Steel to reimburse Itasca County, upon demand, all costs and expenses incurred by the County, the City of Nashwauk, the

2

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

Nashwauk Public Utility Commission and the Itasca County Regional Rail Authority for installation and construction of public infrastructure up to $65.9 million if the Essar Project was not constructed and in operation by the completion date. The completion date was defined under agreement as October 1, 2015. *Id.* at ¶¶ 1 and 2.

7. Between 2008 and 2016, in reliance on the promises made by Essar Steel Minnesota in the Lease Agreements and in the Reimbursement Agreement, Itasca County, through its Itasca County Regional Rail Authority (ICRRA) and the City of Nashwauk's Public Utility Commission (NPUC), completed construction of a railway line, roads, water and sewer lines, and electric transmission lines and electrical substations, as well as design of a gas line (which later Essar Global or one of its affiliates pursued independently). Expenditures directly related to the Project totaled approximately $64.735 million.

8. In 2009, it became apparent that Essar Steel Minnesota was not going to meet the construction deadlines for either the pellet plant or the value-added iron ore facility set out in the Lease Agreements. On October 1, 2009 the Lease Agreements were amended. *See* Attachment E First Amendment to Taconite Iron Ore Mining Leases Numbered 3019N through 3126 N and T-5081 N through T 5089 N (Amending the Lease Agreements in part by extending the deadlines set forth in ¶ 25 of the 2004 Lease Agreements). As amended the Lease Agreements required Essar Steel Minnesota to:
   o Complete construction of plant facilities and start production of ore from the state leased properties by April 1, 2014. Attachment E at ¶ 5.
   o Mine at least 5 million tons of crude taconite ore in the 2014 calendar year. *Id.*
   o Consider production of iron products with a metallic iron content greater than 75% by January 1, 2015 or such other later date as mutually agreed upon by the parties. *Id.*

9. In 2012, in reliance on the commitments made by Essar Steel Minnesota, the DNR in 2009 issued Essar Steel Minnesota an additional 5 mineral leases. *See* Attachment B. The terms of these leases included the terms agreed to by Essar Steel Minnesota in 2009 when the original 27 Lease Agreements were amended. Of these 5 new Lease Agreements 3 covered tax forfeited lands and 2 covered university trust lands. *Id.*

10. On January 28, 2015 Essar Steel Minnesota wrote to DNR asking it to extend the dates to complete the performance requirements of the Lease Agreements as amended. *See* Attachment F Letter Agreement to Taconite Iron Ore Mining Leases Numbered 3019-N through 3126-N and T-5081-N through T-5089-N. On March 25, 2015 the DNR sent Essar Steel Minnesota a letter advising Essar Steel Minnesota that because of its failure to complete construction of the plant facilities and start ore production from the state properties Essar Steel Minnesota had failed to comply with the terms of the amended Lease Agreements. *Id.* at 2. The DNR further advised Essar Steel Minnesota that it would not exercise its option to cancel the now 32 Lease Agreements, but would instead

3

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

amend the performance requirements of the amended Lease Agreements to require that
Essar Steel Minnesota meet the following performance requirements:

- o   By July 1, 2015 start production of ore from the State Properties.
- o   By July 1, 2016, complete construction of plant facilities.
- o   Meet a total production of at least 5 million tons of crude taconite iron ore in
  calendar year 2016.
- o   Consider production of iron products with metallic content greater than 75% by
  January 1, 2018 or such later date as agreed to by the parties.

*Id.* at 3.  The state retained all other existing rights including the right to cancel the Lease
Agreements if Essar Steel Minnesota failed to meet the revised performance
requirements. *Id.*

11. By the spring and early summer of 2016, construction had once again stalled at the
Project and it was apparent that Essar Steel Minnesota did not have the funds available to
recommence construction.  It was clear that Essar Steel Minnesota could not to complete
construction of plant facilities and could not possibly achieve the 2016 production goals.[1]

12. On July 8, 2016, after protracted discussions with both Essar Steel Minnesota and Essar
Global, the DNR sent Essar Steel Minnesota a notice of termination for all of the Lease
Agreements between Essar Steel Minnesota and the State of Minnesota for the Nashwauk
Project effective 12:01PM CST on July 8, 2016.  The notice was sent by certified mail
and was hand delivered to Essar Steel Minnesota at its offices in Hibbing Minnesota.
Minutes before the termination notice was to take effect, Essar Steel Minnesota filed for
bankruptcy in the Delaware Federal Bankruptcy Court.  Essar Global used the bankruptcy
of Essar Steel Minnesota to shield itself from liability under the Lease Agreements.

13. As a direct result of the Essar Steel Minnesota bankruptcy and associated litigation in
bankruptcy to extract the Lease Agreements from the bankruptcy proceeding, the DNR
has expended $24,638 in legal fees to Delaware bankruptcy counsel and an additional
$66,525 in legal fees to the Minnesota Attorney General's office.  Additionally, the
bankruptcy has directly led to a number of claims made by another mining company
against the state to acquire both the Lease Agreements and associated permits.  To date
the DNR has expended an additional $49,045 in payments to the Minnesota Attorney
General's office in litigation with this other mining company directly arising out of the
Essar Steel Minnesota Bankruptcy matter.  In total DNR has, to date, expended $140,208
in legal fees.  This figure does not include internal legal and staff costs associated with
the cost of the bankruptcy proceeding and associated litigation with the other mining
company.

14. At the time the bankruptcy matter was filed, Essar Steel Minnesota had outstanding debts
owed to lenders, contractors, and trades workers associated with meeting the construction
obligations of the Lease Agreements as well as financial obligations to local, state and

---

[1] Essar had minimally performed the requirement that it commence ore production from the State Properties by July
1, 2015 by conducting an engineered blast of state ore in March 2015 and the removal of 183,908 tons of state ore in
the Second Quarter of 2015.

4

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

federal governments in excess of $1 billion dollars.[2]  In total, 505 claims were filed in the bankruptcy proceeding.  Among the claimants were unpaid construction contractors that were not fully paid for their work constructing the pellet facility.  *See In re Essar Steel Minnesota LLC and ESML Holdings Inc.,* Bankruptcy Claims available at https://dm.epiq11.com/#/case/ESM/claims (listing all claims and the value of each claim.) As a consequence of the bankruptcy proceeding initiated by Essar Steel Minnesota, many if not most of these claimants were never fully paid for Project construction and other work undertaken on Essar Steel Minnesota's behalf to comply with the terms of the Lease Agreements.  Additionally, a review of these claims indicates that Essar Steel failed to pay tax and other obligations to the Internal Revenue Service, the State of Minnesota, and the City of Nashwauk.  In short, Essar Steel and its parent Essar Global walked away from all of their contractual obligations associated with the Lease Agreements, leaving a partially built processing plant at the Project site.

15. In August 2016, after the DNR issued its termination notice to Essar Steel for failure to perform under the Lease Agreements as amended, DEED asked Itasca County to demand that Essar Global fulfill its Reimbursement Agreement obligations as set forth in ¶ 2 of the Reimbursement Agreement.  *See* Attachment D at ¶2.

16. To recover from Essar Global under the Reimbursement Agreement, Itasca County was compelled to sue Essar Global.  Itasca County filed suit in April 2017.  In July 2018 the Itasca County District Court granted a partial summary judgment to Itasca County.  It ruled in favor of Itasca County on the issue of the liability of the defendants but left open the question of the amount of damages.  To date, neither Itasca County nor DEED have ever been reimbursed by Essar Global for any portion of the $64.735 million that it was obligated to pay under the Reimbursement Agreement.

17. On December 12, 2016, the bankruptcy court approved a change in the name of Essar Steel Minnesota to Mesabi Metallics Company, LLC (Mesabi) and in December 2017 Mesabi emerged from bankruptcy under the control of Chippewa Capital Partners, which is now wholly owned by Nubai Global Investments.

18. On or about January 7, 2019, DNR learned Essar Global had purchased $260 million in debt related to Mesabi, positioning Essar Global as an investor in the Project. *Essar Global repays Rs 12,000 cr debt, makes comeback in Minnesota iron ore mining project,* Money Control Budget 2019, *(*January 07, 2019) available at https://www.moneycontrol.com/news/business/companies/essar-global-repays-rs-12000-cr-debt-makes-comeback-in-minnesota-iron-ore-mining-project-3361261.html and *Essar Buys Back into Nashwauk Project,* Mesabi Daily News (January 7, 2019) available at https://www.virginiamn.com/news/essar-buys-back-into-nashwauk-project/article_31b1944e-12ab-11e9-a0f8-13a7f4d05c35.html  Essar Global has also

---

[2] Over $100 million of these claims were filed by Essar Global, its Affiliates, and its principles including Madhu Vuppuluri.  https://dm.epiq11.com/#/case/ESM/claims

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

indicated an intent to regain control of the Project and reinstate Madhu Vuppuluri as CEO of the Project. *Id.*

19. On January 11, 2017, the SC Litigation Trustee (Bankruptcy Litigation Trustee) established pursuant to the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company* filed suit against Essar Global Fund Limited, Essar Projects Limited, Essar Projects USA LLC, Essar Projects,India Limited, Essar Project Management Company Limited, Essar Construction Limited, Essar Projects Middle East FZE, Essar Logistics Limited, and Mahdu Vuppuluri alleging fraudulent transfer of funds from Essar Steel Minnesota to Essar Global and its affiliates (Essar Global and Essar Affiliates). The Bankruptcy Litigation Trustee also filed suit against Madhu Vuppuluri, Sanjay Bhartia, Prashant Ruia and Anshuman Ruia alleging that said persons acted in concert with Essar Global and the Essar Affiliates to fraudulently transfer funds from Essar Steel Minnesota to Essar Global and the Essar Affilitates.

20. On August 18, 2018, the Bankruptcy Litigation Trustee amended its complaint. *See* Attachment H Second Amended Complaint *Essar Steel Minnesota LLC et al v. Essar Global Fund Limited et al* (Bankr. D. Del. Aug. 13, 2018). The amended complaint alleges that, between 2008 and 2016, Essar Steel Minnesota paid Essar Global and its affiliates over $1.1 billion to complete the Project and that Essar Global and its affiliates "funneled money paid to them from Project uses to wherever it deemed to be needed by those in Control of Essar Global and Essar Affiliates, without regard for corporate structures, operative contracts of the Law – or any repayment ability. Attachment H at ¶¶ 2-3. The amended complaint further alleges that approximately $500 million of the money paid to the Essar Affiliates for completion of the Project "was not even used on the Project" but was instead used "to shore up the finances of Essar Global...for the benefit of Essar Global." *Id.* at ¶¶ 4-5.

21. Also on August 18, 2018, the Bankruptcy Litigation Trustee amended its complaint against Madhu Vuppuluri, Sanjay Bhartia, Prashant Ruia and Anshuman Ruia. *See* Attachment I Second Amended Complaint *Essar Steel Minnesota LLC et al v. Madhu Vuppuluri et. al* (Bankr. D. Del. Aug. 13, 2018). The Second Amended complaint alleges that Vuppuluri in concert with the Ruia family siphoned off Project construction funds "in blatant acts of self-dealing. Using a byzantine maze of corporate structures to obfuscate their malfeasance and in complete abdication of their fiduciary duties, the Defendants and their cohorts bled . . . [Essar Steel Minnesota] dry, causing the Company and its creditors billions of dollars in damages." Attachment I at ¶ 1.

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

Basis for Debarment[3]

Minnesota Statutes, section 16C.03 authorizes the Department of Administration to debar or suspend vendors as set forth in Minn. R. 1230.1150. A vendor is defined as "a business, including a construction contractor or a natural person, and includes both if the natural person is engaged in a business." Minn. Stat. § 16C.02, subd. 21. Essar Global, Essar Capital Limited, Essar Global Fund Limited, Essar Steel and all other subsidiaries and affiliates together with its principal Madhu Vuppuluri are vendors within the meaning of Minn. Stat. § 16.02, subd. 21.

1.  Essar Global, the Essar Affiliates, Any Future Affiliates, and Madhu Vuppuluri should be Debarred or Suspended for Violation of Contractual Provisions Pursuant to Minn. R. 1230.1150, subp. 2(4).

Minnesota Rule 1230.1150, subp. 2(4) provides that a person[4] may be debarred where said person has "violated contractual provisions . . . of a character that is regarded by the director to be so serious as to justify debarment." In evaluating a debarment case under subpart 3(4), the director is directed to consider whether said person or business "fail[ed] without good cause to perform according to the specifications, time limits, or any terms or conditions in the contract" or has a "record of failure to perform, or of unsatisfactory performance, according to the terms of one or more contracts . . . provided that this failure to perform or unsatisfactory performance was not caused by acts beyond the control of the contractor."

Essar Global together with the Essar Affiliates, its subsidiaries and affiliates, and its principal, Madhu Vuppuluri, should debarred first because they failed, without good cause, to perform according to the specifications, time limits, and terms of the Lease Agreements. The 2004 Lease Agreements contained express time limits for the commencement of mining operation, the completion of construction of the plant facilities, production rates in excess of 5 million tons of taconite ore, and the production of value-added iron ore products. *See* Attachment A at ¶ 25. These conditions were imposed because the ore body covered by the leases is one of the richest ore bodies not under production within the state and its development has the potential to result in a significant rate of return to the university and school trust funds, as well as to local communities. *Supra* at ¶ 1. Additionally, and in compliance with the generalized policy of the state to provide for the diversification of the state's mineral economy, the DNR concluded that the ore body covered by the Lease Agreements provided the best opportunity to develop value-added production and associated jobs in northeastern Minnesota.

As set forth in ¶¶ 4 through 11, for almost a decade the state attempted to work with Essar Steel Minnesota to develop the ore body and the associated pellet production and value-added facilities. Time after time, however, Essar Steel Minnesota failed to meet the central conditions of the Lease Agreements – it repeatedly failed to construct the required pellet plant and achieve the total production levels set forth in the Lease Agreements. For months on end,

---

[3] This debarment request is not intended to apply to a non-Essar affiliated company in good standing with the State of Minnesota to the extent that said company might acquire an Essar assets or Affiliate in bankruptcy.

[4] Minnesota Rule. 1230.0150, subpart 17 defines a person as both a natural person, a business and both where a natural person is engaged in business.

7

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

during the pendency of the Lease Agreements, there was minimal construction activity occurring on the site. For months on end, the state attempted to get compliance with the central terms of the Lease Agreements. When, after almost ten years, the state moved to terminate the Lease Agreements for failure to perform, Essar Steel Minnesota ran to the bankruptcy court in an attempt to retain the Lease Agreements, requiring the state to pay tens of thousands of dollars to extract the Lease Agreements from the Bankruptcy proceeding. For these failures, at a minimum, a debarment action is warranted

Furthermore, there are now formal allegations that the reason the Project was not completed and the central terms of the Lease Agreements were never met was that Project funding was being funneled away from the Project by Essar Global, the Essar Affiliates and Madhu Vuppuluri, the CEO of Essar Steel Minnesota, to Essar Global and the Essar Affiliates. *See* Attachments H and I. This business practice by Essar Global, the Essar Affiliates and the Essar Steel CEO Madhu Vuppuluri constitutes blatant evidence of the shared intent of Essar Global, the Essar Affiliates and Mr. Vuppuluri to ignore their contractual obligations to perform in accordance with the terms of the Lease Agreements and also constitutes grounds for suspension or debarment for failure to perform according to the specifications, time limits, or any terms or conditions in the contract.

To further exacerbate the situation, Essar Global has essentially ignored its contractual obligations to DEED and Itasca County when it refused to reimburse the state and Itasca County in accordance with the Reimbursement Agreement. In accordance with the terms of the Reimbursement Agreement, Itasca County and others expended $64.3 million to provide rail and road access to the Project Site as well as water, sewer and other utility connections. *Supra* at ¶¶ 6 and 7. Essar Global agreed to reimburse these funds should the Project not be built in accordance with the terms of the Lease Agreements. It is undisputed that the Project was never built in accordance with the terms of the Lease Agreements. Yet to this day, Essar Global has not reimbursed the state and Itasca County the cost of utility construction on the site. Essar Global simply ignored and walked away from its contractual obligations. It has failed "without good cause" to perform in accordance with the core specifications of the Reimbursement Agreement and, therefore, should be debarred.

2.    Essar Global, the Essar Affiliates, and Madhu Vuppulari Should be Debarred or
      Suspended Because it is not a Responsible Contractor Within the Meaning of Minn. Stat.
      § 16C.285, subd. 3(2)(i)

Minnesota Statutes, section 16C.285, subdivision 2 provides that only "responsible" contractors may obtain a state contract. Subdivision 3 further provides that a contractor that "repeatedly fails to pay statutorily required wages on one or more projects for a total underpayment of $25,000 or more within a three year period" is not a responsible contractor and is ineligible to be awarded a construction contract. Minn. Stat. § 16C.285, subd. 3(2)(i). The Lease Agreements are construction contracts because they require the construction of a pellet facility. *See* Attachment A at ¶ 25. As evidenced by the claims in the Bankruptcy proceeding, Essar Global, Essar Steel, the Essar Affiliates and Mr. Vuppuluri repeatedly violated this provision when they failed to pay contractors for construction of the pellet facility. *See eg.*

8

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

Claim No. 23 brought by Hoover Construction Co. for $452,057; Claim No. 30 brought by Rice Lake Contracting Corp. for $528,209, Claim No. 39 brought by Cranel Services, Inc. for $101,330, Claim No. 41 brought by JC Custom Welding & Electric, Inc. for $64,797, and Claim No. 50 brought by Hoover Construction Co. for $303,568 (available at https://dm.epiq11.com/#/case/ESM/claims ). By failing to pay these construction contractors and those additional construction contracts as set forth in the list of bankruptcy claimants, Essar Global, the Essar Affiliates and Mr. Vuppuluri violated the statutory requirement to pay contractors prevailing wage and is not a responsible contractor eligible to obtain a state contract. This violation is made all the more egregious by the fact that Essar Global, the Essar Affiliates and Mr. Vuppuluri appear to have intentionally diverted hundreds of millions of dollars from the Project to Essar Global and the Essar Affiliates for non-Project related reasons. Thus, not only did Essar Global violate its contractual obligations to DNR, DEED, and Itasca County, it walked away from its contractual obligations to pay its subcontractors, subcontractors it employed to construct the pellet facility required by the state Lease Agreements.

3.    <u>Essar Global, the Essar Affiliates, and Madhu Vuppuluri Should be Debarred or Suspended for Fraud and Collusion to Commit Fraud that Resulted in the Failure of Essar Steel Minnesota to Perform its Contractual Obligations to the State.</u>

Finally, Minn. R. 1230.1150, subp. 2(5) provides that a vendor may be debarred for "any other cause the director determines to be serious and compelling . . . including all acts that would disqualify the person as a responsible vendor, as defined in part 1230.0150, subpart 2. . ." To be a responsible vendor, the vendor must be free from any judgment, lien or seizure of assets or property to satisfy tax payments or duties. Minn. R. 1230.0150, subp. 20H.

First, as noted above, Essar Global, the Essar Affiliates and Mr. Vuppuluri cannot be considered a responsible vendor because they have violated the provisions of Minn. Stat. § 16C.285, subd. 3(2)(i) requiring payment of prevailing wage.

Second, Essar Global is not free of judgments as required by Minn. R. 1230.1150. Specifically, the Itasca County District Court granted summary judgment to Itasca County in its suit against Essar Global regarding violation of the Reimbursement Agreement. Attachment J *Itasca County et al. v. Essar Global Limited*, Order for Judgment (Itasca County District Court, July 8, 2018).

Finally, as more fully set forth in the Complaints filed by the Bankruptcy Litigation Trustee, Essar Global, the Essar Affiliates, and Mr. Vuppuluri appear to have intentionally diverted funds away from Essar Minnesota Steel in violation of their fiduciary obligations and their obligations under both the Lease Agreements and the Reimbursement Agreement. *Itasca County et al. v. Essar Global Limited*, Order for Judgment (Itasca County District Court, July 8, 2018).Said fraudulent activities in and of themselves constitute grounds for debarment.

9

Filed in District Court
State of Minnesota
2/20/2019 1:21 PM

## ATTACHMENTS

| | |
|---|---|
| Attachment A: | State Mineral Lease No. 3109-N |
| Attachment B: | Mesabi Metallics Active State Iron Ore and Taconite Leases. |
| Attachment C: | Assignment of Permit to Mine from Minnesota Steel to Essar. |
| Attachment D: | Reimbursement Agreement |
| Attachment E: | 2009 Amendment to Taconite Iron Ore Mining Leases Numbered 3019-N through 3126-N and T-5081-N through T-5089-N |
| Attachment F: | 2015 Letter Agreement to Taconite Iron Ore Mining Leases Numbered 3019-N through 3126-N and T-5081-N through T-5089-N |
| Attachment G: | July 8, 2016 Termination Notice to Essar |
| Attachment H: | Second Amended Complaint *Essar Steel Minnesota LLC et al v. Essar Global Fund Limited et al* (Bankr. D. Del. Aug. 13, 2018). |
| Attachment I: | Second Amended Complaint *Essar Steel Minnesota LLC et al v. Madhu Vuppuluri et. al* (Bankr. D. Del. Aug. 13, 2018). |
| Attachment J: | *Itasca County et al. v. Essar Global Limited,* Order for Judgment (Itasca County District Court, July 8, 2018). |

10

# EXHIBIT B

Case 2:19-ap-02004   Doc 1-1   Filed 04/04/19   Entered 04/04/19 20:33:28   Desc
Exhibit Exhibit A to C   Page 14 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 16   Filed 01/31/18   Page 1 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In the Arbitration Between:<br><br>ArcelorMittal USA, LLC,<br><br>                Plaintiff,<br><br>v.<br><br>Essar Steel Ltd.,<br><br>                Defendant. | Case No. 18-cv-83 (DWF/LIB)<br><br>**ARCELORMITTAL USA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CONFIRM ARBITRATION AWARD** |

**INTRODUCTION**

Plaintiff ArcelorMittal USA, LLC ("ArcelorMittal USA") seeks an order confirming an arbitration award issued by the International Court of Arbitration of the International Commerce Commission on December 19, 2017 in ICC Case No. 22187/RD/MK (the "Final Award") in favor of ArcelorMittal USA and against Respondent Essar Steel Ltd. ("Essar Steel"). ArcelorMittal USA petitions the Court to confirm this nondomestic arbitration award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and its implementing legislation in the Federal Arbitration Act ("FAA"). As explained below, there is no basis for denying ArcelorMittal USA's petition. It should therefore be granted.

Case 2:19-ap-02004   Doc 1-1   Filed 04/04/19   Entered 04/04/19 20:33:28   Desc
Exhibit Exhibit A to C   Page 15 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 16   Filed 01/31/18   Page 2 of 10

## BACKGROUND

This proceeding arises out of the breach of a supply agreement between ArcelorMittal USA and Essar Steel. As evident in the arbitration award, this breach caused ArcelorMittal USA significant damages. (January 31, 2018 Declaration of Christopher Tompkins ("Tompkins Decl.") Ex. B, Final Award ¶ 170.)

ArcelorMittal USA operates steelmaking facilities. As part of its operations, it consumes millions of dry metric tons ("DMT") of iron ore pellets. (Petition to Confirm Arbitration Award [Doc. No. 1] ("Petition") ¶ 6; Final Award ¶ 65.) In 2010, Essar Steel Minnesota LLC ("Essar Minnesota"), a subsidiary of Respondent Essar Steel (when together with Essar Minnesota, "Essar"), approached ArcelorMittal USA regarding the potential supply of iron ore from a mine Essar Minnesota was developing in Nashwauk, Minnesota. (Final Award ¶ 65.) After a period of negotiations, in December 2012 Essar Minnesota and ArcelorMittal USA entered into an initial agreement for Essar Minnesota to supply ArcelorMittal USA with a significant volume of iron ore pellets. (Final Award ¶ 66.)

Essar Minnesota, Essar Steel as co-obligor, and ArcelorMittal USA later entered into an Amended and Restated Pellet Sale and Purchase Agreement in January 2014 (the "Amended Pellet Sale Agreement"). The Amended Pellet Sale Agreement is the governing contract in this dispute. (Tompkins Decl. Ex. A, Amended Pellet Sale Agreement.) The Amended Pellet Sale Agreement, as later amended, required Essar to start supplying iron ore pellets to ArcelorMittal USA by

2

Case 2:19-ap-02004    Doc 1-1    Filed 04/04/19    Entered 04/04/19 20:33:28    Desc
Exhibit Exhibit A to C    Page 16 of 78
CASE 0:18-cv-00083-DWF-LIB    Document 16    Filed 01/31/18    Page 3 of 10

July 1, 2016. (Amended Pellet Sale Agreement § 2(a), as amended by Third Amendment § 2(a); Final Award ¶ 72.)

As described more fully in the Final Award, Essar Minnesota and Essar Steel breached their obligations under the Amended Pellet Sale Agreement by failing to supply ArcelorMittal USA with iron ore pellets by the contractual deadline.[1] (*See* Final Award ¶¶ 96–103.)

As a result of this breach, and pursuant to Section 12 of the Amended Pellet Sale Agreement, ArcelorMittal USA filed a Request for Arbitration against Essar Steel[2] in the International Court of Arbitration of the International Commerce Commission (the "ICC Court") on August 9, 2016. (Final Award ¶ 12.) The ICC Court formally notified Essar Steel of the arbitration on August 12, 2016, and later confirmed that Essar had received notice on August 15, 2016. (Petition ¶ 11.) Later that year, on November 18, 2016, Essar Steel filed an Answer and Counterclaim in response to ArcelorMittal USA's Request for Arbitration, and nominated its party-appointed arbitrator. (*See* Final Award ¶¶ 13-16.)

---

[1] A procedural order issued by the ICC Arbitral Tribunal in the arbitration arguably provides that the Final Award is confidential. ArcelorMittal USA has no objection to the public filing of the Final Award but does not know Essar Steel's position on this issue. Accordingly, as noted in the accompanying Local Rule 5.6 Statement, ArcelorMittal USA has filed the Final Award under temporary seal to provide Essar Steel an opportunity to argue that the Final Award should remain confidential.

[2] Essar Minnesota is the subject of a Chapter 11 bankruptcy proceeding and was not a party to the arbitration proceeding.

Case 2:19-ap-02004    Doc 1-1    Filed 04/04/19    Entered 04/04/19 20:33:28    Desc
Exhibit Exhibit A to C    Page 17 of 78
CASE 0:18-cv-00083-DWF-LIB    Document 16    Filed 01/31/18    Page 4 of 10

The two party-appointed arbitrators nominated the presiding arbitrator on January 23, 2017, and the three-arbitrator ICC Arbitral Tribunal was confirmed by the ICC Court on February 6, 2017. (*Id.* ¶¶ 15-17.) The ICC Arbitral Tribunal and parties held a preliminary procedural conference on March 16, 2017, to discuss how the arbitration should proceed and the execution of the Terms of Reference applicable to the arbitration. (*Id.* ¶ 18.) Essar Steel refused to execute the Terms of Reference, which were approved by the ICC Arbitral Tribunal on June 14, 2017, and by the ICC Court on June 28, 2017. Despite its refusal to sign the Terms of Reference, Essar Steel continued to participate in the proceedings and was sent all filings. (*Id.* ¶¶ 20-32.)

On June 20, 2017, the ICC Arbitral Tribunal issued an order setting the schedule for the arbitration, which contemplated a series of disclosures over the course of the summer of 2017 and a live hearing in Minneapolis from October 9-12 and October 16-20, 2017. (*Id.* ¶ 24.) In accordance with the procedures adopted by the ICC Arbitral Tribunal, ArcelorMittal USA produced its written memorials on July 28, 2017, including witness statements from three fact witnesses and three expert witnesses, extensive supporting exhibits, and a memorandum in support of its claim. (*Id.* ¶ 44.)

Essar Steel did not submit any evidence in accordance with the schedule. (*Id.*) On August 9, 2017, Essar Steel informed the ICC Arbitral Tribunal that it would not

Case 2:19-ap-02004    Doc 1-1    Filed 04/04/19    Entered 04/04/19 20:33:28    Desc
Exhibit Exhibit A to C    Page 18 of 78
CASE 0:18-cv-00083-DWF-LIB    Document 16    Filed 01/31/18    Page 5 of 10

be filing any further written submissions or attending the arbitration hearing, but that it was still defending against ArcelorMittal USA's claim and that it was relying upon the ICC Arbitral Tribunal to ensure that ArcelorMittal USA proved its case. (*Id.* ¶ 50.) In response, the ICC Arbitral Tribunal held a telephonic conference, in which Essar Steel declined to participate. (*Id.* ¶ 51.) Following that conference, on August 14, 2017, the ICC Arbitral Tribunal again confirmed it would hold a hearing on October 10-12, 2017, in Minneapolis. (*Id.* ¶ 52.) On September 15, 2017, the ICC Arbitral Tribunal again invited Essar Steel to participate in the hearing and to advise the ICC Arbitral Tribunal if it intended to do so by September 30, 2017. Essar Steel did not respond. (*Id.* ¶ 53.)

The ICC Arbitral Tribunal held a two-day hearing in Minneapolis on October 10-11, 2017. (*Id.* ¶ 54.) At that hearing, ArcelorMittal USA presented live testimony of three experts and three fact witnesses to further support its extensive pre-hearing written submission. (*Id.*) At the request of the ICC Arbitral Tribunal, ArcelorMittal USA made a post-hearing submission on October 27, 2017, including a post-hearing memorandum and an additional witness statement. (*Id.* ¶ 55.) Although the ICC Arbitral Tribunal invited Essar Steel to respond to ArcelorMittal USA's post-hearing submission by November 10, 2017, Essar Steel failed to do so. (*Id.* ¶ 55.) The ICC Arbitral Tribunal declared the proceedings closed on November 14, 2017. (*Id.* ¶ 56.)

On December 19, 2017, the ICC Court issued the Final Award. (*Id.* ¶ 170.)

Case 2:19-ap-02004    Doc 1-1    Filed 04/04/19    Entered 04/04/19 20:33:28    Desc
Exhibit Exhibit A to C    Page 19 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 16   Filed 01/31/18   Page 6 of 10

## ARGUMENT

ArcelorMittal USA's petition is governed by the New York Convention and its implementing legislation at 9 U.S.C. Chapter 2. The New York Convention applies because the Final Award is not domestic, as it involves parties from outside of the country where ArcelorMittal USA now seeks to enforce the Final Award, and is commercial in nature. *See* New York Convention Art. I (1); 9 U.S.C. § 202. Specifically, ArcelorMittal USA seeks to enforce the Final Award in the United States, and Respondent Essar Steel is organized under the laws of Mauritius. The New York Convention therefore applies.

Article III of the New York Convention states: "Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." Under the New York Convention, to enforce an arbitral award, the petitioning party must provide the arbitration award and the agreement that contains the arbitration provision. *See* New York Convention Art. IV.

Upon a properly filed petition, a federal district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." *AVR Communications Ltd. v. American Hearing Systems, Inc.*, Case No. 13-cv-3027 (JNE/TNL), 2014 WL 348248, at *8 (D. Minn. Jan. 31, 2014) (internal quotation marks omitted). The

Case 2:19-ap-02004    Doc 1-1    Filed 04/04/19    Entered 04/04/19 20:33:28    Desc
Exhibit Exhibit A to C    Page 20 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 16   Filed 01/31/18   Page 7 of 10

limited grounds on which a court may refuse to confirm an arbitral award are listed

in Article V of the New York Convention. Those grounds are:

> (a) The parties to the agreement [to arbitrate] were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

> (c) the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

New York Convention Art. V(1).

A federal district court may also refuse to confirm an arbitral award if

(1) recognizing or enforcing an award would be contrary to public policy or (2) the

parties' dispute is not capable of settlement by arbitration under the laws of the

United States. *See* New York Convention Art. V(2). "In accordance with the

Case 2:19-ap-02004    Doc 1-1    Filed 04/04/19    Entered 04/04/19 20:33:28    Desc
Exhibit Exhibit A to C    Page 21 of 78
CASE 0:18-cv-00083-DWF-LIB    Document 16    Filed 01/31/18    Page 8 of 10

Convention's general pro-enforcement bias, these seven grounds for refusing to confirm an award have been held to be exclusive." *AVR Communications Ltd.*, 2014 WL 348248 at *4 (internal citations omitted). It is the burden of the respondent who opposes the petition to establish one of the grounds for refusing to confirm an arbitration award. *Id.* at *3.

None of these grounds for refusal or deferral of recognition or enforcement of an award apply to the Final Award. Essar Steel has not moved to modify, vacate, or correct the Final Award. Nor could it. The Final Award is the product of an arbitration conducted pursuant to the terms of the Amended Pellet Sale Agreement. All parties received clear and timely notice and numerous opportunities to participate. Moreover, confirming the Final Award does not contravene U.S. public policy, nor does it involve a dispute incapable of settlement by arbitration under U.S. law. To the contrary, confirmation and enforcement of the Final Award is fully consistent with the pro-arbitration policies embodied in the New York Convention and the FAA.

ArcelorMittal USA has fulfilled all requirements under the New York Convention. It has submitted a petition (Doc. No. 1) and supplied the agreement containing the arbitration provision and the arbitral award (Tompkins Decl. Exs. A and B). Nothing more is required. Because there is no basis for denying

Case 2:19-ap-02004   Doc 1-1   Filed 04/04/19   Entered 04/04/19 20:33:28   Desc
Exhibit Exhibit A to C   Page 22 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 16   Filed 01/31/18   Page 9 of 10

ArcelorMittal USA's petition, it should be granted, and the Final Award should be confirmed.

## CONCLUSION

For these reasons, the Court should enter an order confirming the Final Award and granting the relief requested by ArcelorMittal USA in its petition.

Dated: January 31, 2018            **GREENE ESPEL PLLP**

    s/ Karl C. Procaccini
Clifford M. Greene, Reg. No. 0037436
Jenny Gassman-Pines, Reg. No. 0386511
Karl C. Procaccini, Reg. No. 0391369
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
cgreene@greeneespel.com
jgassman-pines@greeneespel.com
kprocaccini@greeneespel.com
(612) 373-0830

and

Case 2:19-ap-02004   Doc 1-1   Filed 04/04/19   Entered 04/04/19 20:33:28   Desc
Exhibit Exhibit A to C   Page 23 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 36   Filed 03/30/18   Page 1 of 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In the Arbitration Between:

ArcelorMittal USA, LLC,

                    Plaintiff,

v.

Essar Steel Ltd.,

                    Defendant.

Civil No. 18-83 (DWF/LIB)


**ORDER FOR JUDGMENT
AND CONFIRMING ARBITRATION
AWARD**

---

This matter came before the Court on Plaintiff ArcelorMittal USA, LLC's

("ArcelorMittal USA") Petition to Confirm Arbitration Award (Doc. No. [1]), Motion to

Confirm Arbitration Award (Doc. No. [14]), and Application for Entry of Default

Judgment by Court (Doc. No. [31]).  Upon consideration of the arguments of counsel,

pleadings, and the entire record and proceedings herein,

**IT IS HEREBY ORDERED** the Petition to Confirm Arbitration Award (Doc.

No. [1]), Motion to Confirm Arbitration Award (Doc. No. [14]), and Application for

Entry of Default Judgment by Court (Doc. No. [31]) are **GRANTED**.  The Clerk of

Court is hereby instructed to enter judgment in favor ArcelorMittal USA and against

Essar Steel as follows:

(a)     The arbitration award issued by the International Court of Arbitration of the

        International Chamber of Commerce on December 19, 2017 in ICC Case

        No. 22187/RD/MK is recognized and confirmed in its entirety.

Case 2:19-ap-02004   Doc 1-1   Filed 04/04/19   Entered 04/04/19 20:33:28   Desc
Exhibit Exhibit A to C   Page 24 of 78
CASE 0:18-cv-00083-DWF-LIB   Document 36   Filed 03/30/18   Page 2 of 2

(b)     Judgment in favor of ArcelorMittal USA and against Essar Steel is entered

in the amount of U.S. $1,380,991,356.04, which includes U.S.

$1,379,457,503.00 in damages and U.S. $1,533,853.04 in arbitration costs;

(c)     Pre-judgment interest is awarded in favor of ArcelorMittal USA from and

after December 19, 2017 until March 30, 2018 at a compounded rate of

interest of 8.60% on the sum of U.S. $1,380,991,356.04, in the amount of

$31,889,415.29;

(d)     Post-judgment interest is awarded in accordance with 28 U.S.C. § 1961.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 30, 2018          s/Donovan W. Frank
                                DONOVAN W. FRANK
                                United States District Judge

# EXHIBIT C

Neutral Citation Number: [2019] EWHC 724 (Comm)

Case No: CL-2019-000030,31

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 25/03/2019

Before :

**MR JUSTICE JACOBS**

- - - - - - - - - - - - - - - - - - - -

Between :

**ARCELORMITTAL USA LLC**
**(a company incorporated under the laws of the State of Delaware)**

**Claimant/**
**Applicant/**
**Claimant in the Arbitration**

- and –

**ESSAR STEEL LIMITED**
**(a company incorporated under the laws of Mauritius)**

**Defendant/**
**Respondent in the Arbitration**

- and -

**(1) ESSAR CAPITAL SERVICES (UK) LIMITED**
**(2) MR PRASHANT RUIA**
**(3) MR SUSHIL BAID**

**Respondents**

**AND IN THE MATTER OF A PART 8 CLAIM**

Between :

**ARCELORMITTAL USA LLC**
**(a company incorporated under the laws of the State of Delaware)**

**Claimant**

- and –

**(1) MR PRASHANT RUIA**
**(2) MR JOSEPH SEIFERT**

**Defendants**

(3)  MR NICHOLAS HARROLD
(4)  MR ANDREW WRIGHT
(5)  MR NIGEL BELL
(6)  MR SUSHIL BAID
(7)  ESSAR CAPITAL SERVICES (UK)
LIMITED

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Anthony Peto QC, Harish Salve, Andrew Scott & Isabel Buchanan** (instructed by **Mishcon De Reya LLP**) for **ArcelorMittal USA LLC**
**Daniel Toledano QC & Scott Ralston** (instructed by **RPC LLP**) for **Essar Steel**
**Paul Stanley QC** (instructed by **CMS**) for **Essar Capital Services (UK)**
**Paul McGrath QC & Ruth Den Besten** (instructed by **Stephenson Harwood LLP**) for **Prashant Ruia and Sushil Baid**
**James Bailey** (instructed by **Lipman Karas LLP**) for **Joseph Seifert and Nicholas Harrold**
**Mark Beeley** (of **Orrick, Herrington & Sutcliffe (UK) LLP**) for **Andrew Wright**
**Gregory Denton-Cox** (instructed by **Thomas Cooper LLP**) for **Nigel Bell**
**Hugh Norbury QC** (instructed by **DWF LLP**) for **Essar Oil (UK) Limited, non-party**

Hearing dates: 5th, 6th, 7th March 2019.
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE JACOBS

CL-2019-000030,31

## MR JUSTICE JACOBS:

### A: Introduction

1. ***These proceedings concern a worldwide freezing order,*** search orders and *Norwich Pharmacal* relief sought by ArcelorMittal USA LLC ("AMUSA"), and granted by Butcher J. at a without notice hearing on 14 January 2019, in aid of enforcement of an arbitral award made by a Minnesota-seated Tribunal of the ICC International Court of Arbitration on 19 December 2017. The Respondents and Defendants apply to discharge these orders.

2. The arbitration proceedings arose from a dispute under an agreement dated 17 December 2012 under which Essar Steel Minnesota LLC ("ESML") agreed to supply iron ore pellets from its plant in Nashwauk, Minnesota to AMUSA for a period of 10 years. On 10 January 2014, by way of an amendment and restatement of the 2012 agreement, Essar Steel Limited ("Essar Steel"), the principal defendant in these proceedings and a Mauritius incorporated company, acceded to the agreement as a co-obligor along with ESML. AMUSA terminated the agreement on 27 May 2016 and this gave rise to a dispute as to the propriety of AMUSA's termination.

3. AMUSA referred the dispute to arbitration by way of a Request for Arbitration dated 9 August 2016. Since ESML had filed for bankruptcy pursuant to Chapter 11 of the US Federal Bankruptcy Code by then, the arbitration was pursued against Essar Steel alone. Essar Steel participated in the arbitration fully until August 2017. It filed an Answer and Counterclaim in November 2016, took part in the appointment of arbitrators in January 2017 and attended a telephonic case management conference in March 2017. Subsequently, in May 2017, AMUSA made requests for production of documents in the form of a "Redfern" schedule, to which Essar Steel responded and AMUSA replied. Some documents were produced but outstanding disputes were referred to the Tribunal for determination. The Tribunal made its determination on the document production issues on 9 August 2017 in Procedural Order No. 3. On the same day, Essar Steel informed the Tribunal that it would not be participating in the arbitration any further. Essar Steel asked the Tribunal to take into account the material that had been submitted to it already and to require AMUSA to prove its case to the appropriate standard.

4. ***The Tribunal issued its award on 19 December 2017. It found that AMUSA was entitled to around $1.3 billion as damages from Essar Steel in addition to costs and interest. The award has remained unsatisfied, and there presently appears to be no prospect of Essar Steel deciding to pay the amount of the award. Documents obtained as a result of proceedings in this jurisdiction, and orders made by Butcher J., demonstrate the intention of Essar Steel's owners to put that company into liquidation.***

5. AMUSA has attempted to enforce the award in a number of jurisdictions. It brought proceedings in the **US District Court for the district of Minnesota** which recognised the award and granted relief to AMUSA in the same terms as those set out in the award. Essar Steel did not participate in these proceedings. AMUSA also obtained a provisional order from the **Supreme Court of Mauritius** on 22 February 2018 granting recognition and enforcement to the award. Following Essar Steel's application to set aside the provisional order and to stay the enforcement of the award, the Mauritian Supreme Court heard arguments from the parties on 20 September 2018. The **Mauritian Court's judgment is pending**, but apparently will not be available for some months.

6.      AMUSA has also initiated proceedings in the Cayman Islands. On AMUSA's without
        notice application, which was made on the day after the without notice application was
        made to Butcher J. in England, the **Grand Court of the Cayman Islands granted**
        ***Norwich Pharmacal* relief against two Cayman entities in the Essar Group –
        Essar Global Fund Limited ("EGFL") and Essar Capital Limited ("ECL").** The
        return date for these proceedings was 13 February 2019 and the Cayman Court's
        judgment is awaited.

7.      In January 2019, AMUSA commenced proceedings in **England.** By an Application
        Notice dated 10 January, it sought a worldwide freezing injunction against Essar Steel,
        and a search order against Essar Capital Services (UK) Limited ("Essar Capital
        Services"), Mr. Prashant Ruia ("Prashant") and Mr. **Sus**hil Baid **("Mr. Baid").** By a
        separate Application Notice the same day, AMUSA sought *Norwich Pharmacal* relief
        against Essar Capital Services, Prashant, Mr. Baid, Mr. Joseph Seifert ("Mr. Seifert"),
        Mr. Nicholas Harrold ("Mr. Harrold"), Mr. Andrew Wright ("Mr. Wright") and Mr.
        Nigel Bell ("Mr. Bell"). Who these individuals and companies are, and how they relate
        to each other and to the present dispute, is described in Section B below.

8.      AMUSA's without notice applications were heard in private on 14 January 2019. The
        application was supported by a 70 page affidavit from Mr. Nouroozi, a partner in
        Mishcon de Reya LLP, and a 51 page skeleton argument signed by counsel. Butcher J.
        granted AMUSA permission to enforce the ICC award as a judgment of the High Court.
        He also made a worldwide freezing order ("WFO") and associated disclosure orders
        against Essar Steel. In doing so, Butcher J. was alive to the fact that Essar Steel was not
        present in the jurisdiction and that AMUSA had not shown that Essar Steel had any
        assets here. Nevertheless, he was persuaded that this was a sufficiently exceptional case
        to warrant a WFO against Essar Steel. He also granted a search order against Essar
        Capital Services, Prashant and Mr. Baid, and *Norwich Pharmacal* relief against Essar
        Capital Services, Prashant and Messrs Baid, Seifert, Harrold, Wright and Bell.

9.      The matter came back before Butcher J. for a short hearing on 17 January 2019 to decide
        whether the search order should extend to the server of Essar Oil (UK) Ltd ("Essar Oil")
        in its Stanlow refinery in Ellesmere Port. He concluded that it should not. Butcher J.
        heard the matter again on 28 January 2019, the ordered return date. At that hearing, the
        parties were agreed that this date would not afford the parties an opportunity properly
        to put forward their arguments. Accordingly, Butcher J. adjourned the return date to the
        week commencing 4 March 2019. In the meantime, he allowed the search of the imaged
        documents to continue, ordered that the search must be subject to a confidentiality club
        such that no information would be provided to AMUSA itself and asked the Supervising
        Solicitor to submit a report on the search to the court five days before the return date.

10.     Extensive written arguments were served by the various parties for the hearing on the
        adjourned return date. The hearing occupied three full days, and oral submissions were
        made by counsel for AMUSA (Mr. Peto QC) and by the representatives of Essar Steel
        (Mr. Toledano QC), Essar Capital Services (Mr. Stanley QC), Messrs Prashant and
        Baid (Mr. McGrath QC), Mr. Bell (Mr. Denton-Cox), Messrs Seifert and Harrold (Mr.
        Bailey), and Mr. Wright (Mr. Beeley). Essar Oil was also represented (Mr. Norbury
        QC) for the purposes of seeking costs incurred as a result of the search orders. The
        issues for resolution at the hearing concerned whether the WFO, the search order, and
        the *Norwich Pharmacal* orders should be maintained. It was agreed, or at least largely
        agreed, that I should determine these issues as matters of principle, and leave for later
        determination issues relating to whether the wording of the various orders should (if

maintained) be narrowed. I address in turn the WFO, the search orders, and the *Norwich Pharmacal* orders, and then the issues of costs.

11.    Two matters should be noted at outset. First, there has been no application to discharge Butcher J's. order granting permission to enforce the award as a judgment of the High Court. Accordingly, ***there is now an undisputed judgment of this court which requires Essar Steel to pay the amount of the arbitration award, and there has been a default in relation to that judgment.*** There has been no attempt by Essar Steel, within the present proceedings, to advance any of the potential reasons for refusal of recognition and enforcement of a New York Convention award as set out in the Arbitration Act 1996 s.103. **In particular, and contrary to the position taken in Mauritius, Essar Steel has not argued that it was unable to present its case in the arbitration proceedings.**

12.    Secondly, Butcher J. granted AMUSA permission to serve the arbitration claim on Essar Steel out of the jurisdiction pursuant to CPR 62.18. The court can grant permission to serve out where the claim is to enforce an award in the same manner as a judgment, irrespective of the place where the award was made. Another decision of Butcher J., *Eastern European Engineering Ltd v Vijay Construction (Pty) Ltd* [2018] EWHC 1539 (Comm), establishes that where permission to enforce the award is sought and obtained, the court can in principle grant a WFO, and that a claim for such ancillary relief did not need to be included within the arbitration claim form seeking recognition and enforcement of the award in order for the court to have jurisdiction to make such an order. In that case, like the present, an arbitration claim was brought against a foreign party to enforce a foreign award under s. 101 of the Arbitration Act 1996; and permission to serve out was granted under CPR r. 62.18. The claimant (EEEL) applied for a WFO; and the defendant (Vijay) argued that the court had no jurisdiction to make such an order. Butcher J. rejected that argument, holding that such foreign connections go to the court's discretion, not its jurisdiction:

"33 The first issue is whether Vijay was correct that the court has no jurisdiction to grant a worldwide freezing order under s. 37 Senior courts Act against a foreigner, where service out is under CPR 62.18(8) based on the enforcement of an arbitration award pursuant to s. 101 Arbitration Act and where the seat of the arbitration was not in England and Wales.

34 As I have said, Vijay contended that the court had no jurisdiction to grant a worldwide freezing order because no claim for such an order had been included in EEEL's Arbitration Claim Form. That Claim Form sought only leave to enforce the award in the same manner as a judgment or order to the same effect pursuant to s. 101(2) Arbitration Act 1996, the entry of judgment in terms of the award pursuant to s.101(3) Arbitration Act 1996 , and costs. Service out of the jurisdiction was effected without permission under CPR 62.18(8). Vijay also contended that the Arbitration Claim Form could not have included a claim for a worldwide freezing order and if it had it could not have been served out of the jurisdiction under CPR 62.18(8), or indeed on any other basis.

35 I considered that Mr. Pilling QC for EEEL was correct to submit that a claim for ancillary relief such as a freezing order did not need to be included in an Arbitration Claim Form seeking recognition and enforcement of an award pursuant to s. 101 Arbitration Act 1996 in order for the court to have jurisdiction

CL-2019-000030,31

to make such an order.

36 Indeed, there appeared to me to be an anomaly in this part of Vijay's case. Vijay accepted that this court could, in the present case, make a domestic freezing order. But it was not clear how that could be the case and yet the court have no power to make a worldwide freezing order on the basis that it had not been claimed in the Arbitration Claim Form. There is no claim for a domestic freezing order in the Arbitration Claim Form in this case any more than there is a claim for a worldwide freezing order. And if the question is whether a claim form, notionally amended to include the relevant claim could properly have been served out in the first place (see *NML Capital Ltd v Republic of Argentina* [2011] 2 AC 495 at [77] per Lord Phillips of Worth Matravers) it was not clear as to why the answer would be different had the claim been for a domestic as opposed to a worldwide freezing order. In this regard it is to be noted that Mr. Lewis QC for Vijay was inclined to accept that on the present state of the authorities the difference could not be accounted for by the existence of the jurisdictional gateway in 6BPD 3.1(2), because that head of jurisdiction relates to injunctions which are part of the substantive relief claimed; and that in this regard the position recognised under RSC Order 11 in *Mercedes Benz A.G. v Leiduck* [1996] 1 AC 284 continues to apply to CPR 6BPD 3.1(2), see *Cool Carriers A.B v HSBC Bank USA* [2001] 2 Lloyd's Rep 22 .

37 Thus I consider that the court has jurisdiction to grant a worldwide freezing order, and has a discretion as to whether or not to do so. That exercise of discretion, however, must take into account, as a highly significant matter, the circumstances in which the English court is being asked to act."

13.    This decision, with which I agree, disposes of a threshold argument of Essar Steel which concerned the manner in which AMUSA had applied to Butcher J. for permission to serve out. At the without notice stage, AMUSA made an admitted error in seeking permission to serve the WFO component of the Arbitration Claim Form out of the jurisdiction pursuant to CPR r 62.5 (1)(c). The *Eastern Engineering v Vijay* decision shows, however, that AMUSA did not need to identify and rely upon any jurisdictional gateway in relation to that ancillary component of its claim. Had it needed to do so, then CPR r 62.5 (1)(c) would not assist, since it would not apply to the present arbitration which had a Minnesota seat. But since AMUSA did not need to identify any separate jurisdictional gateway, this error was plainly immaterial and could not in itself justify the setting aside of the WFO.

14.    Mr. Toledano sought to distinguish the decision in *Eastern Engineering* on the basis that, in that case, the freezing order was not included in the Claim Form. In contrast, he pointed out that paragraph 5 of AMUSA's Arbitration Claim Form incorporated the claim for a WFO and ancillary asset disclosure. I do not consider that this is a material distinction. A claimant who has set out a claim for a WFO in its Claim Form cannot be in a less advantageous position as compared to a claimant who has not done so. If the latter can in principle obtain a WFO, I cannot see why the former cannot do so.

15.    Mr. Toledano also relied on the decision of Males J. in *Cruz City 1 Mauritius Holdings v Unitech Ltd and others* [2014] EWHC 3704. He said that there was tension  between

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

the decisions in *Cruz City* and *Eastern Engineering*. I do not consider that the decision in *Cruz City* detracts from Butcher J's. analysis in the latter case. The question that Males J. was focusing on in *Cruz City* was whether a claimant could rely on CPR 62.5(1)(c) to serve out of the jurisdiction on a defendant who was not a party to the arbitration. It was held that the claimant could not do so. Mr. Toledano relied on Males J's. observation in that context that "an application for a post-award freezing order against the award debtor falls within the scope of Section I of CPR 62 and is within the definition of 'arbitration claim', and that the court has jurisdiction to permit service out of jurisdiction of such an application under CPR 62.5(1)(c)" (at [67]). I do not read this observation as suggesting that CPR 62.5(1)(c) is the only available jurisdictional basis for seeking a WFO against a foreign defendant in aid of execution of an arbitral award. Males J. was not considering an argument that this was the case. By contrast, the decision in *Eastern Engineering* is directly in point.

16.     Accordingly, the manner in which AMUSA applied for permission to serve out is immaterial and is of no assistance to Essar Steel in relation to its application to discharge the WFO.

## B:    The WFO and the risk of dissipation

17.     The ***risk of dissipation of assets is a central and critical issue*** in the present case. As in all cases where a freezing order is sought, the applicant needs to demonstrate that there is a real risk of dissipation of assets. In the present case, however, the issue is intimately linked to the other issues. In particular, AMUSA contends that there is evidence of actual or attempted past dissipation of assets, on a significant scale, with a view to prejudicing creditors, and that it is such that the court should exercise its powers of intervention in cases of international fraud or something very close to it. This in turn impacts on the question of whether it was appropriate to grant a search order and a *Norwich Pharmacal* order in the present case.

18.     There was no dispute as to the ***relevant principles relating to the risk of dissipation***. In *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) at [69]-[70], Males J. set out a well-known summary of factors:

> "(a) The claimant must demonstrate a real risk that a judgment against the defendant may not be satisfied as a result of unjustified dealing with a defendant's assets. (b) That risk can only be demonstrated with solid evidence; mere inference or generalised assertion is not sufficient. (c) It is not enough to rely solely on allegations that a defendant has been dishonest; rather it is necessary to scrutinise the evidence to see whether the dishonesty in question does justify a conclusion that assets are likely to be dissipated. (d) The relevant inquiry is whether there is a current risk of dissipation; past events may be evidentially relevant, but only if they serve to demonstrate a current risk of dissipation of the assets now held. (e) The nature, location and liquidity of the defendant's assets are important  considerations. (f) Whether or to  what  extent the assets  are already secured or

incapable of being dealt with is also relevant. (g) So too is the defendant's behaviour in response to the claim or anticipated claim."

19.     AMUSA relied upon a large number of matters as providing the "solid evidence" required. Essar Steel contended that the evidence was insufficient. In order to understand the matters relied upon in this connection, and more generally the issues which arise on the claim for the WFO and ancillary relief sought, it is necessary to explain in more detail some of the companies within the Essar Group and the individuals concerned.

The companies and individuals

20.     **The "Essar Group" is a conglomerate, comprising companies incorporated in various jurisdictions; and in several cases in offshore locations where limited information is publicly available. Members of the Ruia family are its ultimate beneficial owners through complex chains of companies and offshore trusts.**

21.     **EGFL is a company incorporated under the laws of the Cayman Islands. A corporate organogram shows that it is the principal holding company for the Essar Group and the immediate parent of (among other entities) Essar Steel and ECL.**

22.     **Essar Steel is the defendant to the Arbitration Claim**; the debtor under the ICC award; and the subject of the court's order declaring that award enforceable in this jurisdiction. It is a company incorporated under Mauritian law, and has acted as an intermediate holding company for the Essar Group's steel business, or part of it. Its subsidiaries at material times included ESML, a company incorporated under the laws of Minnesota used for the purposes of a major iron ore project in Minnesota, USA (the "Nashwauk Project"). It was a dispute regarding the Nashwauk Project which gave rise to the arbitral proceedings and the ICC award in AMUSA's favour.

23.     **Essar Capital Services** is the First Respondent to the search order, and also a defendant to the Part 8 Claim by which AMUSA applied for *Norwich Pharmacal* orders. It is a company incorporated under English law, and in the past has provided management services to EGFL and its investment advisor, ECL. Its accounts show that it also at one time provided services directly to Essar Steel. It was for these reasons that AMUSA believed that Essar Capital Services would have access to documents and information regarding Essar Steel's assets and what has become of them. Essar Capital Services' registered office address at Lansdowne House, London, were the premises that were the target of the search order.

24.     **Prashant is a member of the Ruia family**, the Second Respondent to the search order and the First Defendant to the Part 8 Claim. The evidence indicates that Prashant is a key individual at the Essar Group, and he was a witness in the Ontario proceedings described below. **He is among the Essar Group's ultimate beneficial owners, and is or was at various times a director or equivalent officer at the relevant Essar Group companies, including Essar Steel, ESML, and ECL. He is also a director of a UK company, Essar Oil**, whose employees are now the principal staff who work at Lansdowne House. As a director of Essar Oil, Prashant has provided an English service address. The consequence is that, pursuant to s. 1140 of the Companies Act 2006,

CL-2019-000030,31

Prashant can be served with a document by leaving it at or sending it by post to his registered address. Section 1140 (3) makes it clear that service can be effected "whatever the purpose of the document in question", and that it is "not restricted to service for purposes arising out of or in connection with" his appointment as director of Essar Oil. It follows that Prashant is a person who is amenable to the jurisdiction of the English court.

25.   **Mr. Baid** is the Third Respondent to the search order and the Sixth Defendant to the Part 8 Claim. **Mr. Baid at material times held senior roles at relevant Essar Group companies, including the position of director at both Essar Steel and Essar Capital Services. He was also a director of EGFL (at least) for the month of December 2018. In his capacity as director of Essar Steel, he gave evidence on Essar Steel's behalf in the Mauritian enforcement proceedings in respect of the ICC award. He has also given evidence on its behalf in the present proceedings; and has given evidence in the Cayman proceedings as well**. As a director of Essar Capital Services, Mr. Baid has also provided an English service address, and therefore he too is amenable to English jurisdiction pursuant to s. 1140 of the Companies Act 2006.

26.   Mr. Seifert is the Second Defendant to the Part 8 Claim. In the past, he held senior roles at relevant Essar Group companies, acting as (among other things) Chief Financial Officer and Chief Investment Officer at EGFL and ECL respectively. He lives in England and was served as of right here, but no longer works for the Essar Group. However, he was involved in one of the key transactions on which AMUSA relies in support of its case on dissipation.

27.   Mr. Harrold is the Third Defendant to the Part 8 Claim. He was in the past Vice President of Essar Capital Services reporting to Mr. Seifert and apparently working closely with him. He lives in England and was served as of right here. Again, he no longer works for the Essar Group.

28.   Mr. Wright is the Fourth Defendant to the Part 8 Claim. He was between September 2011 and 2016 Senior Legal Counsel at Essar Capital Services, and reported to the London-based general counsel. He left the employment of that company in March 2016, but continued to provide services to ECL (the Cayman Islands company). He represented Essar Steel in the arbitral proceedings. He lives in England.

29.   Mr. Bell is the Fifth Defendant to the Part 8 Claim. He was a non-executive director of EGFL from October 2009 until November 2017. He lives in England.

30.   In order to understand important aspects of AMUSA's case on dissipation of assets, and related issues, it is necessary to describe in more detail the way in which Essar Steel's business was organised and certain corporate transactions which took place. *At the start of 2012, there were four principal subsidiaries which were owned by Essar Steel. In simple terms, and ignoring holding companies, these were ESML (which operated in Minnesota), Essar Steel Algoma Inc. ("Algoma") (which operated in Canada), Essar UAE Ltd. (operating in the UAE) and Essar Steel India Ltd. (operating in India). In 2012, in essence, it was decided that the Indian and UAE assets would be moved into a different holding structure; so that instead of being owned by Essar Steel, they were now to be owned by a newly formed Mauritian company called Essar Steel Mauritius, via another wholly owned subsidiary called Essar Resources Mauritius Ltd. which later*

CL-2019-000030,31

*changed its name to Essar Steel Asia Holdings Ltd. This therefore left Essar Steel with the Minnesota asset (ESML) and the Canadian asset (Algoma).*

31.   **There is evidence that the intention was that the transactions under which Essar Steel was divested of the Indian and UAE assets would both be at fair value. The assets were valuable, and Essar Steel was the recipient of various promissory notes for very substantial sums. For example, promissory notes were issued under which Essar Resources Mauritius Ltd. promised to pay Essar Steel around US$ 1.5 billion for the Indian asset. This sum has, however, never been paid to Essar Steel. Contemporaneous documentation shows that Essar Steel assigned the promissory notes to EGFL. No cash was paid for these notes pursuant to the assignment. The consideration for the assignment was expressed to be a future buy back of Essar Steel's shares from EGFL. The effect of that future transaction, if it happened, would be that Essar Steel's capital would be reduced by a very significant sum; because it would in effect be paying its parent company for the shares which its parent owned. Such a buy-back, if carried out, would have obvious solvency implications, and the evidence of Mr. Baid is that the buy-back has not in fact taken place.**

32.   It is in my view impossible to see how the buy-back could now ever take place. *Documentation obtained as a result of the search shows that it is the intention of EGFL to liquidate Essar Steel, which has a very significant liability to AMUSA and (on Essar Steel's case) no significant assets with which to discharge that liability. The documentation also shows that fresh monies obtained by the Essar Group as a result of a transaction with a bank (VTB) will not be used to pay the present arbitration award.* In these circumstances, and leaving aside other difficulties that lie in the path of a buy-back (specifically the unwillingness of a bank to whom the shares were pledged to permit the buy-back), it is impossible to see how Essar Steel could now legitimately buy-back its shares for a significant sum, and thereby reduce its capital. Indeed there is no evidence that this buy-back will now happen. These facts set the scene for an important aspect of the case on dissipation.

33.   *Butcher J. was persuaded that, on the basis of the material before him, there was a real risk, judged objectively, that the judgment would not be met because of unjustified dissipation of assets. I agree with that conclusion, and in my view it has been fortified by materials which have been obtained as a result of the search and documentation provided to AMUSA since the WFO was granted.* AMUSA relied before him, and relied before me, on a variety of matters. It is not necessary for me to address all of them in detail, but I will refer to a number of matters which are perhaps the most striking and which, even without taking into account everything relied upon, amply justify the conclusion that there is a very real risk of dissipation.

The Ontario judgment

34.   FAs described above, **Algoma was among Essar Steel's subsidiaries. Its operations included a major port facility in Ontario. By the end of 2013, Algoma was facing serious financial difficulties. In 2014, it entered into certain transactions in order to address these difficulties. These culminated in two main transactions in November 2014: (i) a recapitalisation of Algoma; and (ii) the transfer ("the Port Transaction") of Algoma's principal port assets to another EGFL subsidiary, Port of Algoma Inc. ("Portco").**

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

35.   On 9 November 2015, Algoma went under protection pursuant to the Canadian Companies' Creditors Arrangement Act (the "CCCA") and a "Monitor" (equivalent to an English trustee in bankruptcy) was appointed to represent it and other related companies. *The Monitor brought proceedings in the Ontario Superior Court of Justice under s. 241 of the Canadian Business Corporations Act ("CBCA") against various Essar Group companies, including EGFL and Essar Steel. That section provides that the court may grant relief where a company's affairs are conducted in a way that is oppressive or unfairly prejudicial to or unfairly disregards the interests of (among others) creditors. The Monitor's case was that the Port Transaction was oppressive.* The Ontario Court so found and granted relief in relation to it. The court's judgment runs to 49 pages and it followed a 5 day hearing at which evidence was given by two members of the Ruia family, Prashant and Rewant, as well as Mr. Seifert.

36.   **I consider that a number of findings of the Ontario Court are of significance in the context of risk of dissipation.**

37.   *First, the court's decision includes findings of what the court described as "bad faith", including matters which are in substance findings of fraud, against the principal individuals. The particular context for the finding equivalent to fraud concerned a commitment which EGFL had made to its subsidiary to provide a cash investment of US$250-300 million.* This commitment was made under agreements made on 24 July 2014. It was the failure of EGFL to adhere to this commitment which in due course led to a "Restructuring Support Agreement" entered into with Algoma and its creditors, and an associated Equity Commitment Letter of the same date; and it was this that led to the Port Transaction which the court found to be oppressive. In relation to the commitment of 24 July 2014, *the Ontario Court found not simply that EGFL had failed to live up to its commitment, but that it made the commitment at a time when it had no intention of doing so.* Thus the court concluded:

> "[82] The entire Port Transaction and the GIP secured loan to Portco would not have been necessary had Essar Global lived up to its obligations under the Restructuring Support Agreement it made with Algoma and the accompanying Equity Commitment Letter dated July 24, 2014 pledging a cash investment of $250 to $300 million. *However, it is quite clear from the evidence that, despite its obligations to Algoma under these agreements, Essar Global had no intention of living up to its promises. Essar Global acted in bad faith in this regard.*
>
> *[83] On March 28, 2014, the Ruias made it clear to Mr. Saraf of Essar Services India Ltd in Mumbai that they did not have $ 250 million for an equity investment in Algoma, that they did not want to tell any banks or investors that they would put in $ 250 million of equity and that they could only put in $ 120 million but would just take it out to reduce liabilities of Algoma owed to Essar companies".*

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

38.    Secondly, despite having entered into a commitment which entitled the subsidiary to a significant cash injection, steps were taken by EGFL and the controlling Ruia family to ensure that, in effect, EGFL was released of that obligation. ***It seems to me that this can properly be described as the dissipation of a valuable asset, i.e. the right of the subsidiary to a capital injection***. ***Moreover, the Ontario Court found that here too there was bad faith.***

> *"[88] It was Essar Global's decision not to fund Algoma according to the terms of the Equity Commitment Letter that made it necessary to carry out the Port Transaction. The Port Transaction was the result of the structure required by GIP to support the loan of $150 million to Portco that was advanced to Algoma net of costs. That reduced the amount of cash equity previously promised by Essar Global to be advanced to Algoma. In the amended RSA, $150 million of historical debt owed by Algoma to Essar Global was converted into preferred equity for Essar Global. That however was not cash as had been agreed to be advanced by Essar Global to Algoma in the Equity Commitment Letter. Moreover, the $150 million debt had been at the bottom of the capital structure of Algoma and its value was certainly questionable, making the conversion of debt to equity also of questionable value. On cross-examination, Mr. Seifert chose not to "speculate" on what he would pay for the $150 million debt and said the value was something in the eye of the beholder. This is confirmatory of the fact that the loans and equity conversion was of questionable value and certainly less than the cash infusion that Essar Global had previously agreed to put into Algoma and later reneged on.*
>
> *[89] In my view, Essar Global's failure to inject cash equity into Algoma as agreed was the root cause of the Port Transaction and the resulting long-term effect on Algoma and its stakeholders of the transfer of control over the Port facilities from Algoma to Portco/Essar Global. The cash equity injection agreed to by Essar Global was a contractual alternative and clearly more beneficial to Algoma.* That root cause was an exercise in bad faith. ***Had an independent committee of the board of directors of Algoma been struck, it may have been that steps may have been taken to hold Essar Global to its bargain rather than simply look to third party financing from GIP under the structure of the Port Transaction. The failure of the board of Algoma to look to some other way to effect a Recapitalization was in itself an indication of a lack of regard for the interests of stakeholders of Algoma."***

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

39.    Thirdly, it is of some significance generally that, as AMUSA put it, it was EGFL and
Essar Steel that "called the shots" regarding the Recapitalisation and Port Transaction.
Algoma's board was not independent, and in the run-up to the transactions the views of
the independent directors had been overridden. This is relevant to the question of
whether the court is entitled, in the context of risk of dissipation, to disregard the
separate corporate personality of the different companies within the Essar Group; a
point to which I return below.

40.    Fourthly, the Ontario Court examined the Port Transaction on its merits. The Monitor
had at one stage advanced a case that the port assets were transferred at an undervalue
but this case was ultimately not pursued. Nevertheless, the court broadly accepted the
Monitor's case that Algoma had been deprived of a critical asset, and that the Port
Transaction was contrary to the reasonable expectations of trade creditors, employees,
pensioners and retirees. ***Algoma had lost long-term control over critical and strategic
assets on terms that enabled EGFL/Portco to veto and control Algoma's affairs, and
which gave unwarranted value to them. The Ontario Court placed particular
emphasis in this regard on the fact that Algoma had not sought to hold EGFL to its
contractual commitments to invest cash and had disregarded legal advice that that
was what it should do:***

> "[122] Algoma's Board held meetings on October 30 and
> November 1, 2014. It is quite clear from the meeting minutes
> that it was Mr. Seifert who was leading the Recapitalization
> effort. At the November 1 meeting, Mr. Schrock of Weil,
> Gotschal & Manges advised that unsecured noteholders would
> not react well to proposed changes to the Port Transaction and
> would likely push for a higher infusion of cash/equity from Essar
> Global, as promised in the Equity Commitment Letter. The
> advisors said that the board should insist that Algoma press all
> parties to fully satisfy their commitments and this could include
> a letter to Essar Global setting forth its obligations regarding the
> equity commitments. That advice was not followed.
>
> [123] I fail to see how the directors of Algoma can rely on the
> business judgment rule in the face of not following advice to go
> after Essar Global on its cash equity commitment. There was no
> issue about the validity of that commitment. ***If the Ruia
> interests had acquiesced to forming an independent
> committee of the board, or listened to the truly independent
> directors before they resigned in frustration, steps may have
> been taken differently including accepting and following Mr.
> Schrock's advice. What happened in the Port Transaction
> was an exercise in self-dealing in that Algoma's critical Port
> asset was transferred out of Algoma to a wholly owned
> subsidiary of Essar Global with a change of control provision
> that benefited Essar Global at a time that a future insolvency
> was a possibility. That would not have been necessary had
> Essar Global lived up to its cash injection commitment. Yet
> the board did not take any steps to call Essar Global on its
> commitment, even in the face of legal advice that it should do
> so.***"

41.    Finally, the court largely rejected the evidence given by Mr. Seifert, Mr. Rewant Ruia,
and Prashant and held that each of them was evasive under cross-examination.

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

42.      Mr. Toledano argued that there was no finding of fraud, and that the case simply
concerned breach of contract; a failure to live up to a funding commitment. He said that
it was a very long way off a conclusion that demonstrates asset dissipation, and a very
long way off a case of fraud. He submitted that AMUSA had cherry picked parts of the
judgment, and that the court could not recreate the Ontario trial. I do not accept these

CL-2019-000030,31

submissions. I have read the entire judgment and do not consider that AMUSA was "cherry picking". I agree that there is no express finding which used the word "fraud", and that the words used are "bad faith". However, I consider that the findings in paragraphs [82] and [83] of the judgment are equivalent to a finding of fraud, and are certainly not a long way off it. I also consider that the substance of the Monitor's case, accepted by the court, included asset dissipation, and again was certainly not a long way off fraud. In that regard, there was a release of a funding commitment of US$ 250 – 300 million, with no attempt to enforce it. The Port transaction was a transaction with a related party which, whilst not at an undervalue, was prejudicial to the interests of Algoma and the creditors, and favourable to the interests of the related party. All of these matters, as well as the findings that the principal witnesses were evasive, provide in themselves solid evidence of a risk of dissipation. Butcher J. held that this transaction, among others, provided "grounds to consider that the Essar Group has been operating to the detriment of its creditors and has engaged in conduct in bad faith". I consider that that conclusion was fully justified.

### The $ 1.3 billion reduction in capital as shown in Essar Steel's 2016 accounts

43.    I have already described the transaction, which took place in 2012 and 2013, whereby Essar Steel India was transferred away from Essar Steel in return for certain promissory notes. These promissory notes were then assigned to EGFL "in consideration of future capital reduction". The auditors of Essar Steel clearly gave consideration in 2014 and 2015 to the accounting treatment of the relevant transaction. The 2014 accounts were signed by the company and the auditors in September 2014. The 2015 accounts were signed by the auditors on 29 September 2015.

44.    The 2015 accounts identified, amongst the company's current assets an amount of US$ 1,511,388,333 as "Other receivables". This very substantial receivable was the largest line item in the company's assets, representing approximately half of its total assets. Note 10 to the accounts explained that most of this amount, just over US$ 1.5 billion, was:

> "Receivable from related parties are unsecured, non-interest bearing and receivable on demand.
>
> Receivable from related parties includes receivable per Promissory Note (see note 6*)"

45.    Note 6 to the 2015 accounts contained a further description of "Investment in Subsidiary Companies", as did Note 6 to the 2014 accounts. The latter, which in some respects was more detailed, stated:

> "On 29th June 2012 and 26th August 2013, a share purchase agreement was entered into between Essar Steel Asia Holdings Limited (a fellow subsidiary) and the Company by virtue of which the company has disposed 1,910,255,183 & 118,678,842 equity shares …INR 10 each of Essar Steel India Limited to Essar Steel Asia Holdings Limited at a consideration of USD

1,388,530,158 and USD 99,450,000 respectively. In this respect, Essar Steel Asia Holdings Limited had issued a Promissory Note in favour of the Company.

The Company has assigned the Promissory Note in favour of Essar Global Fund Limited (holding company) who in turn has assigned it in favour of Essar Steel Mauritius Ltd…."

Note 6 then gave details of further onward assignments.

46.    Accordingly, the treatment of the promissory notes in both the 2014 and 2015 accounts was such as to recognise a very substantial asset of Essar Steel. It is convenient to note at this stage that when, during the arbitration in May 2017, AMUSA sought production of Essar Steel's accounts, Essar Steel produced the 2015 accounts described above. In due course, the Tribunal ordered, on 9 August 2017, the production by Essar Steel of its later accounts, and on the same day Essar Steel in effect withdrew from the arbitration.

47.    As a result of the orders made in the present proceedings, Essar Steel has produced two further sets of accounts: for the financial years ended 31 March 2016 (approved and authorised by the Directors on 29 September 2016), and for the financial year ended 31 March 2017. Essar Steel has not produced accounts for the financial year ended 31 March 2018, notwithstanding that the evidence indicates that these would generally be produced within 6 months of its financial year end, and therefore would normally be available by September 2018. It is said that the accounts remain in draft form, nearly 12 months after the end of the financial year.

48.    The significant feature of the 2016 accounts is that, to put the matter in simple terms, the US$ 1.5 billion receivable is no longer there, and the 2015 accounts have been restated to reflect that position as well. Thus, instead of "Other receivables" showing assets of US$ 1.5 billion for 2015 (and a similar figure in 2014), the accounts have been restated so as to show assets of only US$ 23 million as at March 2015. The figure as at March 2016 is even lower, some US$ 393,005. The adjustment is also reflected in the figures for "Equity and Liabilities". In the original 2015 accounts, this was a comparatively healthy US$ 2.475 billion. In the restated accounts, the 2015 figure was US$ 987,000, and the figure for 2016 was a negative figure of approximately US$ 618,000. The reason for the reduction in Equity and Liabilities is that the sum of approximately US$ 1.5 billion is shown as an "Advance against future buy-back", and this, in effect is a very substantial reduction in capital. The auditors explain the prior year adjustment in Note 26 to the restated 2015 accounts in the following terms:

"In 2013, the Company disposed of 2,028,934,025 equity shares held in Essar Steel India Limited (ESIL) to Essar Asia Holdings Limited (ESAHL) and, as consideration, the latter issued promissory notes for the amount of USD 1,487,980,158. Subsequently, under a future buyback arrangement, the promissory notes were assigned to Essar Global Fund Limited (EGFL), the sole shareholder of the Company, as an advance against future buyback of 1,487,980,158 equity shares at USD 1

each. This amount should have been classified under equity. Accordingly, the financial statement for the years ended 31 March 2014 and 2015 have been restated to reflect the correct accounting treatment. The Company will have to satisfy the solvency test to finalise the share buyback".

49.     In a further note (on page 9 of the accounts) setting out the "Statement of Changes in Equity for the Year Ended 31 March 2016", it is stated:

> "Advance against future buy-back represents the consideration paid to the sole shareholder in 2013 towards future buy back of 1,487,980,158 equity shares at par value. Under the buyback arrangement, the Company has right for gross physical delivery of its own equity shares. The sole shareholder has no contractual obligation to refund the cash or provide another financial asset and hence, it is to be classified as equity. However, this has been wrongly classified as an asset in the previous years. Accordingly, the financial statements of 2014 and 2015 have been restated to reflect the accounting treatment."

50.     Mr. Baid addressed this transaction in his first witness statement on behalf of Essar Steel. His evidence is that a lender to whom the shares in Essar Steel had been pledged would not agree to release the shares. He adds that:

> "Moreover, the share buyback can only be completed if ESL satisfies the solvency test in section 6 of the Companies Act of Mauritius 2001".

51.     In my judgment, the matters which I have described are significant for a number of reasons.

52.     First, the materials provide solid evidence of asset dissipation, or at least attempted asset dissipation, on a massive scale. Essar Steel started out, as a result of its disposal of Essar India, with a very significant US$ 1.5 billion asset, and the existence of this asset was recognised in the 2014 and 2015 accounts. On the basis of the restatement in the 2016 accounts, however, this valuable asset has disappeared, for no consideration beyond a potential "buyback" arrangement. But it is impossible on the current evidence to see how the buyback of shares can ever take place, given the unwillingness of the lender to agree to the buyback but more importantly the solvency position of Essar Steel. Indeed, Mr. Baid does not suggest that it will ever take place. On behalf of Essar Steel, Mr. Toledano was unwilling to accept that this meant that the asset remains with Essar Steel, or at least that Essar Steel must have a valuable claim against EGFL, which received the promissory note but has not provided valuable consideration in the form of the return of valuable shares. The effect of this argument was, therefore, that Essar Steel's US$ 1.5 billion asset had indeed disappeared, but without Essar Steel having received anything in return. If this were the correct analysis, then it seems to me to be a classic case of asset dissipation.

53.     Secondly, there is in my view on the present evidence a solid case that the valuable asset does remain with Essar Steel, or at least that Essar Steel has potentially valuable claims against EGFL and others who may have participated in the dissipation of its

asset if it has indeed been dissipated. It is not necessary to analyse the different ways in which these claims could be advanced, or against whom they could be advanced. Indeed, it is not possible to do so since in due course the outcome of claims will depend upon the jurisdiction in which any litigation is brought. For present purposes, the court is entitled to proceed on the basis of the presumption that foreign law is the same as English law. It is not difficult to see that Essar Steel can claim, for example, on the basis that the consideration for the assignment of the valuable promissory notes has clearly failed and the transaction has become ineffective, and therefore it retains this asset. Indeed, it may even be the case that, if the 2018 accounts were to be produced, and given that the buyback will not proceed, this asset would need to be shown as an asset in Essar Steel's accounts.

54.    Thirdly, it is to my mind obvious that, unless an injunction were to be granted, this asset could easily be dissipated. It is unnecessary to look any further than the events surrounding the Algoma transactions to see the very real possibility, if not likelihood, that Essar Steel's asset, which comprises in substance a receivable owed by related companies, would be released or transferred away from Essar Steel, rather than being used to meet the judgment debt that now exists arising out of the award.

55.    Fourthly, the manner in which the information about this restatement has come to light provides evidence of an attempt to conceal the information about the restatement from AMUSA; evidence which is relevant both to the risk of dissipation and the appropriateness of the ancillary orders which the court has made. The background here is that during the course of the arbitration, AMUSA made disclosure requests on 1 May 2017 for various documents, including Essar Steel's financial statements from 2007 to the present. These documents were, on AMUSA's case, relevant and material to the issues in the arbitration, and specifically a very substantial counterclaim which was being advanced for hundreds of millions of dollars by Essar Steel. Essar Steel objected to the disclosure of these accounts in their response dated 31 May 2017, but said that without prejudice to their objections "Essar Steel attaches … its financial statements for the year ended 31 March 2015". At the time of the production of these financial statements, the 2015 accounts had been restated approximately 8 months earlier. However Essar Steel produced only the original (unrestated) accounts, rather than those which had been restated. I did not consider that Essar Steel's evidence in the case, or Mr. Toledano's submissions, gave me a satisfactory explanation of why the only accounts produced in the arbitration were 2015 accounts which evidenced the existence of the substantial asset that I have described, but which in fact had been restated so as to show a significantly different financial position. Mr. Toledano argued that the reason for producing the 2015 accounts in the arbitration was to evidence certain capital injections which had been made. However, this could have been evidenced by production of the restated accounts, rather than accounts which, on Essar Steel's case, had been restated and therefore superseded.

56.    The further developments in relation to this aspect of the arbitration are also material in this regard. AMUSA pressed for production of the further accounts pursuant to its disclosure request, and served a response to Essar Steel's case. On 9 August 2017, the Tribunal ruled in favour of AMUSA, and ordered the production of the accounts. It was on that day that Essar Steel withdrew from the arbitration. It seems to me to be highly unlikely that these two events, namely the order for production of the accounts and Essar Steel's withdrawal from an arbitration in which they faced a  very substantial

CL-2019-000030,31

claim, were unconnected and were simply a coincidence. Although it is part of Essar Steel's case in Mauritius that the proceedings were conducted in a manner which was procedurally unfair, with insufficient time being allowed, that is not a case which has been advanced in these proceedings as a reason why the arbitration award should not be enforced. Moreover, even if Essar Steel did have a perception that there had been procedural unfairness, the fact remains that the withdrawal occurred on the same day as the Tribunal's order for production. It is an obvious inference that Essar Steel did not want AMUSA or the Tribunal to see its restated or more recent accounts, even if that meant withdrawing from participation in the arbitration.

57.    In addition, when Essar Steel withdrew, they made it clear that they were standing by their defence and counterclaim, and invited the Tribunal to "have due regard to the material that it has already submitted". That material included the 2015 accounts which Essar Steel knew to have been restated and which had been withheld from disclosure. It seems to me that AMUSA were entitled to submit, as it did, that Essar Steel thereby invited the Tribunal to proceed on a false basis, and that this is also relevant to risk of dissipation and the ancillary orders in the present proceedings.

58.    Furthermore, there is also evidence that, even within the present proceedings, there has been a reluctance to produce Essar Steel's more recent accounts, including the 2016 accounts. On 25 January 2019, AMUSA's solicitors requested production of the 2016, 2017 and 2018 accounts. Further requests were then made, including under CPR r31.14. These were met with a negative response until the 2016 accounts were produced on 15 February 2019 in an exhibit to Mr. Baid's witness statement of that date.

59.    Fifthly, and against this background and given the timing, I consider that it is strongly arguable, to put it at its lowest, that the restatement of the accounts, and the removal or attempted removal of the US$ 1.5 billion asset, was connected with the substantial claim that AMUSA was in a position to make, and had indeed made, against Essar Steel. The termination of the contract, which gave rise to the claim against Essar Steel, was in May 2016, and arbitration proceedings were commenced (after pre-arbitration correspondence) in August 2016. As at that time, the existence of the US$ 1.5 billion asset was of course shown in Essar Steel's accounts, both in the 2014 and the 2015 accounts. It is now said by Essar Steel that this was a mistake on the part of the directors (Mr. Baid) who drew up and signed the accounts, and the auditors who audited them. But as AMUSA rightly submitted, it does seem to be an extraordinary mistake to make, not least given the size of the asset and its importance in the context of Essar Steel's balance sheet. The evidence provided by Essar Steel, including the evidence of Mr. Baid, does not explain how this enormous mistake came to be made, either by the directors or the auditors, and no documents showing communications with the auditors have been provided. Ultimately, AMUSA's submission was that there was or may have been no "mistake", and that the 2014 and original 2015 accounts did correctly recognise Essar Steel's entitlement to this valuable asset; particularly bearing in mind the uncertainty surrounding whether any share buyback would ever take place. It is of course not possible to express a concluded view on that argument, but it certainly seems to me to be strongly arguable that there was no mistake, notwithstanding the fact that the auditors subsequently signed off on the restatement (a point on which Mr. Toledano heavily relied). To my mind, it is also strongly arguable that the restatement of the 2015 accounts in September 2016 so as to remove the asset, and the termination under the

contract and the commencement of arbitration proceedings in the previous few months, was also no coincidence.

Indian Supreme Court's 2018 judgment

60.     On 4 October 2018, the Indian Supreme Court issued a lengthy judgment in a case between ArcelorMittal India Private Ltd. (a subsidiary within the ArcelorMittal Group) and Satish Kumar Gupta and others. The case concerned the Indian insolvency of Essar India, and respective bids by an ArcelorMittal company and also a company called Numetal to bid for Essar India. The decision of the Supreme Court is relied upon by AMUSA because of the findings which the court made concerning Mr. Rewant Ruia, a member of the Ruia family who also featured in connection with the Algoma transaction.

61.     One of the matters on which the Indian Supreme Court focused was a statutory provision (Section 29A (c) of the Insolvency and Bankruptcy Code 2016). This provision was aimed at ensuring that, as the court said, "persons who are in charge of the corporate debtor" for whom a resolution plan is made "do not come back in some other form to regain control of the company without first paying off its debts". The section is therefore an important protection for creditors. The relevant issue in the case concerned Numetal and its alleged connection with Mr. Ruia. In substance, if this was Mr. Ruia's company, then (as the Supreme Court said) "the only manner in which Numetal could successfully present a resolution plan would be to first pay off the debts of [Essar India], as well as those of such other corporate debtors of the Ruia group of companies ...".

62.     The court's decision concluded, in substance, that Mr. Ruia had sought to evade this prohibition, and had done so through what the court described in paragraph [88] of the judgment as a "smokescreen in the chain of control". The smokescreen involved the use of an elaborate chain of companies and trusts. The Indian Supreme Court therefore concluded that Numetal's participation was caught by the prohibition and was ineligible.

63.     AMUSA contends, convincingly in my view, that Mr. Rewant Ruia was likely to have been acting in concert with other members of his family to acquire Essar India's assets without meeting its liabilities to creditors. The case therefore provides solid evidence, in my view, of the misuse by the family of corporate structures to the prejudice of creditors of the Essar Group of companies.

64.     In his witness statement, Mr. Baid submitted that there had been no attempt to shield any corporate ownership structures from the relevant authorities. But this submission is difficult in my view to reconcile with the conclusions of the Supreme Court, including that there was "one more smokescreen in the chain of control, which would conceal the fact that the actual control over AEL is by none other than Shri Rewant Ruia himself".

Report by the Directorate of Revenue Intelligence

65.     The Indian Directorate of Revenue Intelligence (the "DRI") produced a report dated 11 March 2015 (the "DRI Report"). The report runs to some 247 pages, but only the summary (22 pages) was contained in the exhibits. The summary does not directly

CL-2019-000030,31

concern Essar Steel, and it does not directly implicate any of the individuals who are the focus of AMUSA's case. Nevertheless, the summary provides solid evidence of what appears to be serious fraudulent activity within the Essar Group. The DRI found that Essar Group entities had conspired to create a fraudulent invoicing customs duty scheme and participated in trade-based money laundering via a UAE-incorporated company called Global Supplies (UAE) FZE ("GSF"). The DRI found GSF to be a "front company of the Essar Group" created "to act as an intermediary invoicing agent for facilitating invoice inflation" and a "dummy agent … for enabling siphoning off of money abroad".

66.    If the DRI Report had been the only evidence relied upon in this case, I do not think that it would justify the grant of any of the relief sought. However, I consider that it is relevant as an additional piece of evidence which shows a pattern of wrongdoing, in this case fraudulent activity, within the Essar Group. Mr. Baid's evidence that the report is being challenged by certain companies is not in my judgment an answer in the present context. Even if there is a challenge to the DRI report, that does not mean that the DRI report does not provide strong and solid evidence of the matters which it addresses and describes.

Conclusion in relation to risk of dissipation

67.    In addition to the matters set out above, AMUSA relied upon various other points. I will not address them in detail, since in my view the foregoing are more than sufficient to provide solid evidence of a risk, indeed a very serious risk, of dissipation of Essar Steel's assets. That conclusion is reinforced by the matters which I describe below in the context of the argument concerning the search order, specifically (i) the non-production of ESML's documents within the arbitration and (ii) the emails sent by Ms. Popat on the morning of 16 January after service of the search order.

68.    In reaching this conclusion as to dissipation of assets, I have taken into account conduct which related to different companies within the Essar Group as a whole. I do not consider that this infringes any relevant legal principles relating to the limited circumstances in which the corporate veil can be pierced so as, for example, to impose liability upon a person or company other than the company that is a contracting party. When considering the risk of dissipation, it is in my view legitimate to look at the actions of the ultimate beneficial owners of a group of companies, or conduct in relation to holding company and subsidiary, notwithstanding the existence of separate legal personality. The straightforward reason for this is that if there is solid evidence that the owners or controllers of company A have dissipated its assets, that is highly material to the question of whether there is a risk of dissipation of the assets of company B which is within the same ownership or control. Other evidence in the case reinforces the conclusion that, at least in the present context of considering the risk of dissipation, the existence of separate legal personality does not matter. Thus, Ms. Popat's emails sent on the morning of 16 January, described in more detail below, were emails sent by an Essar Oil employee (Ms. Popat) to an employee of Essar Capital (Mr. Radia) concerning the concealment of documents relating to a third company, Essar Capital Services.

**C: Is it just and convenient to grant a worldwide freezing order?**

CL-2019-000030.31

69.    Essar Steel argued that even if there were a solid risk of dissipation, it is not just and convenient to grant a WFO. The substance of this argument was that this court should not become an international policeman, let alone an international detective agency. The present case, as far as Essar Steel was concerned, had no sufficient connecting factors with the English jurisdiction. The seat of the arbitration was Minnesota, and it was of no significance that the award could now be enforced as an English judgment. The debtor is Essar Steel, a Mauritian company. It has no substantial assets in England: its only assets here are two bank accounts with very small sums. Its directors are not English. There were no real connecting factors between Essar Steel and England, and it was wrong for that purpose to take into account the English connections of other companies within the Essar Group, or English connections of the individuals who worked for those companies, in considering the appropriateness of relief. The corporate structure of the Essar Group should, in the context of this argument, be respected. If any WFO were to be sought, it should be obtained from the courts of Mauritius, where Essar Steel is incorporated, or Minnesota which is the place of the award. This is not a case of international fraud, where the English court might be inclined to be more willing to intervene.

70.    AMUSA submitted, in summary, that the relevant test was simply whether it was just and convenient to grant the relief sought. The authorities in this area provided guidelines, but ultimately the test was the statutory test in s. 37(1) of the Senior Courts Acts 1981. However even if the exercise of the court's discretion were trammelled by the prior case law, the present case could properly be regarded as a case of international fraud or something very closely analogous thereto. If it were necessary to show an exceptional case for intervention in the present circumstances, then this case was exceptional. Butcher J. had correctly regarded the case as analogous to fraud given the evidence that Essar Group "has been operating to the detriment of creditors and has engaged in conduct in bad faith".

71.    In connection with these submissions, I was referred to a large number of authorities including *Republic of Haiti v Duvalier (No 2)* [1990] 1 QB 202 (CA), *Rosseel NV v Oriental Commercial Shipping (UK)* [1990] 1 WLR 1387 (CA), *S&T Bautrading v Nordling* [1998] IL Pr 151, *Credit Suisse Fides Trusts SA v Cuoghi* [1998] QB 818 (CA), *Motorola Credit Corp v Uzan (No 2)* [2004] 1 WLR 113 (CA), *Mobil Cerro Negro Ltd v Petroleos de Venezuela SA* [2008] 1 Lloyd's Rep 684, *Banco Nacional de Comercio Exterior SNC v Empresa de Telecommmunicaciones de Cuba SA* [2008] 1 WLR 1936 (CA), *Masri v Consolidated Contractors International (UK) Ltd (No 2)* [2009] QB 450, *ICICI Bank UK Plc v Diminico NV* [2014] 2 CLC 647, *Conocophillips China Inc v Greka Energy (International) BV* [2013] EWHC 2733 (Comm), *Taurus Petroleum Ltd v State Oil Marketing Co of the Ministry of Oil, Republic of Iraq* [2018] AC 690 (SC), *Great Station Properties SA v UMS Holding Ltd* [2017] EWHC 3330 (Comm) and *Eastern European Engineering Ltd v Vijay Construction (Pty) Ltd* [2018] EWHC 1539 (Comm).

72.    The authorities in this area of the law were considered and summarised by Popplewell J. in *Conocophillips China Inc v Greka Energy (International) BV.* [2013] EWHC 2733. At paragraph [41] he said

        "Drawing these strands together, I derive the following principles as applicable when the court is asked to grant a freezing order in support of relief which has been or is to be

granted under s 101 of Arbitration Act 1996 to enforce a New York Convention arbitration award obtained abroad:

> (1) The principles are the same as those applicable where the court is asked to grant freezing order relief in support of foreign proceedings in exercise of its jurisdiction under s 25 of the Civil Jurisdiction and Judgments Act 1982. The relief is treated as ancillary to the substantive rights contained in the award, which arise at the seat of the arbitration. The relief is not treated as ancillary to an English judgment which is for these purposes to be treated in the same way as a judgment of the English court determining the merits of a substantive dispute between a Claimant and a Defendant over whom it has assumed *in personam* jurisdiction. There is, in this context, a distinction between the two, which was emphasised by Lord Donaldson MR in the *Rosseel* case.

> (2) In such cases, it will rarely be appropriate to exercise jurisdiction to grant a freezing order where a Defendant has no assets here and owes no allegiance to the English court by the existence of *in personam* jurisdiction by domicile, or residence, or some other reason. Protective measures should normally be left to the courts where the assets are to be found or where the Defendant resides.

> (3) Where there is reason to believe that the Defendant has assets within the jurisdiction, the English court will often be the appropriate court to grant protective measures by way of a domestic freezing order over such assets. That is so, whether or not the Defendant is resident or, for some other reason, is someone over whom the English court would assume *in personam* jurisdiction.

> (4) Where the Defendant is resident within the jurisdiction or is someone over whom the court has or would assume *in personam* jurisdiction for some other reason, a worldwide freezing order may be granted applying the same principles as apply to the grant of such an order in aid of foreign substantive proceedings under s 25 of the Civil Jurisdiction and Judgments Act, as explained in the *Cuoghi*, *Motorola* and *Banco Nacional* cases.

> (5) Where the Defendant is neither resident within the jurisdiction nor someone over whom the court has or would assume *in personam* jurisdiction for some other reason, the court will only grant a freezing order extending to foreign assets in exceptional circumstances. It is likely to be necessary for the Applicant to establish at least three things:

CL-2019-000030,31

(a) That there is a real connecting link between the subject matter of the measures sought and the territorial jurisdiction of the English court, in the sense referred to in *Van Uden*.

(b) That the case is one where it is appropriate within the limits of comity for the English court to act as the international policeman in relation to assets abroad. That role will not be appropriate unless it is practical for an order to be made, and unless the order can be enforced in practice if it is disobeyed. The court will not make an order, even if within the limits of comity, if there is no effective sanction it could apply if the order were disobeyed. That may often be the case if the Defendant has no presence or assets within the jurisdiction.

(c) The court will only grant worldwide relief if it is just and expedient to do so, taking into account the discretionary factors identified at para 115 of the judgment in the *Motorola* case. They are:

(1) whether the making of the order will interfere with the management of the case in the primary court, eg where the order is inconsistent with an order in the primary court or overlaps with it;

(2) whether it is the policy in the primary jurisdiction not itself to make worldwide freezing/disclosure orders;

(3) whether there is a danger that the orders made will give rise to disharmony or confusion and/or risk of conflicting, inconsistent or overlapping orders in other jurisdictions, in particular the courts of the state where the person enjoined resides or where the assets affected are located;

(4) whether at the time the order is sought there is likely to be a potential conflict as to jurisdiction rendering it inappropriate and inexpedient to make a worldwide order; and

(5) whether, in a case where jurisdiction is resisted and disobedience to be expected, the court will be making an order which it cannot enforce."

73.    There was no dispute that this is a good summary of the relevant principles. There are, however, a number of matters that I consider to be important in that context. First, as is clear from paragraph [44] of the judgment, Popplewell J. was not considering a case of "international fraud". Secondly, it is clear from cases such as *Republic of Haiti v Duvalier* that in cases of international fraud, the English court may be more willing to intervene. In *Mobil Cerro Negro Ltd. v Petroleos de Venezuela SA,* Walker J. indicated that in cases of international fraud, the court would not look for such strong connecting factor with England as it would in other cases: see in particular paragraphs [86], [119], [120-122] and [155] of the judgment. Thirdly, the present case is not a case where s. 25 of the Civil Jurisdiction and Judgments Act is directly applicable, and therefore the

CL-2019-000030,31

decision in *Van Uden Maritime BV v Kommanditgesellschaft in Firma Deco-Line* (Case C-391/95) [1999] QB 1225, does not provide a constraint of requiring a real connecting link between the subject matter of the measures sought and the territorial jurisdiction of the English court. Mr. Peto was correct to say that ultimately the question is governed by the s.37 (1) discretion: i.e. what is just and convenient. Fourthly, Popplewell J. was careful not to lay down prescriptive rules as to when the court would intervene. He recognised, consistently with the authorities, that the court could grant a freezing order relating to foreign assets in "exceptional circumstances". He then identified a number of matters which he considered "likely to be necessary".

74.    A number of the authorities in this area were considered by Butcher J. on the without notice application. He was already familiar with the relevant issues as a result of his judgment in *Eastern European Engineering Ltd v Vijay Construction (Pty) Ltd.* He regarded the present case as analogous to a case of international fraud, and in my judgment he was right to do so. Indeed, the evidence in that regard has in my view strengthened since the without notice application. At that time, AMUSA and Butcher J. were aware of the earlier stages of the transactions by which Essar Steel divested itself of Essar India. They were not, however, aware of the restated 2015 accounts reflecting an attempt to dissipate one of Essar Steel's major assets, shortly after the commencement of the arbitration proceedings which have ultimately led to the unsatisfied English judgment in this case.

75.    There is no precise definition of what is meant by the phrase "international fraud" found in the case-law, but I do not consider that it is confined to cases where the underlying cause of action is a claim in deceit or a proprietary claim relating to the theft of assets. If there is a strong case of serious wrongdoing comprising conduct on a large or repeated scale whereby a company, or the group of which it is a member, is acting in a manner prejudicial to its creditors, and in bad faith, then I see no reason why the English court should not be willing to intervene rather than to stand by and allow the conduct to continue and, to put the matter colloquially, to let the wrongdoer get away with it. In the present case, I would regard the attempted dissipation of Essar Steel's US$ 1.5 billion asset, in the face of the commencement of arbitration proceedings, as sufficient in itself potentially to warrant intervention under the "international fraud" exception, or as constituting "exceptional circumstances". It is clear from *Duvalier* that the scale of the wrongdoing may be relevant to the question of whether the court should intervene: see per Staughton LJ at page 217. The other examples (Algoma, Numetal, DRI) of conduct, in different jurisdictions, which was fraudulent or prejudicial to creditors, reinforces the conclusion that there are exceptional circumstances applicable in the present case.

76.    Of course, there are other factors potentially at play in the exercise of the court's ultimate discretion, for example the likelihood that its orders will be obeyed or the danger of conflict with the courts of other jurisdictions. In the present case, I consider that these favour the exercise of the court's jurisdiction, and that none of the countervailing arguments have persuaded me otherwise.

77.    First, this is a case where it is practical for an order to be made, and for the order to be enforced in practice if it is disobeyed. Indeed, Essar Steel did not contend to the contrary. In fact, the various Respondents and Defendants were in different ways keen to emphasise, in particular, that they had responded properly and in a timely fashion to

<u>MR JUSTICE JACOBS</u>
**Approved Judgment**

CL-2019-000030,31

the various orders which the court had made, thereby seeking to persuade the court that there was no sufficient reason for the stringent orders which the court had made.

78. Secondly, this is a case where AMUSA has already been able to act effectively. It has obtained documentation as a result of the search order and disclosures made pursuant to the court's orders. These have provided, it seems to me, important information which enables AMUSA to identify and pursue at least one major asset of Essar Steel, namely the US$ 1.5 billion receivable. The fact that AMUSA has already obtained important information reflects the core reason why AMUSA took proceedings in this jurisdiction. Whilst it appears to be the case that Essar Steel itself does not carry on business in England, and has no substantial assets here, there are nevertheless material connections between Essar Steel and this jurisdiction. For some time, professional services were provided to Essar Steel and its ultimate parent EGFL by Essar Capital Services operating from Lansdowne House in London. Essar Capital Services employed a number of professional staff whose services were provided to other entities pursuant to various service agreements. Amongst the professionals who were employed by this company are Mr. Seifert, Mr. Wright and Mr. Harrold, all of whom live in England. By mid-2016, Essar Capital Services had largely wound down its role of employing London-based professional employees, but it had not done so completely: the final professional employee did not leave until March 2017. During the time that these professionals were employed, Essar Capital Services was party to a shared services agreement with another Essar Group company relating to the premises at Lansdowne House, and this is where these professionals worked. There is a server at Lansdowne House, referred to in these proceedings as the "Oil server", and this holds documents that were generated or saved by employees based at Lansdowne House, which previously included Essar Capital Services employees when it had professional employees.

79. There are therefore within this jurisdiction relevant documents relating to Essar Steel's assets, as well as senior people who have been involved with the business in the past and who are likely to have knowledge of those assets and what has become of them. In addition, the Ruia family maintains a residence here, Prashant visits London, and both Prashant and Mr. Baid are directors of English companies and have given an address for service within the jurisdiction which can be utilised pursuant to s. 1140 of the Companies Act 2006.

80. Thirdly, I was not impressed by the submission that proceedings should have been brought in Minnesota. There was no evidence adduced by Essar Steel, or otherwise, that the Minnesota court would contemplate granting effective extraterritorial relief including relief that would be effective in England. Paragraph 80 of the decision in *Motorola* shows that it cannot be assumed that that a US court has the same ability or willingness as an English court to grant a freezing order. It is clear on the authorities that the fact that a foreign court has no jurisdiction to grant WFO does not preclude the English court from exercising its jurisdiction to do so. Indeed, this is likely to be a factor in favour of granting worldwide freezing relief: see *Motorola* at [119]. This is not a case where the Minnesota court has refused relief on its merits, or where there is evidence that it would be likely to refuse relief on its merits, in which case different considerations might possibly apply: see *Refco Inc v Eastern Trading Co.* [1999] 1 Lloyd's Rep 159 172 (Morritt LJ).

81.   Fourthly, the position is somewhat different in relation to Mauritius, where there was evidence that Mauritian courts could, as a matter of principle, grant WFO. AMUSA's evidence before Butcher J. from Mr. Nouroozi was that he did not believe that the Mauritian courts would be offended or regard their process as being interfered with by the relief sought on the WFO application. Mr. Nouroozi pointed out that the Mauritian courts had a similar power to grant freezing orders and ancillary relief, including on a worldwide basis. Although Mr. Toledano criticised this evidence as unsatisfactory, I did not think that there was any force in that criticism. Essar Steel has not adduced any evidence for the present hearing which contradicts Mr. Nouroozi's evidence in that regard and I consider that I am entitled to proceed on the basis of the evidence that the Mauritian courts would not regard the WFO as offensive in some way. After all, if the Mauritian courts are themselves willing to grant WFOs, that is a good reason for thinking that they would not regard the grant of a WFO by an English court as offensive. The WFO does not presently conflict with any order of the Mauritian courts, and this is not a case where the Mauritian courts have refused equivalent relief or where there is evidence that those courts would be likely to do so.

82.   In those circumstances, the fact that there is a possibility of obtaining relief from the Mauritian courts seems to me to be at most a neutral factor when it comes to the question of whether relief in the form of a WFO is just and convenient. I certainly see no reason why the court should decline to exercise its powers because of the possibility of relief being granted by the Mauritian courts, particularly since it is difficult to see how any such relief could have been anything like as effective as the relief which the English court has granted, given the presence in this jurisdiction of Lansdowne House, documents and people with the relevant knowledge. For example, one of the items which was secured as a result of the search order was the laptop computer of Mr. Wright, notwithstanding (as described below) Ms. Popat's suggestion that this should be hidden. That computer has been secured as a result of an effective order which this court was able to grant. It is by no means clear that any order of the Mauritian courts would have had a similar effect.

83.   It may be that, in due course, the present WFO granted by this court could be replaced by an order of the Mauritian courts, particularly if those courts grant permission to enforce the arbitration award and if further proceedings to do so are then taken in Mauritius. The present injunction will therefore not necessarily continue until (see *Haiti* at 214) the "crack of doom". The present stage of the proceedings is directed at the freezing of Essar Steel's assets, with a view to enforcement of an award which has now become an English judgment debt. In the light of the conclusions which I have reached in this judgment, it is clearly important that potential assets are identified so that there can be enforcement in due course. As I have said, there is no present conflict with any order of the Mauritian courts, and the evidence indicates that the Mauritian courts would not be offended by the grant of the WFO. In these circumstances, I consider that it is just and convenient to grant an injunction to ensure that the position is secured, notwithstanding the possibility that subsequent developments in Mauritius may conceivably result in this court revisiting the issue.

**D: Non-disclosure**

84.   The relevant principles concerning material non-disclosure in the context of a without notice application are set out in the judgment of Ralph Gibson LJ in *Brink's Mat Ltd v Elcombe* [1988] 1 WLR 1350, 1356–7. The material facts are those which it is material

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

for the judge to know in dealing with the application as made, and an applicant must make proper inquiries before making the application. Ralph Gibson LJ's sixth and seventh principles were as follows:

> (6) Whether the fact not disclosed is of sufficient materiality to justify or require immediate discharge of the order without examination of the merits depends upon the importance of the fact to the issues which were to be decided by the judge upon the application. The answer to the question whether the non-disclosure was innocent, in the sense that the fact was not known to the applicant or that its relevance was not perceived, is an important consideration but not decisive by reason of the duty upon the applicant to make all proper inquiries and to give careful consideration to the case being presented.

> (7) Finally "it is not for every omission that the injunction will be automatically discharged. A locus poenitentiae may sometimes be afforded" : per Lord Denning MR: Bank Mellat v. Nikpour at page 90. The court has a discretion, notwithstanding proof of material non-disclosure which justifies or requires the immediate discharge of the ex parte order, nevertheless to continue the order, or to make a new order on terms.

>> "Where the whole of the facts, including that of the original non-disclosure are before (the court), it may well grant a second injunction if the original non-disclosure was innocent and if an injunction could properly be granted even had the facts been disclosed": per Glidewell L.J.: *Lloyds Bowmaker Ltd. v. Britannia Arrow Holdings PLC*".

85. Applying these principles, I do not consider that there was any fact which was not disclosed which was of sufficient materiality to justify or require immediate discharge of the order, and in any event, I would exercise my discretion in favour of continuing the order.

86. The first non-disclosure alleged concerns statements at the without notice application to the effect that England was the nerve centre for the management of group investments, that Essar Steel was being administered from England and that England was where the investment management centre was. It is said that these statements were speculation, largely based on the presence here of other Essar Group companies. In fact, Mr. Nouroozi's first Affidavit set out what in my view is a fair summary of the information that was available from Companies House as to the business of Essar Capital Services. This included the fact that Essar Capital Services had previously provided management services to EGFL and associated companies, and that it had subsequently entered into a service agreement with ECL under which it appeared that similar services were provided. The continuing provision of services, of some considerable value, is recorded in the accounts of Essar Capital Services for the year ended 31 March 2017, which were signed by Mr. Baid on 25 January 2018. These accounts include the statement that Essar Capital Services' "principal activity is to provide exclusive investment management services to Essar Capital Limited". The value of such services was over £ 5 million in 2016, and £ 3.7 million in 2017. The

CL-2019-000030,31

filings also include identification of a number of active directors with addresses in different parts of the world. It seems to me that AMUSA made appropriate enquiries and presented the evidence fairly to Butcher J.. The fact that more detailed evidence has now been forthcoming from Mr. Baid and others, and that this evidence suggests (contrary to the impression from the accounts filed in January 2018) that no significant professional services are now provided by Essar Capital Services, does not mean that there was a material non-disclosure by AMUSA.

87.     Essar Steel's second point concerns AMUSA's failure to explain why it did not seek relief in existing proceedings in Mauritius, only to offer an unconvincing ex post facto explanation. I reject this argument. Mr. Nouroozi's first Affidavit contains a detailed account of the proceedings which had taken place both in Mauritius and Minnesota. It identified a number of possible arguments which could be raised by Essar Steel, including that the case was insufficiently connected to England to make it just and convenient to grant the relief sought. In that context, reference was made to paragraph 162 of Mr. Nouroozi's Affidavit, which acknowledged that AMUSA had not hitherto identified evidence that Essar Steel had assets within the jurisdiction or that any of its assets were transferred at an undervalue to related parties within the jurisdiction. In paragraphs 170 – 174, Mr. Nouroozi explained why, nevertheless, it would not be inexpedient for the English court to grant the relief sought. These paragraphs address the position in Mauritius and correctly state that there was no conflict between the relief sought and any existing orders in Mauritius or Minnesota. He also states that he did not believe that the Mauritian courts would be offended or regard their processes as being interfered with by the relief sought. As I have said, this statement has not been the subject of any contrary evidence from Essar Steel. In these circumstances, there is no substance in the allegation of non-disclosure.

88.     It is true that in Mr. Nouroozi's second witness statement, he identifies a difficulty (concerning the inability to deploy Essar Steel's 2015 accounts) in bringing proceedings in Mauritius. This difficulty was not identified in his first Affidavit. However, Mr. Peto explained that these particular difficulties had not been identified at the time when the application to Butcher J. was made, and in those circumstances, I do not see how they are relevant to a case of material non-disclosure or how they materially advance Essar Steel's case.

89.     Thirdly, Essar Steel alleges that the court was wrongly told that Mr. Bell was a current director of EGFL, and that insufficient enquiries were made as to whether that was still the case. Mr. Bell has raised a similar point in connection with the order made against him. I reject that argument for the reasons set out below in the context of the order against Mr. Bell.

90.     Fourthly, it is alleged that AMUSA's legal submissions on the nature of the jurisdiction were inadequate and incomplete. It is said that there was inadequate citation of the authorities concerning the circumstances in which the court will make a freezing order in support of a foreign arbitration award. The position here is that Butcher J. was familiar with this argument, having decided the *Eastern European Engineering Ltd. v Vijay* case, in which a number of the authorities are discussed. Paragraph 144 of AMUSA's skeleton in support of the application expressly referred to that case in the context of whether it was inexpedient for the court to grant the relief sought. Given his familiarity with this area of the law, Butcher J. invited some further submissions from AMUSA on the day of the application and these were provided. Butcher J. then made

CL-2019-000030,31

his decision in circumstances where he was fully aware of the point, and potential argument of Essar Steel. In these circumstances I cannot accept that there has been any material non-disclosure. There is a separate question as to whether it was appropriate for the WFO to be made in the light of these authorities, and for reasons set out in Section C above I have held that it was.

91.    Fifthly, it is said that AMUSA failed to explain that paragraph 9 of the WFO was a departure from the standard form, and the jurisdictional basis for it, when it does not actually police the WFO. It is not clear whether or not Butcher J. was provided with a draft of the WFO which showed changes from the standard form. However, as an experienced commercial judge, he would have appreciated that paragraph 9 went beyond the standard form. Whilst there may be arguments as to whether paragraph 9 looks too far back in time, I consider for reasons set out elsewhere in this judgment that the function of paragraph 9 is to police the WFO.

92.    Sixthly, it is said that AMUSA failed to draw the court's attention to a lack of clarity in the WFO. I cannot see how this can be a non-disclosure. The judge was fully aware of the terms of the order that he was being asked to make, and would not have made it in those terms if he had considered it to be unclear.

93.    Finally, Essar Steel rely upon the admitted error by AMUSA in identifying CPR 62.5 (1) (c) as a jurisdictional gateway for the freezing order. However, the decision in *Vijay* establishes that it was not necessary for AMUSA to identify and rely upon any jurisdictional gateway and therefore this error was immaterial. If the correct position in law had been identified to the judge, and *Vijay* cited in that context, the WFO would obviously still have been made.

94.    I therefore reject the case on non-disclosure. It follows that, in principle, the WFO should remain in place.

**E: Scope of paragraph 9 of the WFO**

95.    Issues arise as to the width of paragraph 9 of the WFO. Similar issues were raised as to the width of aspects of the search and *Norwich Pharmacal* orders. However, the parties were essentially agreed that for present purposes I should consider the question of whether the various orders should be discharged in whole. If, as I have decided, they should remain in place, then submissions can in due course be made as to whether paragraph 9 should be narrowed.

**F: The search order**

96.    As previously indicated, it was agreed at the hearing that I should presently address the question of whether the search order should have been granted as a matter of principle. Questions will arise in due course as to the width of the search order.

97.    The case-law has consistently stressed that a search order is an exceptional, not a routine, order, and that it is one that requires careful justification. There was no dispute as to the requirements that need to be satisfied. These are set out in the *White Book*, vol 2, at paragraph 15–91, quoting Warren J. in *Indicii Salus Ltd v Chandrakeharan* [2006] EWHC 521 (Ch). That passage was in turn recently approved by the Chancellor in *MX1 Ltd v Farazhad* [2018] 3 WLUK 744 at [40].

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

98.    Mr. Stanley QC, who presented the principal argument in relation to the search order, summarised the requirements as follows:

    a.    A strong prima facie case that there is a civil cause of action. That must relate, presumably to the case on the merits in the proceedings.

    b.    A serious "danger to the claimant" that the order will avoid: the evidence to be preserved must be "of major, if not critical, importance".

    c.    Clear evidence that the respondent to the order possesses "incriminating documents or things". For "incriminating" one should probably substitute "relevant evidence", having the characteristics set out above, i.e. "relevant evidence of major, if not critical, importance".

    d.    A "real possibility" that that evidence will be destroyed if the relief is not given.

    e.    Proportionality: that the harm to the respondent will not be out of proportion to the legitimate object of the order.

99.    I agree with this summary. It is also clear that unless those conditions are satisfied, an order should be refused. If they are satisfied, an order may or may not be granted: it remains a matter of discretion.

100.    However, before addressing those requirements, Mr. Stanley raised a threshold point. The statutory basis for a search order is s.7 of the Civil Procedure Act 1997. This provides, so far as material to the present issues, that the court may:

       "Make an order under this section for the purpose of securing, in the case of any existing or proposed proceedings in the court –
       (a) the preservation of evidence which is or may be relevant"

In s 7 (8), the "court" was defined as "the High Court". Mr. Stanley submitted that the evidence therefore had to be such as to be relevant or "may be" relevant to English proceedings, rather than foreign proceedings. It followed from this submission that if the WFO fell away, there were no existing or proposed proceedings in England to which the evidence was or may be relevant. This was essentially because there was no realistic case that AMUSA would be taking enforcement measures in English proceedings. Enforcement would likely take place in other jurisdictions, for example Mauritius (the place of incorporation of Essar Steel) or the Cayman Islands (where EGFL were incorporated).

101.    I considered that this submission had considerable force. It is, however, unnecessary to consider whether or not there is a real prospect of enforcement measures in England. This is because if, as I have concluded, the WFO is to remain in place, there are existing English proceedings to which a search order can be ancillary pursuant to s. 7. I see no reason why a search order cannot be ancillary to proceedings, such as the present proceedings, in which a WFO has been granted and which is to remain in place. The important question is whether the evidence to be preserved is, or may be, relevant to those proceedings. Against that background, I turn to the various requirements summarised above.

102. The first requirement is that there should be a strong prima facie case that there is a civil cause of action. In the present case, there is an unanswerable case that there is such a cause of action, since AMUSA has obtained an English judgment. There is also, in so far as relevant, more than a strong prima facie case that a WFO should be granted: Butcher J. granted a WFO, and I have concluded that it should not be discharged.

103. The second (a serious danger to the claimant that the order will avoid) and fourth (a real possibility of destruction) requirements can be considered together, because they are related. Mr. Stanley focused in particular on the requirement that the evidence must be of "major, if not critical, importance". It seems to me that, given the relationship between Essar Capital Services and Essar Steel, AMUSA was entitled to consider that Lansdowne House would contain evidence of major if not critical importance in relation to identification of Essar Steel's assets, and hence the policing of the WFO. Mr. Stanley sought to draw a distinction between Essar Steel's current assets, and assets that had been disposed of in the past. He suggested that the real purpose of the search order was to attempt to collect evidence in support of a case which related to past disposals, and which would almost certainly not be made in England. This had nothing to do with policing the WFO, which could be the only legitimate purpose of a search order.

104. In my judgment, however, it is not possible to draw a hard and fast distinction between past disposals and Essar Steel's current assets. As Mr. Peto submitted, a past disposal may for one reason or another have been ineffective, or a sham, such as to give rise to a current claim by Essar Steel itself whether on the basis that the property is held on trust or otherwise. The $ 1.5 billion receivable provides a good illustration of this. The original 2015 accounts show the existence of the asset. The 2016 accounts, restating the 2015 accounts, purport to show that the asset is no longer there. The surrounding documentation, some of which has now been produced as a result of the search order, provides evidence that the purported consideration for the disposal was a proposed share buy-back. Other documentation is likely to reveal that this transaction has been ineffective, as Mr. Baid's evidence confirms. This information enables AMUSA to contend that Essar Steel still has a valuable asset, and it is in a position to give notice to relevant third parties within the Essar Group aimed to prevent any dissipation of this asset, whether by release, assignment or otherwise.

105. It also follows from these considerations that the respondents to the order possess relevant evidence of major, if not critical importance. That evidence relates to the existence of assets currently held by Essar Steel and the related question of prior disposals. It is true that the search order is drawn broadly, but this is inevitable in circumstances where AMUSA had no relevant information as to Essar Steel's assets.

106. As to risk of destruction, it seems to me that the matters which I have already described, in the context of the evidence as to a very serious risk of dissipation, are pertinent to this question. If there is solid evidence of serious wrongdoing which is analogous to international fraud, then that provides at least a starting point for serious concerns as to the risk of destruction of documents. I have already described the circumstances in which, as I have concluded, the original 2015 accounts were withheld from production in the arbitration, and the Tribunal was invited to proceed on the basis of accounts which Essar Steel knew had been restated. But in addition to these matters, there are two other aspects of events which reinforce the conclusion that there is a real possibility that evidence will be destroyed. I take them chronologically. The first was known to Butcher J. at the time of the without notice application, and was the subject of detailed evidence

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

from Mr. Nouroozi in paragraph 53 of his affidavit in support of the application. The second was not, because it arises from events at the time of the search itself.

## Mr. Vuppuluri's documents

107.    One of Essar Steel's two official representatives for the arbitral proceedings was Mr. Madhu Vuppuluri, a senior Essar Group employee who was identified in the arbitration award as the President and CEO of Essar Steel. Mr. Vuppuluri had also been ESML's President and CEO prior to that company being put into Chapter 11, and he had been the primary point of contact for AMUSA in respect of the Nashwauk Project.

108.    In the course of the arbitration, AMUSA sought, in substance, ESML documentation either from Essar Steel itself or from Mr. Vuppuluri. On 28 March 2017, Mr. Wright on behalf of Essar Steel wrote to the Tribunal saying that neither Essar Steel nor Mr. Vuppuluri had access to the vast majority of relevant project documentation. It was said that all of Mr. Vuppuluri's papers and computers were the property of ESML. Essar Steel indicated that it would write to the bankruptcy administrator of ESML in order to obtain documentation, but that if information was not forthcoming or was delayed, then Essar Steel's ability to participate properly and fully in the dispute would be severely prejudiced. In a subsequent letter dated 16 May 2017, which was sent after it had written to ESML's bankruptcy administrator, Essar Steel stated that it had very little documentation that it could produce unless and until it received co-operation from ESML. This position was in substance reiterated in Essar Steel's responses to AMUSA's requests for disclosure of relevant and material information.

109.    This position was not accepted by AMUSA. AMUSA had learned from lawyers acting for the bankruptcy trustee of ESML that Mr. Vuppuluri retained access to his emails and other files in connection with his duties at ESML. AMUSA was told that Mr. Vuppuluri still had his ESML laptop, which had been copied by ESML and returned to him. They also learned that his Essar email account (that he had used at ESML pre-bankruptcy) was associated with the domain of one of Essar Steel's affiliates, not ESML, and thus Mr. Vuppuluri could continue to access and use it. In the light of that information, the statement made to the Tribunal by Essar Steel in its March 2017 letter, that Mr. Vuppuluri had no access to the relevant project correspondence and documents, appeared false.

110.    The Tribunal in due course overruled Essar Steel's objections to production in its Procedural Order No. 3 issued on 9 August 2017, which was the day that Essar Steel withdrew from the arbitration. The Tribunal also identified various ways in which Essar Steel could obtain ESML documentation. The Tribunal specifically referred to Mr. Vuppuluri's continuing access to his email and computer:

> "In their August 1 letter, counsel for ArcelorMittal responded that they have discussed with ESML counsel the question of Essar's Mr. Vuppuluri's continuing access to his email and computer and have been assured that such access is available and unimpeded".

111.    It is now accepted by Mr. Baid, on behalf of Essar Steel, that Mr. Vuppuluri did have continuing access to his emails. In paragraphs 9 and 10 of his second Affidavit in the Mauritian enforcement proceedings, Mr. Baid said as follows:

CL-2019-000030,31

"I have been able to discuss matte rs further with Mr. Vuppuluri, having reviewed the contents of Mr. Lazar's witness statement. Mr. Vuppuluri has confirmed that his laptop was indeed returned to him by ESML and that he has continued to use the same email address since the bankruptcy. At the time the letter dated 28 March 2017 that I referred to in Baid 1 was drafted, ESL did not appreciate this to be the case. I am informed by Mr. Vuppuluri that at the time his laptop was returned to him, he assumed that it had been "wiped" and that he has not used it since its return. It has only become apparent to him that this is not in fact the case on recently checking the position.

In paragraph 11 of Lazar1, AMUSA states that in June 2017, Mr. Pauker's counsel, White & Case LLP, told AMUSA's representative that Mr. Vuppuluri still had access to emails and documents. The contents of these communications were never relayed to Essar Steel. I note that Mr. Lazar does not explain why AMUSA chose to withhold from Essar Steel the fact and content of these communications. Had the contents of these communications been relayed at the time, the position in this regard might have been clarified with Mr. Vuppuluri somewhat earlier."

112.    These passages in his second Affidavit were in effect a correction to what Mr. Baid had said on oath in his first Affidavit in those proceedings, where he had relied upon what was said by Essar Steel in the 28 March 2017 letter to the Tribunal.

113.    I consider that this aspect of the arbitration proceedings provides solid and powerful evidence in support of AMUSA's case that documentation relating to ESML, and available on Mr. Vuppuluri's computer, was deliberately withheld from production, and that deliberately false information was given to the Tribunal in the 28 March 2017 letter as to the availability of that information. If, as Essar Steel now accepts, Mr. Vuppuluri did in fact have access via his computer and email, it is somewhat remarkable that the contrary should have been stated in the letter dated 28 March 2017, and then reiterated in the response to AMUSA's request for production of documentation. In saying this, I should emphasise that I am not making a definitive fact-finding that documentation was deliberately withheld and that false information was deliberately given. It is theoretically possible that, if the matter were to be investigated in detail, with the benefit of cross-examination of Mr. Baid and Mr. Vuppuluri, a court might accept the innocent explanation put forward by Mr. Baid in his Affidavit in the Mauritian proceedings and repeated in substance in his first witness statement in these proceedings. However, I do agree with Mr. Peto's submission that the account given by Mr. Baid is a "very unlikely story". At its lowest, the episode indicates a cavalier attitude on the part of Essar Steel and Mr. Vuppuluri to the production of relevant documents, since it would not have been difficult – and indeed was incumbent on both of them – to check what the position actually was.

114.    I was also unimpressed with Mr. Baid's attempt to criticise AMUSA for not having brought to Essar Steel's attention the fact that Mr. Vuppuluri still had access to emails and documents. AMUSA's Redfern schedule response stated clearly that it was their understanding that Mr. Vuppuluri "has access to his emails and other files in connection

with his duties at Essar Minnesota." The Tribunal's Procedural Order No. 3 referred to a letter dated 1 August 2017 from counsel to AMUSA stating that they had discussed with ESML counsel the question of Mr. Vuppuluri's continuing access to his email and computer and had been assured that such access was available and unimpeded.

115. The existence of solid and powerful evidence as to the deliberate withholding of documentation, and deliberately false information having been given to the Tribunal, is in my view highly material to the issue of whether THERE is a real possibility of destruction, and is supportive of AMUSA's case in that regard.

The response to the search order

116. The search order was executed at 9.20 a.m. on the morning of 16 January 2019. At 09.53 that morning, Ms. Popat – who was the receptionist on the front desk and apparently an employee of Essar Oil – sent the following email to Mr. Sanjiv Radia. Mr. Radia is a qualified non-practising solicitor who works for ECL (the Cayman Islands company), and who was working at Lansdowne House at the time. Ms. Popat's email to him stated, succinctly:

"hide all docs for ecsl asap as soon as you come in".

117. Some 3 hours later, Ms. Popat sent a further email to Mr. Radia:

"you need to hide andres pc i think".

118. This e-mail contained a typo, but it was common ground that the reference to "andres pc" was a reference to the computer (a laptop) of Mr. Wright. The evidence was that this particular email was subsequently deleted both from Ms. Popat's computer and from Mr. Radia's computer, although in due course it was possible to recover it. In an Affidavit served by Ms. Popat subsequent to the hearing, in the context of committal proceedings which AMUSA had commenced against her, Ms. Popat said that she had deleted the email both from her computer and Mr. Radia's computer.

119. AMUSA attached considerable significance to these two emails, including the deletion of the second email by Ms. Popat with the active consent of Mr. Radia. They submitted that this showed that Butcher J. was quite right in his instinct that this was an appropriate case for a search order because there was a real possibility that documents would be destroyed. They also relied upon the fact that the emails were sent by an Essar Oil employee to an ECL employee, but relating to the need to hide the documents of a different UK company Essar Capital Services. *This showed that the Essar Group did not in practice draw distinctions between the various Essar corporate entities.*

120. Mr. Stanley on behalf of Essar Capital Services did not seek to minimise the seriousness of what had occurred. He recognised the "forensic embarrassment" created by these documents. But he submitted that Ms. Popat was a junior employee who had acted foolishly, and that there had been equally foolish concealment of that by a more senior employee who certainly should have known better. The second email was deleted by or with the agreement of Mr. Radia because, in effect, Ms. Popat begged him to do so, having realised that it was improper for her to have sent it and having appreciated that it might have very serious repercussions for her. Therefore these events told one very little. More significant was the fact that the suggestions of Ms. Popat had not in fact

MR JUSTICE JACOBS
Approved Judgment

CL-2019-000030,31

been acted upon: documents were produced, and Mr. Wright's laptop was not concealed but has been imaged and is being searched.

121.   As with many aspects of this case, it is not appropriate or indeed possible for me to make definitive fact-findings relating to the state of mind of these two individuals, or why they acted as they did. This is reinforced by the consideration that AMUSA have commenced committal proceedings against Ms. Popat, and are likely to do so against Mr. Radia. Indeed, on Friday 15 March (i.e. after the conclusion of the hearing to discharge the orders) I gave directions in the committal proceedings which will lead to a hearing which is presently estimated to last one and half days (to include the proposed proceedings against Mr. Radia).

122.   Ultimately, the question which I am considering in the present context is whether there is a real possibility that evidence will be destroyed if the relief is not given. I consider that the content of the two emails, and the subsequent destruction of one of those emails, provides very solid evidence of that real possibility. These emails were, after all, sent after a court order had been made and served, with a penal notice attached. If such emails could be sent after a court order, it is not difficult to imagine what might have happened if there had been no court order for preservation. The suggestion that the first email was a panicked immediate reaction by Ms. Popat to the search order is a matter that is likely to arise for consideration at the committal hearing, and again it is not appropriate for me to express any views about that. However, I note that by 09.53 that morning Ms. Popat was not the senior person dealing with the search order. By that time, Ms. Samantha Chambers, who was a qualified solicitor and legal counsel to and the company secretary of Essar Oil, had arrived and was engaged in discussions with Mr. Warburton who was one of the solicitors supervising the search order. It is therefore perhaps somewhat surprising that Ms. Popat should be panicking, since a qualified lawyer was dealing with the search order. But even if the first email was sent without sufficient thought and in a panic, it is difficult to see how that explanation could apply to the second email. That was sent some 3 hours later, after there must have been time for reflection. The deletion of that email occurred some time after that.

123.   It seems to me that this episode does provide evidence which reflects adversely upon the culture within the Essar Group, and that it is therefore consistent with the other evidence (already described) as to bad faith, conduct prejudicial to creditors, and the deliberate withholding or concealment of documentation.

Other issues relating to the search order and conclusions

124.   There are a number of remaining issues concerning the search order.

125.   First, it is a requirement that the search order should be proportional; so that the harm to the respondent is not out of proportion to the legitimate object of the order. In principle, it seems to me that a search order of some width is proportional. Questions as to the precise width, and whether this particular order should be cut back to some degree, are to be addressed at a subsequent stage in the light of my decision as to the principle. In that context, my conclusion that the proper function of the search order is to support the WFO, rather than to provide evidence in support of enforcement proceedings elsewhere, may well result in a narrowing of the search order as well as (as further discussed below) the *Norwich Pharmacal* order.

126.   Secondly, Mr. Stanley for Essar Capital Services argued that there had been material
       non-disclosure at the without notice stage. He submitted that the judge was given the
       impression that AMUSA had only recently learned of wrongdoing, whereas in fact the
       essential material deployed in support of the application had been deployed in
       proceedings brought in Minnesota in March 2018. The claim in those Minnesota
       proceedings, which were separate from other proceedings in Minnesota to enforce the
       award, was to pierce the corporate veil. In so doing, AMUSA relied upon evidence of
       asset-stripping. Those proceedings had been dismissed on forum non conveniens
       grounds. In the context of the present application, the past history demonstrated that
       there could be no genuinely held belief that Essar companies would destroy documents,
       since nothing had been done to prevent them from doing so for many months. It was
       submitted that this should have been made clear.

127.   I do not consider that there was material non-disclosure. Even if there was, I would not
       consider it appropriate to discharge the search order in the exercise of my discretion. I
       do not think that Butcher J. was given the impression that the application was based
       exclusively or even principally upon recently-discovered material. It would have been
       apparent, for example, that the Algoma judgment (March 2017) was not recent, whereas
       the judgment of the Supreme Court of India (October 2018) was. Mr. Nouroozi's first
       Affidavit did disclose that the proceedings that had been brought in Minnesota in March
       2018; that these proceedings were in respect of what AMUSA alleged in broad
       summary to be the misuse of corporate arrangements at Essar Group to its detriment;
       and that the proceedings had been dismissed on grounds of lack of personal jurisdiction
       and forum non conveniens. A copy of the Complaint made in those proceedings was
       exhibited to that Affidavit. I do not consider that it would have made any material
       difference to the outcome of the application if Butcher J. had been given more details
       of precisely when all the information relied upon had come to light.

128.   Nor do I consider that there is any force in the point that the existence of prior
       proceedings meant that Essar Steel would have long been alerted to the contentions
       made, and that therefore there could have been no real belief that documents would be
       destroyed. I have no reason to doubt that AMUSA did genuinely consider that there
       was a real possibility of destruction, and for reasons already given I consider that the
       evidence justifies this conclusion. Furthermore, although it is true that AMUSA had
       started proceedings in other jurisdictions, not only Minnesota but also Mauritius, they
       had given no prior notice of any intention to start proceedings in England. There had
       therefore been nothing in the nature of a "tipping off" which might have meant that
       steps might already have been taken to destroy documents in London. Ms. Popat's
       emails, described above, are indicative that what happened in London took the Essar
       Group by surprise, notwithstanding proceedings elsewhere.

129.   Thirdly, Mr. McGrath QC for Prashant and Mr. Baid made extensive submissions to
       the effect that the search orders be discharged as against them, even if the search order
       could be justified as against Essar Capital Services. Mr. McGrath's basic point,
       expounded at some length and in considerable detail, was that there needed to be
       personal service of the search orders upon his clients. The way in which AMUSA
       proceeded was improper in the context of search orders. The CPR lays down various
       requirements as to the way in which these very intrusive orders are to be made and
       executed, with important safeguards for those who are recipients of such orders. Steps
       should have been taken to ensure, for example, that a Supervising Solicitor personally

explained the search orders to Prashant and Mr. Baid. Instead what happened was that they were purportedly served under the s. 1140 of the Companies Act 2006 by leaving documents at UK addresses which those individuals had provided, in circumstances where AMUSA knew that they would not be at those addresses. The search order was then executed at Lansdowne House, where neither Prashant nor Mr. Baid was. Mr. McGrath submitted that it was not permissible to serve such an order pursuant to s. 1140. But in any event, apart from sending relevant materials to them by e-mail, there was (wrongly) no attempt to ensure that the Supervising Solicitor spoke to them, or explained their rights.

130.    I consider that s. 1140 is wide in its scope, and that there is no basis as a matter of statutory construction for contending that it was impermissible for AMUSA to serve the present proceedings, including the search orders, on Prashant and Mr. Baid. The statute (s.1140 (1)) expressly permits service of "a document", and subsection (3) provides that the section "applies whatever the purpose of the document in question".

131.    That said, I consider that insufficient attention was paid by AMUSA to the consequences of executing a search order on Prashant and Mr. Baid in circumstances where it was known that they would not be present at the premises to be searched. Mr. McGrath reasonably argued that the terms of the order made applied to all of the respondents to the order. Thus, for example, paragraph 33 of the order provided that it "must be served by the Supervising Solicitor", and this did not happen.

132.    Ultimately, however, it seemed to me that Mr. McGrath's points were all highly technical in nature, and that there is no point of substance which would justify me in setting aside the search orders as against Prashant and Mr. Baid, notwithstanding that it will remain in place as against Essar Capital Services. It was clear from the skeleton argument in support of the without notice application that AMUSA did not anticipate serving Prashant or Mr. Baid personally within the jurisdiction. That is why AMUSA referred to s.1140 in some detail, emphasising (correctly in my view) that there was "no requirement under the statute that the director be resident or otherwise present in the jurisdiction in order to be served here". It was also of course clear from the application that the search would be carried out at Lansdowne House, which was described as the effective headquarters in this jurisdiction of the Essar Group. The likelihood that Prashant and Mr. Baid would be elsewhere, and the reason for making them party to the search orders, was explained to Butcher J. as follows:

> "Also the fact that your Lordship's preservation order can't preserve documents on line, even if we have the most obedient people in the world at Lansdowne House it doesn't stop necessarily people abroad like Mr. Baid and others being able to access clouds elsewhere and deny access by changing passwords they don't then tell people in London.
>
> So we have a window to be able to go in and get these documents and preserve them for enforcement, which if we end up with a preservation order and serve it, that is as good as a tip-off. And it means that people like Mr. Baid and others, they are beyond the scenes.

> That's really the reason why there is no effective enforcement
> otherwise. So in this case a preservation order won't carry the
> can.
>
> …
>
> It is a narrow window. If we can go in and if the gags work, you
> can't tip anybody off, you must tell us how we can get into these
> computers, we copy them before anyone outside can interfere.
> Then they are there for your Lordship and this court to decide
> what to do with them afterwards. And we can hear any
> objections."

133.    It seems to me that there were good reasons to make Prashant and Mr. Baid party to the
search orders, so as to try to prevent any outside interference by them with the relevant
servers or computer systems at Lansdowne House. Butcher J. would have understood
that they were not present in the jurisdiction, and he would not have been contemplating
personal service on these individuals, for example by a Supervising Solicitor boarding
a plane to wherever they might be and serving them abroad. As it was, they were
notified by email and knew about the orders at about 10.05 am on 16 January 2019.
They opened the orders minutes later. There is no evidence that they did not understand
the order, or that they were placed in any difficulty. The technical points raised by Mr.
McGrath in relation to the order do not seem to have caused Prashant or Mr. Baid any
prejudice.

134.    Moreover, I do not think that it is necessary, when a search order is executed, for all
respondents to be present or even to have been notified. Paragraph 5 of the order
required compliance not only by each respondent, but other persons defined as
"Controller of Access": namely, "any other person having responsible control of the
Premises or who has the knowledge or ability to give access to documents on any
Electronic Data Storage Device … situated on or remotely accessible from the
Premises".

135.    I was also persuaded that there were other good reasons why it was appropriate to make
these individuals party to the search orders. The search orders applied not only to
Lansdowne House, but also to "any other premises within the jurisdiction" identified
pursuant to paragraph 26 of this Order. It therefore applied to other places where "Listed
Items" (which I describe in more detail below) were located. It was therefore possible
that, for example, there would be disclosure of the existence of Listed Items at the
residence of Prashant in London.

136.    Accordingly, I decline to set aside the search orders made against any of the
respondents.

## G: The Norwich Pharmacal orders

137.    Butcher J. made three orders for the provision of information by parties other than Essar
Steel itself. It is convenient to start by describing the order made against the three
individual defendants, Mr. Seifert, Mr. Harrold and Mr. Wright, since these were the
simplest. A separate and wider order was made against another individual defendant,
Mr. Bell. However, during the course of the hearing Mr. Peto accepted that the order

relating to Mr. Bell should be no wider than the order against the other three individuals. This was an important concession, not least because Mr. Denton-Cox had understandably made forceful submissions both in writing and orally as to why Mr. Bell should be treated no differently to Mr. Seifert or Mr. Harrold, bearing in mind that Mr. Bell (like those other two gentlemen) no longer worked within the Essar Group.

138. Neither Mr. Seifert nor Mr. Harrold seek to discharge this order: their position is that they are willing to comply with it, that they have complied with it, and they seek only their costs of doing so pursuant to an express provision in Schedule B to the order which sets out the undertakings provided by AMUSA.

139. The order provided for the provision of information in different phases. The first phase, set out in paragraph 2, was the provision of information "immediately upon service of this Order upon him by the Supervising Solicitor", so far as each individual was aware and to the best of his knowledge and belief. The order permitted the defendants to delay giving this information for up to 3 hours for the purposes of seeking independent legal advice, or a longer period if agreed by the Supervising Solicitor. The information required was:

> "(a) Where the Listed Items (as defined in Schedule D) are located, whether those Listed Items are in his own custody or in the possession of someone else.
>
> (b) The name address and contact details of any person who has the information set out in paragraphs 2 (a) above".

140. Paragraph 6 of Schedule D set out what the "Listed Items" were, namely:

> "… all categories of document or information evidencing or relating to:-
>
> (a) Any direct or indirect disposal of Essar Steel Limited's assets to related parties from 1st January 2012 to the date hereof;
>
> (b) Any disposal of Essar Steel Limited's assets at an undervalue from 1st January 2012 to the date hereof;
>
> (c) What has become of such assets as described in 6 (a) and (b) above;
>
> (d) The identity, location and value of Essar Steel Limited's assets as at the time the order is served;
>
> where the asset has or at the time of the disposal had a value of more than US$ 250,000."

141. Schedule D provided lengthy and all-inclusive definitions of key terms used within the definition of "Listed Items", namely "documents", "assets", "related parties" and "disposal … at an undervalue".

142. The second phase was the provision, within 7 days after service of the order, of an affidavit setting out "the above information to the best of his knowledge, information

CL-2019-000030,31

and belief together with details of any change in circumstances between the information
provided at the date of service of this order and the date of the affidavit". Accordingly,
the Affidavit was intended as sworn confirmation of the information previously given,
subject to any change of circumstance.

143.    These two phases were concerned with the provision of information as to the location
and possession of the Listed Items, or information as to which other people knew of the
location or possession. The third phase was concerned with the detail of what those
assets were. Paragraph 5 of the order required each Defendant, within 7 working days
after being served with the order, to "deliver up copies of documents that fall within the
description of Listed Items in their custody or control". This third phase therefore was
to occur simultaneously with the second phase.

144.    The final, fourth, phase was the provision of a further Affidavit to be provided within
21 days after being served with this order. The Affidavit was to set out "to the best of
his knowledge, information and belief the information required to be provided by
Schedule E to this Order". Schedule E used similar terminology to Schedule D, and
required the deponent to:

        "Identify and provide full particulars of
        (a)   Any direct or indirect disposal of Essar Steel Limited's assets to related
        parties from 1st January 2012 to the date hereof;
        (b)   Any disposal of Essar Steel Limited's assets at an undervalue from 1st
        January 2012 to the date hereof;
        (c)   What has become of such assets as described in 1 (a) and (b) above;
        (d)   The identity, location and value of Essar Steel Limited's assets as at the time
        the Order is served; where the asset has or at the time of the disposal had a value
        of more than US$ 250,000.
        (e)   The name, address and contact details of any person who has the information
        set out in paragraphs 1 (a) – (d) of this Schedule."

145.    The order contained various other provisions, including a prohibition against
destruction and against tipping off.

146.    The other order was for the provision of information by Essar Capital Services, Prashant
and Mr. Baid. They were, of course, also Respondents to the search order. These orders,
taken together, required the provision of information in a manner which was in some
ways similar to the orders that I have described, using similar definitions, but with some
added requirements. The material parts of the order are as follows:

        "DELIVERY UP OF ARTICLES/DOCUMENTS

        19. The Respondent or any Controller of Access must:

        (a) Immediately hand over to the Applicant's solicitors any of the
        Listed Items, or procure the delivery up to the Applicant's
        solicitors of any of the Listed Items, which are in his possession
        or under his control. Any items the subject of a dispute as to
        whether they are Listed Items must immediately be handed over

to the Supervising Solicitor for safe keeping pending resolution of the dispute or further order of the court.

(b) Immediately give the Search Party effective access to any Container that may contain Listed Items to enable it to be searched, including (without limitation) by providing all keys, items, or information that may be necessary to gain such access.

(C) Immediately give the Search Party effective access to any Electronic Data Storage Device that may contain Listed Items or from which Listed Items may be remotely accessed to enable it to be searched, including (without limitation) by providing all necessary passwords, keys, PIN numbers, user-names, combinations, codes and any other items or information that may be necessary to gain such access and which may be necessary to gain access remotely to other Electronic Data Storage Devices not located on the Premises whether within or outside the jurisdiction.

(d) If any Electronic Data Storage Device contains Listed Items, cause such items to be displayed so that they can be read and copied and the Respondent must provide the Applicant's Solicitors with copies of all such items contained on the device. The Supervising Solicitor may dispense with compliance with this sub-paragraph (d) in whole or in part if (s)he is of the view that such compliance is rendered unnecessary by the computer imaging provisions in paragraphs 20-24 below.

## ELECTRONIC DATA IMAGING ORDER

20. The Respondent or any Controller of Access must immediately hand over to and permit the Independent Computer Specialist to make up to two electronic copies or images of any or all of the documents (whether they are Listed Items or not) accessible on or accessible remotely from an Electronic Data Storage Device.

21. If the Respondent claims that it is entitled to claim privilege against self incrimination in relation to any document or part of a document accessible on or from an Electronic Data Storage Device, and the Supervising Solicitor decides that it is so entitled, then the Supervising Solicitor shall instruct the Independent Computer Specialist to delete (or if such deletion is not possible, to redact) such incriminating material from the electronic copies taken pursuant to paragraph 20 above without reading them as soon as possible.

22. In the event that the Independent Computer Specialist is unable to complete the copying or imaging of any Electronic Data Storage Device on the Premises or accessible remotely from the Premises or the Independent Computer Specialist states

CL-2019-000030,31

to the Supervising Solicitor that for technical or other reasons it is preferable to remove such device from the Premises in order to complete the work indicated in paragraph 20 above, the Supervising Solicitor shall be permitted to allow the Independent Computer Specialist to remove such device or continue remote imaging on the basis of the undertaking provided by the Independent Computer Specialist at Schedule G and any device shall be returned to the Respondent as soon as possible after such work is completed.

23. Any copy or image taken of an Electronic Data Storage Device shall be handed over by the Independent Computer Specialist to the Supervising Solicitor who will keep it safely in his custody to the order of the court. The Independent Computer Specialist may, at the direction of the Supervising Solicitor, take such steps to re-organise the material upon the copies as may be expedient to expedite the search of their contents. The Applicant's Solicitors and the Independent Computer Specialist shall then be entitled to search for Listed Items upon such copies or images on condition that:

such search shall not take place until after the Return Date and the Respondent be given at least 2 clear working days' written notice of such search by the Applicant's Solicitors;

the search take place under the Supervising Solicitor's supervision;

the Respondent and its legal advisors shall be entitled to be present at such search; and

the Applicant's Solicitors shall be entitled to take copies of any Listed Items found, subject to the Respondent's right to prevent the Applicant's Solicitors from taking a copy of any part of a document which the Supervising Solicitor believes to be privileged.

24. All reasonable steps shall be taken by the Applicant, the Applicant's Solicitors and the Independent Computer Specialist to ensure that no damage is done to any Electronic Data Storage Device or to data contained on such device. The Applicant and its representatives may not themselves search an Electronic Data Storage Device unless they have sufficient expertise to do so without damaging the Respondent's system.

LISTED ITEMS IN THE HANDS OF PERSONS OTHER THAN THE RESPONDENT

CL-2019-000030,31

25. If there are any Listed Items in the jurisdiction or accessible from Electronic Data Storage Devices within the jurisdiction which are in the custody of third parties who hold such items on behalf of or to the order of the Respondent or under the control of the Respondent (or in respect of which the Respondent is entitled to call for copies whether upon the payment of a fee or otherwise) or under the control of any of the companies listed in the organogram at Schedule I, the Respondent must:

(a) as soon as practicable procure the delivery up of such items or copies of such items to the Applicant's Solicitors (at the Applicant's cost);

(b) as soon as practicable procure that any third party, including without limitation suppliers of information technology services, provide all information and permissions necessary to assist the Independent Computer Specialist to make up to two electronic copies of the Listed Items; and

(c) as soon as practicable and in any event within 3 working days of service of this order supply the Applicant's Solicitors with signed letters of authority authorising and requiring any such third party to deliver up such items to the Applicant's Solicitors.

PROVISION OF INFORMATION

26. The Respondent and any Controller of Access must immediately give the following information to the Applicant's Solicitors (in the presence of the Supervising Solicitor so far as practicable) so far as he is aware and to the best of his knowledge and belief:

(a) where the Listed Items are located, whether situated on or off the Premises and whether within or outside the jurisdiction. Without any prejudice the generality of the foregoing, the Respondent and any Controller of Access (i) on which files, folders or other parts of the Electronic Data Storage Devices Listed Items are likely to be found and must to the best of their ability give such information as is necessary to enable Listed Items on the Electronic Data Storage Device to be located, accessed and copied; (ii) answer to the best of their information, knowledge and belief any question asked by the Supervising Solicitor or by the Independent Computer Specialist which in the opinion of the Supervising Solicitor is necessary for the efficient identifying, locating, accessing and copying of such Electronic Data Storage Devices or parts thereof which may contain Listed Items.

(b) the identity and contact details of any other person who may have the information referred to in paragraph 26(a) above and who may know of the keys, codes, pin numbers and other

CL-2019-000030,31

> information referred to in paragraphs 19(b) and (c) above which are necessary to access the information in the Containers and Electronic Data Storage Devices.

> Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be fined, to have his assets seized or to be imprisoned.

> 27. Within 7 working days after being served with this Order the Respondent must swear and serve an affidavit setting out the above information together with details of any change in circumstances between the information provided at the date of service of this Order and the date of the affidavit."

147.    Thus, the first phase (paragraph 26 of the search order) required the provision by the Respondents of information (so far as they are aware and to the best of their knowledge and belief) immediately to the Applicant's solicitors in the presence of the Supervising Solicitor.

148.    At the same time, each Respondent was required (paragraph 19 of the search order) to hand over any of the Listed Items, or procure the delivery up to the Applicant's solicitors of any of the Listed Items, which were in his possession or under his control, and to allow effective access to, amongst other things any electronic data storage device that may contain Listed Items. The order also contained (in paragraph 25) a provision requiring the Respondents to procure the delivery up of Listed Items in the jurisdiction, or accessible from electronic data storage devices within the jurisdiction, which are in the custody of third parties.

149.    The second phase was a confirmatory Affidavit (paragraph 27 of the search order), setting out the above information referred to in paragraph 26 of the order, together with details of any change of circumstances.

150.    The third phase was the provision within 21 days after service of an affidavit setting out the information required to be provided in Schedule B to the order. The information required was materially identical to that required by the final (fourth) phase of the order against the individuals.

151.    Accordingly, the orders required the provision of documentation and information focusing on the prior disposal of assets since 1 January 2012, the whereabouts of those assets, and Essar Steel's current assets. They also required the preservation of documentation – a matter which was less controversial than the positive obligations to provide documentation and information. It was agreed between the parties that it was appropriate for me to consider whether or not any of these orders should have been made as a matter of principle, leaving aside questions which arise as to the precise width and wording of the orders which have been made. Mr. Denton-Cox for Mr. Bell qualified his agreement to this approach by submitting that it was necessary to look at the existing wording in order to see whether the relief sought was necessary or just and convenient. However, it seemed to me that it was possible to consider those issues in deciding whether or not the orders were justified as a matter of principle, whilst leaving

CL-2019-000030,31

for later determination whether the orders went too far to accomplish any legitimate purpose for which they could be made.

152.    AMUSA's submission as to the legal basis and justification for these orders was as follows. The court has the power to grant injunctive relief regarding the provision of information and documents under s. 37 of the Senior Courts Act 1981. The jurisdiction is exemplified by *Norwich Pharmacal Company & Ors v Customs & Excise* [1974] AC 133 and is unaffected by the court's other powers as regards disclosure under CPR Part 31: see r. 31.18. Pursuant to this jurisdiction, where a person is wittingly or unwittingly caught up in the wrongdoing of another so as to facilitate that wrongdoing and is thereby more than a mere witness, the court may order disclosure against them or that they provide information: see *Norwich Pharmacal* at p175 per Lord Reid.

153.    AMUSA submitted that the purpose of the information and document preservation orders is to discover, for the purposes of enforcing the ICC award (which has now been recognised as a judgment in England), what (and where) Essar Steel's assets are, or what has become of them. AMUSA was thus seeking information to facilitate enforcement of the ICC award and was now seeking it to enforce an English judgment. At the without notice application, AMUSA submitted that the purpose of the application was to enforce the liability under the award, to restrain unjustified dissipation of assets, and obtain information and preservation and delivery up of documents necessary to identify and locate such assets and ascertain what has become of them. AMUSA submitted that it needed the information in order to ascertain what Essar Steel's assets were, and to freeze them so that they would be available for enforcement. The object of the present proceedings was not to obtain evidence for foreign proceedings. It was trying to find out what assets Essar Steel has and where they have gone so that it can take an informed decision as to what enforcement steps it can pursue, including what proceedings are viable and where. The order sought was therefore ancillary to a freezing order or to enforce a final judgment. It may be that, in due course, AMUSA would take steps to apply to use the information for the purposes of proceedings in some other jurisdiction. But that was not the object of the present proceedings.

154.    The various defendants (but not Mr. Harrold and Mr. Seifert) opposed the grant of such relief on a variety of grounds, in particular: that the documents and information were being sought for the purposes of proceedings abroad; that the orders were unnecessary, certainly at the present stage of the case, when it was sufficient to await Essar Steel's asset disclosure; AND that it was not necessary to make orders against all 7 of the respondents, since documentation and information could be provided by one of them (such as Essar Capital Services).

Analysis and conclusions

155.    A threshold issue raised in the course of argument was whether these *Norwich Pharmacal* orders were, as a matter of principle, available at all. A number of the defendants argued that they were not available on the grounds that information was being sought for use in foreign proceedings. In that regard, reliance was placed upon the decisions in *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2012] EWHC 1737 and *Ramilos Trading Limited v Buyanovsky* [2016] 2 CLC 896 (a more recent case that applied *Omar*).

156. I do not accept this submission. I consider that Mr. Stanley was correct to accept that the court had jurisdiction to make a *Norwich Pharmacal* order in support of an English freezing injunction, albeit only to the extent that it was necessary to obtain information about wrongdoing; a matter which needed to be considered with care. In *Mercantile Group (Europe) AG v Aiyela* [1994] QB 366, a very strong Court of Appeal held that a *Norwich Pharmacal* order could be made against the wife of the first defendant in circumstances where the wife had become mixed up in her husband's arrangements to defeat execution of a judgment against him. Hoffmann LJ said that in circumstances where discovery was sought against a third party in aid of a post-judgment freezing order:

> "all that is necessary to found jurisdiction [in such cases] is that the third party should have become mixed up in the transaction concerning which discovery is required and, of course, that the court should consider it 'just and convenient' to make an order. The court will naturally exercise with care a jurisdiction which invades the privacy of an innocent third party. But this is a matter to be taken into account in the exercise of the discretion. It does not go to the existence of the jurisdiction".

157. The decision in *Aiyela* was considered in *NML Capital Ltd v Chapman Freeborn Holdings Ltd et al* [2013] EWCA Civ 589. It is clear from the judgment of Tomlinson LJ at [31] that he considered that a *Norwich Pharmacal* order could properly be made as ancillary to a freezing injunction; and that the court's jurisdiction to do so was derived from s.37 (1) of the Senior Courts Act 1981 and the court's ancillary power to make such an order effective. This decision therefore confirms, in my view, the court's jurisdiction to make a *Norwich Pharmacal* order in a case such as the present.

158. The judgment in *NML* at [25]-[33] shows that it is indeed important to focus carefully on the transaction which is identified as the relevant wrongdoing. But it is also clear that that relevant wrongdoing can include cases where (i) assets are removed from a jurisdiction for no purpose other than to insulate them from execution in satisfaction of a judgment debt or (ii) assets are transferred between persons or companies for a similar purpose. The Court of Appeal considered that it was not sufficient to engage the *Norwich Pharmacal* jurisdiction simply to identify a person who had traded with a judgment debtor. It said that it was:

> "unlikely that the jurisdiction could be engaged short of involvement in something which in itself and necessarily amounts to what Sir Thomas Bingham MR in *Aiyela* described as 'wilful evasion' by the judgment debtor. Non-satisfaction of a judgment debt is not wilful evasion of it."

159. In the light of these decisions, I consider that in principle the court can make orders for the provision of information in aid of enforcement of a judgment in circumstances where there is evidence that a judgment debtor has taken steps to dissipate his assets or attempted to make himself judgment-proof. In view of the decisions in *Omar* and *Ramilos*, I am not persuaded that it would be appropriate to make such orders where the sole purpose was to facilitate enforcement proceedings abroad. However, in the present case there exists a different reason for making the orders sought, namely to support and make effective the WFO which the court has granted. Here, the WFO has

CL-2019-000030,31

been granted by the court because of the risk that assets will be dissipated. In order to render that WFO effective, the court has granted (as it would typically grant) an order against Essar Steel for the disclosure of its assets. This enables the applicant to give notice to third parties of the existence of the order, and thereby seek to prevent any further dissipation. This necessarily occurs prior to the commencement of enforcement proceedings in foreign jurisdictions. It seems to me that precisely the same rationale underlies the *Norwich Pharmacal* order. AMUSA can therefore justifiably point to purposes for which they need the information which do not involve foreign legal proceedings, including protecting itself from further wrongdoing by further dissipations of assets. This is a legitimate basis on which the court can intervene: see the judgment of Zacaroli J. in *Blue Power Group sarl v ENI Norge AS* [2018] EWHC 3588 (Ch), paras 26-30. Neither *Omar* nor *Ramilos* were cases where a freezing order was in place, and information was sought in order to make that order effective.

160.  Since there is in my view no reason in principle why the orders should not be made, the next important question is whether they were appropriate. The basic principles upon which *Norwich Pharmacal* relief is ordered are conveniently set out by Flaux J. in *Ramilos Trading Ltd v Buyanovsky* [2016] EWHC 3175 (Comm), [2016] 2 CLC 896, [11]:

a.  There must be a wrong carried out or arguably carried out by the ultimate wrongdoer; the wrong may be a crime, tort, breach of contract, equitable wrong or contempt of court (see *Orb arl v Fiddler* [2016] EWHC 361 (Comm) [84] (Popplewell J.), quoted in *Ramilos* at [12]); the test is one of good arguable case, i.e. the same standard that applies to a freezing injunction (*Ramilos* at [23]);

b.  There must be a need for an order to enable action to be brought against the ultimate wrongdoer or seek other legitimate redress for the wrongdoing. Necessity is not merely a matter of discretion, but a 'threshold condition'; the order is an exceptional one and it is to be exercised only where the court is satisfied that it is necessary to do so: see *Ramilos* at [24] and [25];

c.  The person against whom the order is sought must (a) be mixed up in so as to have facilitated the wrong and (b) be able or likely to be able to provide the necessary information to enable the ultimate wrongdoer to be sued;

d.  Where those conditions are satisfied the court "still has to exercise its discretion as to whether to grant the order sought, weighing relevant factors and deciding whether to order disclosure in the interests of [justice]": *Ramilos* at [27];

e.  The jurisdiction "cannot be used for wide-ranging discovery or the gathering of evidence, but is strictly confined to necessary information": *Ramilos* at [46]; see also [61].

161.  Applying these criteria, it seems to me that there was and is a strong case for *Norwich Pharmacal* relief as a matter of principle, albeit that I have (as introduced below) reservations as to the extent of the relief that has been ordered in this case. This is a

CL-2019-000030,31

matter to be addressed at a later hearing. In relation to the issues of principle, I conclude as follows.

162. First, it is clear from *NML* that, for the purposes of *Norwich Pharmacal* relief, there must be some "wrongdoing" which goes beyond mere non-payment of the arbitration award. However, given my conclusions in the context of the WFO, there is (to put the matter at its lowest) a good arguable case that Essar Steel has sought to transfer or dissipate assets in order to prevent successful enforcement of the award.

163. Secondly, I consider that it is necessary for information about current assets, and at least some prior disposals, to be given by persons other than Essar Steel itself, in order to enable effective action to be brought against Essar Steel by way of making the WFO effective. ***The evidence relating to past dissipation of assets by Essar Steel, conduct within the Essar Group which was in bad faith or fraudulent, and the non-production and concealment of documents within the arbitration, indicates to me that this is not a case where the Claimant should be required to wait and see what Essar Steel say***. Mr. Stanley may be right in saying that *Norwich Pharmacal* orders are not usually sought at the time when a WFO including a disclosure order is first obtained, and that a claimant will often wait to see what information is provided. But in the present case I consider that there is a necessity for relief, since otherwise it is not possible to have confidence that relevant assets will be identified and frozen.

164. Various defendants submitted that orders were unnecessary because orders could be made against others within their number. The difficulty with this approach is that it is not sufficient in my view simply for X to say that Y can do it, when at the same time Y is saying that X can do it. In order to choose between X and Y, the court would need to be satisfied that either X or Y is a person whose disclosure of documents or information provision would be both reliable and comprehensive. I did not think that the materials enabled the court to be so satisfied.

165. ***In that context, it is to be noted that when Essar Capital Services, Prashant and Mr. Baid gave their initial disclosure (on 18 and 21 January 2019) of locations of the Listed Items, only two locations were identified:*** the premises of Essar Steel in Mauritius and a server located in the UAE. ***It was only subsequently that a far larger number of further locations were identified. Some 18 additional locations were*** identified in the letter sent on behalf of Essar Capital Services on 24 January 2019. At around that time or shortly afterwards, Mr. Wright, Mr. Seifert and Mr. Harrold served Affidavits which identified a large number of other locations, other than the two originally identified. It is not clear whether this disclosure, or the intention of those individuals to make this disclosure, was influential in the identification of the additional 18 locations on 24 January. ***However, it does seem to me to show the value of obtaining information from a number of different sources. In Mr. Baid's second Affidavit served on 11 February 2019, he identified 40 locations additional to the two that he had originally identified. On the same day, a letter from Stephenson Harwood on behalf of Mr. Baid identified 57 potential locations. I accept of course that it would not be at all surprising if there were gaps in the initial disclosure of locations, given that the defendants were responding at short notice to an order. It does, however, seem surprising that only two locations were initially identified.***

166. Against this background, the court cannot be confident that it could identify particular parties as being persons whose disclosure would be reliable and comprehensive. I

consider that in order to ensure that reliable and comprehensive information is provided, it is necessary to require all of the parties to respond.

167.   In a related submission, Mr. Bell submitted that he had only been a non-executive director of EGFL and was not in general apprised on a real time basis of EGFL's assets and liabilities, and that it was not necessary and proportionate to order Mr. Bell to provide the same documents and information as were being sought direct from Essar Steel in London, and also from EGFL and ECL in proceedings in the Cayman Islands. I was not persuaded by this submission. In the transcript of Mr. Bell's evidence in proceedings brought in England by Midtown Acquisitions LP ("Midtown Proceedings"), Mr. Bell's evidence was that the board of EGFL met around every three weeks, and that there was quite a level of detailed information that would be given to the board of that company. If Mr. Bell has no information that he can give in response to the order for the provision of information, then he can say so briefly. If, however, he has relevant information, then he should provide it so as to ensure that reliable and comprehensive information is available. It may possibly be the case that the information does not take it any further than that provided by Essar Steel, or by EGFL and ECL assuming that the orders obtained in the Cayman Islands are maintained. However, on the present material the court cannot conclude that Mr. Bell has no material information over and above such information as has been or will be provided by those companies.

168.   Thirdly, I consider that there is prima facie evidence (to use the expression of Hoffmann LJ in *Aiyela*), or a good arguable case, that these defendants have become mixed up in the wrongdoing so as to have facilitated it, and are able or likely to be able to provide the relevant information for the purposes of making the WFO effective. In that context, it is important to focus on the period when the wrongdoing arguably occurred, particularly bearing in mind arguments of various defendants as to when they ceased to work within the Essar Group or to provide services to Essar Steel.

169.   The *NML* decision emphasises the importance of focusing on the relevant wrongdoing. Mr. Denton-Cox on behalf of Mr. Bell argues that the relevant wrongdoing in the present case could only have occurred once the arbitration award was published on 19 December 2017, since it was only at that stage, or at least at a time very close to it, that steps could have been taken to frustrate the ICC award by dissipation or transfer of assets. Although I am presently dealing with the question of whether the orders should have been made as a matter of principle, rather than whether their terms require some adjustment, I do consider that there is considerable force in the submission that 1 January 2012 is too far back in time. Essar Steel did not become a party to the relevant contract until 2014, and it was not until May 2016 that the contract was terminated so as to lead to the arbitration proceedings. That said, there is in my view no reason in principle why the relevant wrongdoing should not pre-date the decision of the arbitrators. It is perfectly possible for a party to take steps to transfer his assets or dissipate them in anticipation of an adverse or potentially adverse award or judgment, or indeed in anticipation of a default under a contract. Indeed, I have already held that I was not satisfied that the restatement of the 2015 accounts in September 2016, and the commencement of arbitration proceedings some months earlier, was simply a coincidence. For present purposes, it is sufficient to say that I do not consider that there is anything wrong in principle in the *Norwich Pharmacal* order requiring the provision of information and documents about disposals prior to the date of the arbitration award,

MR JUSTICE JACOBS
Approved Judgment                                                              CL-2019-000030,31

although there is a substantial question as to whether an order dating back to January 2012 is justifiable.

170.   In the present case, this timing issue presents no difficulty. Prashant, Mr. Baid and Mr. Wright all continue to work within or on behalf of the Essar Group, and Essar Capital Services is still a company within the group. Even if one takes May 2016 as the starting point, that covers the period when Mr. Bell was still a non-executive director of EGFL: he only resigned in November 2017, shortly before the arbitration award.

171.   Fourthly, I consider that the interests of justice, looking at all the relevant factors, justify the orders sought. In that regard, the matters set out above concerning the risk of dissipation of assets, and the evidence which led to my conclusion on that issue, are highly relevant. Once the court has decided to grant a WFO, and to exercise jurisdiction on the basis that the present case is analogous to international fraud, it is not a big leap then to grant *Norwich Pharmacal* relief.

172.   Finally, as indicated above, I do have reservations about the time-period covered by the order. There may be other arguments which lead to the conclusion that in other respects the order goes too far. However, these matters can be resolved at a subsequent hearing, because I am satisfied that *Norwich Pharmacal* relief should be granted as a matter of principle.

173.   I can deal with the remaining issues briefly.

174.   Mr. Bell alleges that the order should be discharged because of material non-disclosure of evidence which Mr. Bell had given in the Midtown Proceedings. A transcript of that evidence was available to AMUSA but was not produced. In the course of that evidence, Mr. Bell indicated (as summarised above) that he was generally not apprised on a real time basis of EGFL's assets and liabilities and other matters which EGFL had been ordered to disclose in the Midtown Proceedings, and that he did not have direct access to EGFL's books, records and documents. Had this been explained, the court would have concluded that it was not necessary and proportionate for Mr. Bell to provide the same documents and information as were being sought direct from various Essar Group companies. The court was told that Mr. Bell was a director, but not told that he was a non-executive director. In addition, the court should have been told that AMUSA did not know whether or not Mr. Bell was still a director of EGFL.

175.   I did not consider that there was any real substance to these allegations of non-disclosure. Mr. Bell had been a director of EGFL for many years, from October 2009. There was no publicly available information that revealed that he had ceased to be a director in November 2017, and I do not think that AMUSA can properly be criticised for not having identified this change in circumstance. Nor do I think that there is any substance to the argument that there was non-disclosure of the fact that he was a non-executive director, in circumstances where the transcript of his evidence shows that he attended very regular board meetings and was provided with detailed information at those meetings. Had AMUSA known that he was no longer a director, then they would not have sought, or obtained, relief beyond that which was obtained against Mr. Seifert and Mr. Harrold. AMUSA has now conceded that it cannot ask the court for extended relief, and does not do so. However, the case for *Norwich Pharmacal* relief, in the same terms as was sought against Mr. Seifert and Mr. Harrold could and would have been made, and in the light of my judgment would have been justified. In these

circumstances, I do not consider that there is any basis for setting aside the order in its entirety for alleged non-disclosure.

176.  It was also submitted on behalf of Mr. Bell that his medical condition, and recent surgery, should excuse him from swearing the affidavit required by the order. In common with Butcher J., who extended time in relation to Mr. Bell at a hearing on 28 January 2019, I consider that Mr. Bell's health may provide a reason for a further extension of time, albeit not indefinite. I will hear counsel as to what extension maybe appropriate.

177.  On behalf of Mr. Wright, Mr. Beeley submitted that paragraph 6 of the order against him should be discharged. This was because in order to provide an affidavit setting out the information in Schedule E to that order (see paragraph 144 above), he would inevitably have to draw on knowledge that he acquired in privileged circumstances. He had acted primarily as a legal adviser, and he is unable to produce that which he knows and is privileged. The order, he says, places Mr. Wright in a near-impossible position.

178.  I do not accept this argument. Paragraph 6 of the order requires Mr. Wright to identify certain transactions or assets. The transactions and assets are not privileged, and there is nothing in the order which requires Mr. Wright to disclose legal advice that he gave about the transaction or assets. If there were a maintainable claim for privilege, then Mr. Wright would be entitled to withhold disclosure. Mr. Peto accepted this. But I do not consider that the fact that Mr. Wright learned about the transactions or assets as a result of being a legal adviser to the relevant companies is sufficient in itself to establish a claim for privilege.

179.  Mr. Beeley relied upon the decision of Teare J. in *JSC BTA Bank v Ablyazov* [2012] EWHC 1252 at [27-28] in support of the proposition that privilege extends to facts known to a lawyer for the purpose of giving legal assistance or advice. In my view, that decision is not authority for the proposition that privilege extends to all non-privileged facts which come to the attention of a lawyer who is acting as such. Indeed, Teare J. noted at [18] that "whether or not information provided by a client to his solicitor is protected by legal professional privilege will depend upon the circumstances in which it is communicated by the client to his solicitor". That, in turn, is likely to depend on whether the information was conveyed to the lawyer in circumstances in which the client would expect him to keep it confidential (see [24]-[25]). For example, in *Re Cathcart ex p Campbell* (1869–70) LR 5 Ch App 703, a decision that Teare J. relied on, a solicitor was asked to disclose the location of his client. He refused to do so on the basis that this information came to his knowledge in his professional capacity. James LJ rejected the solicitor's assertion of privilege. He said (at 705) that:

> "If, indeed, the gentleman's residence had been concealed; if he was in hiding for some reason or other, and the solicitor had said, "I only know my client's residence because he has communicated it to me confidentially, as his solicitor, for the purpose of being advised by me, and he has not communicated it to the rest of the world", then the client's residence would have been a matter of professional confidence; but the mere statement by the solicitor, that he knows the residence only in consequence of his professional employment, is not sufficient."

CL-2019-000030,31

Thus, the *Ablyazov* case is in my view rightly regarded in *Hollander: Documentary Evidence,* 13th edition, [17-21–17-24] as a case where a client's contact details had been provided confidentially in order to enable him to receive legal advice. I do not consider that this can or should be extended to all facts which become known to a lawyer in consequence of his professional employment.

180. In my view, therefore, the fact that Mr. Wright acquired information in his capacity as a solicitor does not, in and of itself, entitle him to claim privilege in respect of all such information. It is for Mr. Wright to determine whether he considers that he is entitled to withhold certain information, because of the particular circumstances in which otherwise non-privileged information about transactions and assets were communicated to him. If he determines that he is entitled to do so, and asserts and explains his claim for privilege in his Affidavit, then that claim can then be considered by AMUSA and if necessary challenged. But I do not think it appropriate to discharge paragraph 6 in its entirety against Mr. Wright.

## H:    Costs issues

181. Two costs issues were the subject of submissions. Mr. Harrold and Mr. Seifert ask for their costs to be paid pursuant to paragraph 5 of Schedule B to the order against them. This contains an undertaking by AMUSA to "pay the reasonable costs of compliance with this order unless the court orders otherwise". I see no reason to order otherwise, and therefore these individuals are entitled to their reasonable costs. I see no reason to delay payment of those costs on the basis of AMUSA's argument that it is appropriate for them to serve further Affidavits essentially to supplement those already served. The costs incurred are £ 68,000 for Mr. Seifert and £ 58,000 for Mr. Harrold. I consider that there should be an order for payment of the reasonable costs of these individuals, and I shall hear counsel further on the question of the precise form of order and the amount of a payment on account.

182. Mr. Norbury QC on behalf of Essar Oil asks for the costs which his client has incurred as a result of the search order. Essar Oil is the principal occupant of Lansdowne House. Mr. Stanley on behalf of Essar Capital Services also asks for payment of his client's considerable costs, particularly of the search process. Neither of these companies has the benefit of any provision in the orders which concerns the payment of their costs. I consider that it would be inappropriate, in the exercise of my discretion, to order their costs to be paid. Both companies are ultimately owned by the Ruia family, who also ultimately own Essar Steel which has defaulted on the arbitration award. To order AMUSA to pay the costs of these companies would at least indirectly benefit the members of the Ruia family whose conduct has led me to conclude that there is a serious risk of dissipation of Essar Steel's assets and that this is an appropriate case for a wide-ranging search order. I consider that it would be contrary to justice to require AMUSA to pay the costs of those companies in these circumstances. I therefore make no order in relation to these costs.